# UNITED STATES COURT OF FEDERAL CLAIMS

Biloxi Marsh Lands Corporation and      *
Lake Eugenie Land & Development Inc.,      *
     *    CASE NO. 12-00382
     Plaintiffs,      *
     *
     Versus      *
     *    Hon. Robert H. Hodges
The United States of America,      *
     *
     *
     Defendant.      *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PLAINTIFFS' RESPONSE/OPPOSITION TO THE UNITED STATES' MOTION TO DISMISS THE COMPLAINT FOR LACK OF JURISDICTION

OF COUNSEL:

Charlton B. Ogden III
TAGGART MORTON, LLC
2100 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-2100
Telephone:  (504) 599-8505
Fax:  (504) 599-8501
E-Mail:  cogden@taggartmorton.com

Camilo K. Salas III
SALAS & Co., L.C.
650 Poydras Street, Suite 2000
New Orleans, LA  70130
Telephone:  504-799-3080
Fax:  504-799-3085
E-Mail:  csalas@salaslaw.com

Counsel of Record for Plaintiffs
Biloxi Marsh Lands Corporation and
Lake Eugenie Land & Development Inc.

November 2, 2012

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES....................................................................................iii

INTRODUCTION ...............................................................................................1

STANDARD OF REVIEW....................................................................................3

ARGUMENT....................................................................................... ..................3

A.   THE STATUTE OF LIMITATIONS HAS NOT RUN AND THE MOTION FOR
     SUMMARY JUDGMENT SHOULD THEREFORE BE DENIED................................3

   1.  In Cases of Gradual and Continuous Process of Land Erosion,
       A Taking Claim Does Not Accrue Until The Situation Has Become
       Stabilized And The Consequences Have So Manifested Themselves
       That A Final Account May Be Struck. ....................................................4

          a. *The law.*............................................................................................4

          b. *The facts in this case.*......................................................................7

   2.  Government Efforts To Mitigate The Effects of a Taking By A Gradual Physical
       Process Stay The Statute of Limitations. ...................................................9

          a. *The law.*............................................................................................9

          b. *The facts in this case.*...................................................................... 12

CONCLUSION................................................................................................... 18

EXHIBITS

1. U.S. Army Corps of Engineers, Executive Summary of the Mississippi River-Gulf Outlet Deep-Draft De-Authorization Final Report to Congress (õDraft De-Authorization Reportö) (May 2007)..................................................................................................................15

2. U.S. Army Corps of Engineers, Integrated Final Report to Congress and Legislative Environmental Impact Statement for the Mississippi River ó Gulf Outlet Deep-Draft De-Authorization Study (õFinal Deep Draft De-Authorization Studyö) (June 2008) ......................15

3. U.S. Army Corps of Engineers, Draft Environmental Impact Statement for the Mississippi River-Gulf Outlet (MRGO), Louisiana, and Lake Borgne ó Wetland Creation and Shoreline Protection Project (õDEISö) (October 2008) ..................................................15,16

4. Intent to Prepare a Draft Environmental Impact Statement for the Mississippi River-Gulf Outlet Ecosystem Restoration Feasibility Study, 73 Fed. Reg. 57340, 57341 (October 2, 2008)........................................................................................................................17

5. Moving *Post-Katrina Clean-Up and Reconstruction Management Before S. Comm. On Environment and Public Works,* Congressional Quarterly Testimony (February 26, 2007) (statement of John Paul Woodley, Jr., Assistant Secretary of the Army (Civil Works)) ............12

6. B.F. Krumrine *et al.*, *Coastal Restoration Division Annual Project Reviews (La. Dept. Natural Resources*, Dec. 2001)..................................................................................................12

7. Wilson and Associates, Inc., *Status Report – Comprehensive Plan for Timely Modification of the Mississippi River Gulf Outlet* (õWilson Status Reportö) (July 31, 200) í   í   13

8. United States Army Corps of Engineers, *Louisiana Coastal Area, Ecosystem Restoration Study*, Attachment 5 (November 2004)..............................................................14,16

9. Army Corps of Engineers, Lake Borgne ó Mississippi River Gulf Outlet Shoreline Protection (PO-32) Final Design Report (December 2004) .........................................................14

10. Intent to Prepare A Draft Environmental Impact Statement for the Mississippi River-Gulf Outlet, Louisiana, Navigation Project ó Bank Stabilization, 71 Fed. Reg. 74,490, 74,491 (December 12, 2006) ...................................................................................14,15

# <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                    **<u>Page</u>**

*Applegate v. United States*, 25 F.3d 1579 (Fed. Cir. 1994) ...........................................4,5,6,7,9,10

*Applegate v. United States*, 28 Fed.Cl. 554 (1993), *rev'd on other grounds*, 25 F.3d 1579
    (Fed. Cir. 1994)....................................................................................................9,10,11

*Banks v. United States*, 76 Fed. Cl. 686, 697 (2007) ...................................................................18

*Banks v. United States*, 314 F.3d 1304 (Fed. Cir. 2003)...................................................5,6,7,10,11

*Barnes v. United States*, 538 F.2d 865 (Ct. Cl. 1976)......................................................................5

*Boling v. United States*, 220 F.3d 1365, 1372 (Fed. Cir. 2000) ...................................................... 7

*Cooper v. United States*, 827 F.2d 762 (Fed. Cir. 1987) ............................................................... 5

*McDonald v. United States*, 37 Fed. Cl. 110 (1997).......................................................................5

*Northwest Louisiana Fish & Game Comm'n v. United States*, 446 F.3d 1285
    (Fed. Cir. 2006)....................................................................................................4,5,6,11

*St. Bernard Parish and Other Owners of Real Property in St. Bernard
Parish or the Lower Ninth Ward of the City of New Orleans v. United
States*, 88 Fed Cl. 528 (2009) ..................................................................................2,3,5,7,8,9,12

*United States v. Dickinson*, 331 U.S. 745 (1947) ..................................................................4,10

# I.  <u>INTRODUCTION</u>.

This is an action brought by plaintiffs, Biloxi Marsh Lands Corporation[1] ("Biloxi") and Lake Eugenie Land & Development, Inc.[2] ("Lake Eugenie") (collectively, "plaintiffs"), against the United States to obtain just compensation for the government's permanent taking of plaintiffs' land for public use without exercising the power of eminent domain and without providing plaintiffs just compensation, in violation of the U.S. Constitution and in breach of certain land servitudes granted by plaintiffs and assigned to the United States.  The taking of plaintiffs' properties is the direct, natural and probable result of the gradual physical processes set in motion by the construction, maintenance dredging (improper or otherwise), operation and expansion of the Mississippi River Gulf Outlet ("MRGO"), a project that was authorized by Congress.

The gradual physical processes that have eroded and continue to erode plaintiffs' properties to this date have not yet stabilized.  Alternatively, if those processes have stabilized, stabilization did not occur until June 15, 2006 (six years prior to the filing of this suit), or even until July 9, 2009, when the MRGO was finally physically closed with the construction of a closure structure (made of 352,086 tons of stone) across the entire channel.

Moreover, the government's continuous efforts to mitigate the deleterious effects of MRGO and the processes that have eroded plaintiffs' properties – – efforts that continue to this day – –  rendered uncertain, at least until June 15, 2006 or until the physical closing of the MRGO on July 9, 2009, the accrual of plaintiffs' claims for statute of limitations purposes.

---

[1] Biloxi is the owner of 1) property on which part of the MRGO was constructed pursuant to certain servitudes granted by Biloxi for that purpose; and 2) property located outside of, but immediately adjacent to the servitudes, which has eroded.

[2] Lake Eugenie is the owner of 1) property on which part of the MRGO was constructed pursuant to the certain servitudes granted by Lake Eugenie for that purpose; and 2) property located outside of, but immediately adjacent to the servitudes, which has eroded.

In an effort to prevent the Court from reaching the merits of plaintiffs' claims, the government argues (1) that plaintiffs' claims accrued, for statute of limitations ("SOL") purposes, in 1988, more than six years prior to the filing of the complaint, and (2) there was no "justifiable uncertainty" over the accrual of plaintiffs' claims as to excuse plaintiffs' failure to file suit within six years after 1988.  *See* Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Incorporated Memorandum of Law in Support Thereof ("Govt. Br.") at pp. 10, 15.

The government's SOL motion fails for two separate and independent reasons.  First, the gradual physical process that resulted in the flooding of plaintiffs' properties did not stabilize in 1988 as claimed by the government.  Indeed, in a very real sense, the situation is not yet stabilized because the physical processes that the MRGO set in motion continue to erode plaintiffs' lands to this date and no one knows what is the extent of the damage.

Second, even if we assume *arguendo* that the gradual physical process that is effecting the taking had stabilized in 1988 as a matter of geology and hydrology, the government's efforts to mitigate the deleterious effects of MRGO – efforts which continue to this day – rendered accrual of plaintiffs' taking claims for SOL purposes justifiably uncertain at least until June 15, 2006, six years before suit was filed.  This factual finding was recently made by this Court in another case involving the MRGO.  *St. Bernard Parish and Other Owners of Real Property in St. Bernard Parish or the Lower Ninth Ward of the City of New Orleans v. United States*, 88 Fed Cl. 528 (2009) (hereinafter cited as "*St. Bernard Parish*") (holding that the stabilization doctrine applies to claims for flooding resulting from the construction,  operation and maintenance of the MRGO and that stabilization did not occur prior to October 17, 1999).

Ultimately, the government's argument misapprehends both the law governing taking claims and the numerous occasions on which the Supreme Court, the Federal Circuit and this Court have instructed that the SOL analysis governing gradual physical process taking claims is to be guided by the practical and pragmatic, rather than the hypertechnical and artificial, application of accrual principles.

## II.  STANDARD OF REVIEW.

Plaintiffs agree generally with the standard of review set forth in the government's motion.

## III. ARGUMENT.

**A.    THE STATUTE OF LIMITATIONS HAS NOT RUN AND THE MOTION TO DISMISS FOR LACK OF JURISDICTION SHOULD THEREFORE BE DENIED.**

The government's SOL motion fails for two independent reasons.  First, the gradual physical process that is causing the erosion of plaintiffs' properties did not stabilize before June 15, 2006 (six years before the Complaint was filed) and certainly not in 1988 as claimed by the government.[3]  Indeed, as the Complaint alleges, and as this Court has already found, the land erosion being caused by the MRGO is not yet stabilized because the MRGO and the physical processes it set in motion continue to erode the lands on which it was built and the lands that surround it.  *See* Complaint ¶¶ 3, 38; *St. Bernard Parish* at pp. 552-55.

Second, even if the gradual physical process that is effecting the taking of plaintiffs' land had stabilized before June 15, 2006 as a matter of geology and hydrology, the government's efforts to mitigate the deleterious effects of MRGO rendered accrual of plaintiffs' taking claims for SOL purposes justifiably uncertain at least until June 15, 2006.  Indeed, the Corps of Engineers' mitigation programs continue apace with its recently completed project to close the

---

[3] For convenience, we will refer to the time period in which the government contends the SOL ran as being "1988" or "before 1988."

MRGO, and announced projects to restore the lands destroyed by MRGO, including plaintiffs'
lands.

>    **1.    In Cases of Gradual and Continuous Process of Land Erosion, A
>    Taking Claim Does Not Accrue Until The Situation Has Become
>    Stabilized And The Consequences Have So Manifested Themselves
>    That A Final Account May Be Struck.**

>    **a.    *The law.***

Plaintiffs allege a taking, not by an overt act of condemnation, but by gradual and
continuous processes of erosion and land loss affecting the plaintiffs' property. *See, e.g.,*
Complaint ¶¶ 1, 3, 18, 19, 31, 33, 34, 38, 39. A "continuous physical taking process is very
gradual. . . . [T]he almost imperceptible physical process has delayed detection of the full extent
of the destruction- a necessary precondition of striking a final account." *Applegate v. United
States*, 25 F.3d 1579, 1582 (Fed. Cir. 1994).

In *United States v. Dickinson*, 331 U.S. 745 (1947), Justice Frankfurter declared for a
unanimous Court that, in taking cases, the "Fifth Amendment expresses a principle of fairness
and not a technical rule of procedure enshrining old or new niceties regarding -causes of
action-' when they are born, whether they proliferate, and when they die." *Id.* at 748. The
question whether the SOL has run on a government taking is therefore "a practical matter and not
a technical rule of law." *Id.* at 749. "When dealing with a problem which arises under such
diverse circumstances procedural rigidities should be avoided." *Id.* A plaintiff who has suffered
a taking by a gradual physical process such as intermittent flooding may "postpon[e] suit until
the situation becomes stabilized"- "until the consequences of inundation have so manifested
themselves that a final account may be struck." *Id.*

The Federal Circuit has repeatedly reaffirmed that "*Dickinson* discouraged a strict
application of accrual principles in unique cases involving Fifth Amendment takings by
continuous physical processes." *Northwest Louisiana Fish & Game Comm'n v. United*

*States*, 446 F.3d 1285, 1291 (Fed. Cir. 2006).  *See also Banks v. United States*, 314 F.3d 1304, 1308 (Fed. Cir. 2003); *Applegate v. United States*, 25 F.3d 1579, 1582 (Fed. Cir. 1994);  *St. Bernard Parish* (holding that the stabilization doctrine applies to claims for flooding resulting from the construction,  operation and maintenance of the MRGO).

Furthermore "[d]etermining when a taking cause of action accrues is a fact-specific endeavor that must often be done in a somewhat imprecise manner, this aspect of taking cases being in the nature of a jury verdict."  *McDonald v. United States*, 37 Fed. Cl. 110, 114 (1997) (quoting *Barnes v. United States*, 538 F.2d 865, 873 (Ct. Cl. 1976) (brackets omitted); *see also Cooper v. United States*, 827 F.2d 762, 764 (Fed. Cir. 1987) (same).

The government argues here that Plaintiffs' claims accrued no later than 1988, and are therefore time-barred, because "by 1988 plaintiffs could not only see the extensive erosion on the banks of the MRGO . but were on notice that absent remedial action, their land would continue to erode by 15 feet a year, and perhaps as much as 40 feet a year."  Govt. Br. at p. 12.  But the Federal Circuit has flatly rejected the application of this "awareness rule" that the government proposes here.

In *NW La. Fish & Game*, a Federal Circuit decision addressing the stabilization doctrine, the plaintiff claimed that a Corps of Engineers navigation project, involving the construction of locks and dams on the Red River, limited the ability of the plaintiff, a Louisiana commission, to draw down the water level of a lake, which then led to the uncontrollable growth of vegetation in the lake, which rendered part of the lake "inaccessible, unmanageable, and virtually useless, resulting in a taking."  446 F.3d at 1286.  The government argued, as it does here, that the SOL had run because a gradual physical process taking claim had accrued when the plaintiff first knew or should have known about the likely effect the government's actions would have on its property.  *Id.* at 1289.  The trial court agreed with the government and dismissed the case,

finding that the taking had occurred no later than December 1994, when the Corps had taken action to raise the water level in a pool created by its lock and dam. *Id.* According to the trial court, it was at that time that the plaintiff "knew . . . about the damage that was going to occur." *Id.* (citations omitted). The trial court also stressed that even before 1994, the plaintiff had calculated the costs it would incur in controlling the growth of vegetation in the lake, thus establishing that "the damages . . . were not only foreseeable, but foreseen." *Id.* (citations omitted).

The Federal Circuit reversed, and held that accrual of the plaintiffs' taking claim could not have occurred before January 1997, which was when the Corps first definitively refused to draw down the water level and it was clear that the vegetation in the lake had grown to harmful levels. *Id.* at 1291. Observing, as we have previously noted, that "*Dickinson* discouraged a strict application of accrual principles" in gradual physical process takings cases, the court held that "[w]hen the damages from a taking only gradually emerge, e.g., as in recurrent flooding, a litigant may postpone a suit for a taking until 'the situation becomes stabilized' and 'the consequences of inundation have so manifested themselves that a final account may be struck.'" *Id.* at 1290-91 (citations omitted). The trial court erred, according to the court, in focusing on the time at which the plaintiff knew or should have foreseen "'the damage that was going to occur as a result of raising the pool level.'" *Id.* at 1290. As the Federal Circuit explained, "the correct standard recites that accrual occurs when the harmed party knows or should have known of" the foreseeable impact "*and* all events which fix the government's alleged liability have occurred." *Id.* at 1290 (emphasis in original)(citation omitted). Under this test plaintiffs' claim did not accrue in 1988 as argued by the government.

Through its opinions in *Applegate* and *Banks[II]*, the Federal Circuit, in commenting further upon the "permanence" element of a "stabilized" gradual claim, has introduced the notion

of "justifiable uncertainty."  That is, a gradual taking claim does not reach a stabilized condition, and hence the claim has not accrued, if the property owner has "justifiable uncertainty" about whether his or her loss is permanent or irreversible.  In *Applegate*, that "justifiable uncertainty" arose by the government's promises to build a sand transfer plant (*Applegate*, 25 F. 3d at 1582) and, in *Banks*, 314 F.3d at 1309-10, by virtue of the Corps' mitigation efforts to nourish the shoreline along Lake Michigan.  *See Boling v. United States*, 220 F.3d 1365, 1372 (Fed. Cir. 2000) ("critical element that delayed stabilization in *Applegate* [is] the justifiable uncertainty about the permanency of the taking.")

      **b.  *The facts in this case.***

Under the legal standard expounded above, the government's SOL motion should be denied.  Far from showing that the effects of MRGO on plaintiffs' property had stabilized prior to 1988, the government has not even taken issue with the plaintiffs' claims that MRGO's destructive effects on their property are continuing– even accelerating.  In a very real sense, in fact, the flooding situation has not stabilized yet.  Indeed, as will be explained in the next section of this brief, the government's own reports show that the problem is getting worse and has not stabilized – – certainly it did not stabilize in 1988.   In fact, the evidence shows that the damage continued to worsen after 1988 and all the events that fixed the government's liability had not yet occurred.

In another case involving the MRGO, *St. Bernard Parish,* the government argued that the damage caused by MRGO had stabilized on October 17, 1999 (more than six years after that suit was filed) rather than in 1988 as argued in this suit.  This Court disagreed with the government and in an opinion issued August 3, 2009, found that the effects of MRGO continued, thus preventing stabilization:

      Plaintiffs' knowledge of the existence of past flooding and the *potential* for severe
      flooding, however, is only one of the elements of accrual. *See Nw. La. Fish &*

*Game I*, 446 F.3d at1290. The second element is "when *all events* which fix the government's alleged liability have occurred." *Id.* (quoting *Boling*, 200 F.3d at 1370) (emphasis added). To make that determination, the court first must identify "[t]he *source of the entire* [*takings*] claim." *Dickinson*, 331 U.S. at 749 (emphasis added). When the "source" is "not a single event," suit may be postponed "until the situation becomes stabilized." *Id*.

\* \* \* \*

In this case, the record evidences that the north bank of the MRGO **was not "stabilized" in 1998**. *See* Gov't S. J. Ex. G (1998 COAST 2050 REPORT at 88-90). **Nor did this situation stabilize thereafter**. The Government's proffered evidence alone estimates that between 1968 and 2006, the surface width of the MRGO increased up to 15 feet each year. *Id.*; *see also* Pl. S. J. Ex. 7 (2000) EPA REPORT at 3-14 ("Wave wash erodes the [MRGO] by about 15 feet per year."). Moreover, it was not until 2004 that the Army Corps acknowledged the urgency of the situation:

Rapid action is required to protect the integrity of the Southern Lake Borgne shoreline and to prevent continued erosion of the MRGO **channel banks** from ocean wave vessel wakes. . . . Critical action points [on the MRGO] . . . face significant risk of losing the integrity of bayou **banks** . . . [threatening] *a potential major breach of the navigational channel* into [Lake Borgne.] A breach between the lake and the MRGO navigation channel would result in rapid wetlands loss as storm waves from the lake and ship wakes from the channel impact sensitive interior wetlands[.]

Pl. S. J. Ex. 8 (2004 ARMY CORPS STUDY at MRGO 31-32)) (emphasis added).

Although the impending closure of the MRGO will end the destruction of any remaining wetlands by saltwater intrusion, restoration of these wetlands to their pre-1968 condition will take some years. *See* Pl. S. J. Ex. 13 (DRAFT ENVIRONMENTAL IMPACT STATEMENT FOR THE MISSISSIPPI RIVER-GULF OUTLET, LOUISIANA AND LAKE BORGNE-WETLAND CREATION AND SHORELINE PROTECTION PROJECT (Oct. 2008) at 1-2 ("Without intervention, [–]the problems of wetland loss, Case 1:05-cv-01119-SGB Document 82-2 Filed 08/03/09 Page 35 of 60 36 shoreline erosion, saltwater intrusion, and storm surge threats in the MRGO and Lake Borgne area] will progressively worsen, especially once the land bridge between Lake Borgne and the MRGO is eroded away. The [Army Corps] proposes to protect, restore, and increase wetlands in the MRGO and Lake Borgne area."). Protecting this land bridge is "vital to prevent the exposure of the Hurricane Protection System (HPS) levees in Orleans Parish and St. Bernard Parish from the full effects of storm-driven waves and storm surge. . . . [T]he loss of wetland areas does increase storm surge and wave potential at the hurricane protection system[.]" *Id.* at 1-5.

88 Fed Cl. 552-53 (emphasis added)

This Court in *St. Bernard Parish* reviewed in detail much of the available documents, which show the damage caused by MRGO increased as time went along. It is not true that "the channel was in substantially the same condition in 1988 – – almost 25 years ago" as argued by the government. Gov. Br. p. 13. The evidence shows just the opposite and the government's argument lacks merit.

2.    **The Government's Efforts To Mitigate The Effects of a Taking By A Gradual Physical Process Stay The Statute of Limitations.**

a.    *The law.*

Even if the geography and hydrology of MRGO had stabilized in 1988, the statute of limitations for takings claims still would not have expired because the government itself negated stabilization with its efforts to mitigate the destructive effects of MRGO.

In *Applegate v. United States*, 25 F.3d 1579 (Fed. Cir. 1994), a case very similar to ours, especially because it also involves damage to land caused by maintenance dredging of a navigable channel, the Federal Circuit reviewed the application of the six-year SOL to claims that the Corps of Engineers had taken the plaintiffs' beachfront property by building jetties and dredging a channel (through a barrier island and a lagoon) that led to erosion and flooding of plaintiffs' land. The project was completed in 1952 and its corrosive effect on the plaintiffs' property began immediately, aggravated by "maintenance dredging" of the channel. *See Applegate v. United States*, 28 Fed. Cl. 554, 556-57, 559-60, 563 (1993), *rev'd on other grounds*, 25 F.3d 1579 (Fed. Cir. 1994). *See also* 25 F.3d at 1580. Plaintiffs did not file suit in this Court until 1992, which meant that their claims had to accrue no earlier than 1986 or they were barred. 25 F.3d at 1581. This Court dismissed the action, ruling that plaintiffs were aware "that periodic dredging would be required. From 1966 the public was aware of the cause of erosive conditions. The damage from the dredging commenced immediately and inevitably recurred each year afterwards. As such, plaintiffs were on notice, as of 1954, that the project would block sand and

9

that the Corps would periodically dredge sand in order to sustain the Project." 28 Fed. Cl. at 563.

The Federal Circuit reversed, holding that the stabilization analysis mandated by the Supreme Court in *Dickinson* was affected by the **proposals** of the Corps of Engineers (in 1962 and 1988) to mitigate the beach damage by building a sand transfer plant: "With **plans** for a sand transfer plant **pending**, the landowners had no way to determine the extent, if any, of the permanent physical occupation. . . . [U]ncertainty has stayed accrual of the claim. The Government's promises to restore the littoral flow destroyed any predictability of the extent of damage to the land." 25 F.3d at 1582-83. "[T]he Corps set in motion a very gradual and perpetual physical process of taking. The Corps further complicated ascertaining the extent and nature of the consequences of this process with proposals to correct the damage. Thus, following the *Dickinson* doctrine, this taking situation had not stabilized." *Id.* at 1584. Indeed, the Federal Circuit explained that, due to the Corps' ongoing mitigation projects and proposals, "the landowners remain justifiably uncertain about the permanency of the erosion and the taking" *even at the time the Court of Appeals issued its decision. Id.* at 1583.[4]

The Federal Circuit recently reaffirmed this rule in *Banks v. United States*, 314 F.3d 1304, 1308 (Fed. Cir. 2003), holding that the *Applegate* analysis controls "the stabilization doctrine set forth in *Dickinson* as . . . applied to situations in which the government was attempting to mitigate actions that would otherwise constitute a permanent taking." *See also Id.* at 1309 (expressly reaffirming *Applegate*). The trial court in *Banks* had tried to distinguish *Applegate* "on the grounds that 'two critical factors' present in *Applegate* are not present here: 'repeated and unequivocal promises by the Corps to cure the erosion problem and a

---

[4] The Corps had "also proposed an interim beach renourishment plan" in addition to the sand transfer plant and had "conduct[ed] further research and development" of ways to address the adverse effects on plaintiffs' property. 28 Fed. Cl. at 557.

congressional appropriation to cover the cost of the cure." *Id.* at 1309 (quoting the lower court decision). But the Federal Circuit would have none of it: "[T]he Court of Federal Claims and defendant misread *Applegate* as requiring the presence of a legally binding promise or duty or a matter requiring a congressional appropriation." *Id.* The Court of Appeals noted that, "[i]n *Applegate*, mere promises of a sand transfer plant, held out by the Corps and repeatedly renewed but never implemented," precluded stabilization of the taking situation and that, "[h]ere, even greater uncertainty was created by the Corps" because "the Corps in this case actually performed its mitigation activities for several years before the filing of this action." *Id.* at 1309-10. These mitigation efforts created "justifiable uncertainty" about the taking until the Corps issued a report in 1999 that "emphasized the irreversible and potentially permanent nature of the erosion." *Id.* at 1310, 1307.[5] And most recently, in *NW La. Fish & Game,* the Federal Circuit again returned to the theme of mitigation, holding that stabilization did not occur until "the Corps refused to drain the lake to alleviate the harm caused by the" overgrowth of vegetation resulting from the Corps' project. 446 F.3d at 1291.[6]

More recently, in *St. Bernard Parish*, a case that involves this very same body of water, the MRGO, this Court held that the stabilization doctrine applied and denied summary judgment on a motion alleging that the SOL had expired.

---

[5] The Corps action that effected the taking in *Banks* was the building of jetties that blocked the littoral flow of sand and eroded and inundated beachfront property. 314 F.3d at 1306. The Corps' mitigation efforts included "more than fifteen years of beach nourishment with fine sand" and "placing barge-loads of large rocks into the lake." *Id.* at 1307. As this Court recently reaffirmed, a particular plaintiff need not be aware of the government's mitigation efforts for them to stay stabilization of his claim, "given that the standard for determining accrual of a gradual taking is objective," and therefore the issue "is neither whether plaintiffs knew of the Corps' mitigation efforts nor whether they believed that such efforts, if they did know about them, would help their situation." *Banks v. United States*, 76 Fed. Cl. 686, 697 (2007). Evidence of a plaintiff's "subjective knowledge" of government mitigation proposals is therefore immaterial. *Id.*

[6] *See also id.* ("the [plaintiff] could only conjecture about potential harms or the prospect that the Corps may agree to mitigate those harms when until [sic] they actually occurred. . . .Indeed, the Corps might have elected to avoid the damages altogether by allowing a drawdown.").

11

**b.  *The facts in this case.***

The Corps of Engineers and other federal agencies have for many years undertaken enormous projects to mitigate the destructive effects of the MRGO.  These mitigation efforts created uncertainty about the fate of plaintiffs' properties and thereby delayed the running of the SOL.  In *St. Bernard Parish* this Court outlined in great detail the many actions, resolutions and appropriations taken by the government to try to ameliorate the destructive effects of MRGO. We discuss several representative examples of these mitigation projects here.

The government argues that these mitigation projects "are not comprehensive projects to restore the eroded banks of the MRGO, let alone directed to restoring plaintiffs' specific property." Gov. Br. at p. 15.  But the government is wrong.

The federal Coastal Wetlands Planning, Protection and Restoration Act of 1990 ("the Breaux Act") was enacted to restore wetlands exclusively in Louisiana; it encompasses "143 projects" that "will create, protect, or restore over 120,000 acres of wetlands in coastal Louisiana."[7]  Since passage, the Breaux Act has dedicated $40 million annually to restoring wetlands in southeastern Louisiana.[8]  A number of these projects are specifically targeted to ameliorate the destructive impact of MRGO, such as the MRGO Back Dike Marsh Project and the Shore Protection and Marsh Creation in Lake Borgne at Shell Beach Project, which "will maintain the integrity of the marshes that separates Lake Borgne from the MRGO."[9]

---

[7] *Post-Katrina Clean-Up and Reconstruction Management Before S. Comm. On Environment and Public Works,* Congressional Quarterly Testimony   (February 26, 2007) (statement of John Paul Woodley, Jr., Assistant Secretary of the Army (Civil Works)) at 6 (attached as Exhibit 5).

[8] B.F. Krumrine *et al.*, *Coastal Restoration Division Annual Project Reviews (La. Dept. of Natural Resources*, Dec. 2001) at 1 (attached as Exhibit 6).

[9] *See id.* at 5.  Both of these projects either began after 1999 or were ongoing after 1999.  The MRGO Back Dike project was being implemented as of December of 2001.  The Shore Protection project near Shell Beach was, as of December 2001, authorized for future construction. *Id.*

The report known as the "1998 COAST 2050 REPORT" issued in 1998 by the Louisiana Coastal Wetlands Conservation and Restoration Task Force and the Wetlands Conservation and Restoration Authority recommended implementation of seventeen specific "Regional Ecosystem Strategies," including closing the MRGO to deep-draft navigation:

> [The MR-GO] is perceived as a major problem in the Pontchartrain Basin. Wave erosion causes a 15-foot per year loss along 37 miles of the north bank. When the [MR-GO] was completed in the 1960s salinity increased in the basin, causing massive environmental damage. . . . **The *north bank of the* [*MR-GO*] *should be stabilized as soon as possible.***

*Id*. at 88, 90 (emphasis added).

"Stabilization" was recommended to be accomplished in the "Near Term (1-5 years)," *i.e.*, by 2003 at the latest. *Id*. In addition, within the "Long Term (16-50 years)," the 1998 COAST 2050 REPORT recommended that the MRGO be closed to deep-draft navigation. *Id*. at 90.

Under a different statute, the Water Resources Development Act, the Corps of Engineers conducted three projects along the MRGO in 1999 to create 76 acres of wetlands with material dredged from the channel.[10]

In 2000, a Task Force of the Environmental Protection Agency ("EPA") reported on its Comprehensive Plan for Timely Modification of the MRGO.[11] This endeavor was initiated by the EPA in 1999 "in direct response" to the "1998 resolution passed by St. Bernard Parish seeking closure of the channel."[12] It addressed "modification of the MRGO, potentially including closure of the channel," and it noted the important issues of "environmental restoration, and hurricane protection."[13]

---

[10] *See id.* at 6
[11] Wilson and Associates, Inc., *Status Report – Comprehensive Plan for Timely Modification of the Mississippi River Gulf Outlet* ("Wilson Status Report")(July 31, 2000)(attached as Exhibit 7).
[12] *Id.* at p. 2-5.
[13] *Id*.

In a November 2004 report entitled "Louisiana Coastal Area, Ecosystem Restoration Study,"[14] the Corps warned that "the rate of wetland loss in the area is *accelerating*."[15] Therefore, "[r]apid action is required to protect the integrity of the southern Lake Borgne **shoreline and to prevent continued erosion of the MRGO channel banks** from ocean-going vessel wakes.  Additional ecosystem restoration features are required to address serious ecological problems" **caused by MRGO**.[16]  "Without action, critical landscape components that make up the Lake Borgne estuary would be lost and future efforts to restore other parts of the ecosystem would be much more difficult and expensive if not impossible."[17]  The Corps identified multiple "[c]ritical action points" along the MRGO that "face significant risk of losing the integrity of bayou banks" and that threaten "a potential **major breach of the navigation channel** into the lake"— a breach that "would result in rapid wetlands loss as storm waves from the lake and ship wakes from the channel impact sensitive interior wetlands."[18]  The Corps therefore proposed building 38 miles of rock breakwaters to prevent the merger of the MRGO into Lake Borgne,[19] noting that "[s]trategic placement of similar protective breakwaters has been effectively used along the MRGO in other locations to prevent bankline retreat and to protect large areas of estuarine wetlands from further erosion and degradation."[20]  The Corps warned that the "merging of Lake Borgne into the MRGO" would "threaten[] nearby coastal communities" including "Shell Beach, Yscloskey and Hopedale."[21]

---

[14] United States Army Corps of Engineers, *Louisiana Coastal Area, Ecosystem Restoration Study*, Attachment 5 (November 2004)(attached as Exhibit 8).

[15] *Id.* at 31.

[16] *Id.*

[17] *Id.*

[18] *Id.* at 32.

[19] *Id.* at 3, 32.

[20] *Id.* at 2.

[21] Army Corps of Engineers, Lake Borgne – Mississippi River Gulf Outlet Shoreline Protection (PO-32) Final Design Report (December 2004) at 10 (attached as Exhibit 9).  *See also id.* at 2. The Corps acknowledged that the real problem was not nature, but the MRGO, because shoreline erosion rates in the MRGO channel were between three and five times the erosion rate in Lake Borgne. *Id.* at 10.  *See also* Intent to Prepare A Draft

14

Finally, in late 2008 the Corps admitted defeat and formally recommended total closure of the MRGO by erection of a rock dike across its entire width and the construction of other õrock dikes that protect wetlands along the MRGO.ö[22]   The Corps acknowledged that õthe highest rates of erosion in the areaö occur in the MRGO, in õexcess of 35 feetö of shoreline per year, õresult[ing] in the direct loss of approximately 100 acres of shoreline brackish marsh every year.   Additional losses of wetlands and shallow ponds result from high tidal ranges and rapid water exchangeö through the MRGO.[23]

The Corps understands that merely damming the MRGO will not undo the destruction it has wrought.   The Corps and other federal agencies in 2008 released their Draft Environmental Impact Statement for the Mississippi River-Gulf Outlet, Louisiana and Lake Borgneô Wetland Creation and Shoreline Protection project (õWetland Creation DEISö).[24]   This report reviewed the past and pending projects aimed at mitigating the problems caused by the MRGO[25] and addressed õthe problems of wetland loss, shoreline erosion, saltwater intrusion and storm surge threats in the MRGO and Lake Borgne area.   Without intervention, these problems will progressively worsen, especially once the land bridge between Lake Borgne and the MRGO is eroded away. The [Corps] proposes to protect, restore and increase wetlands in the MRGO and Lake Borgne area.ö[26]

---

Environmental Impact Statement for the Mississippi River-Gulf Outlet, Louisiana, Navigation Project ó Bank Stabilization, 71 Fed. Reg. 74,490, 74,491 (December 12, 2006) (attached as Exhibit 10).

[22] U.S. Army Corps of Engineers, Executive Summary of the Mississippi River-Gulf Outlet Deep-Draft De-Authorization Final Report to Congress (õDraft De-Authorization Reportö) (May 2007) at 13 (attached as Exhibit 1). *See also* U.S. Army Corps of Engineers, Integrated Final Report to Congress and Legislative Environmental Impact Statement for the Mississippi River ó Gulf Outlet Deep-Draft De-Authorization Study (õFinal Deep Draft De-Authorization Studyö) (June 2008) at xvii-xviii, 119 (attached as Exhibit 2).

[23] Draft De-Authorization Report at 6.  *See also* Final Deep Draft De-Authorization Study at xiv, 6.

[24] U.S. Army Corps of Engineers, Draft Environmental Impact Statement for the Mississippi River-Gulf Outlet (MRGO), Louisiana, and Lake Borgne ó Wetland Creation and Shoreline Protection Project (õDEISö) (October 2008) (attached as Exhibit 3).

[25] *See id.* at pp. 1-8 to 1-17.

[26] *Id.* at p. 1-2. *See also id.* at pp. 1-6 to 1-7.

Specifically, the Corps "recognized the need for critical near-term restoration of the land bridge between the MRGO and Lake Borgne."[27]   "The protection of this critical land bridge is vital to prevent the exposure of the Hurricane Protection System (HPS) levees in Orleans Parish and St. Bernard Parish from [*sic*] the full effects of storm-driven waves and storm surge. . . . [T]he loss of wetland areas does increase storm surge and wave potential at the hurricane protection system."[28]   The Corps therefore urged the **appropriation** of $108 million to restore the land bridge, **the banks of MRGO** and the associated wetlands.[29]

The Corps has recognized that "[c]onstruction and maintenance of the MRGO caused widespread wetland loss and damage to estuarine habitats from the outer barrier islands in the lower Chandeleur chain to the cypress forests and tidal fresh water marshes in the western reaches of the Lake Borgne basin."[30]   "Continued operation of the MRGO results in high rates of **shoreline erosion** . . . which destroys wetlands and threatens . . . adjacent communities."[31]

The October 2000 report of a federal task force convened by the EPA (and which included the Corps of Engineers) concluded that the "construction, operation and maintenance of the MRGO have caused substantial environmental changes," have "breached major hydrologic boundaries," and have cost Louisiana "[m]ore than 65,000 acres of natural habitat."[32]   The EPA specifically highlighted MRGO's role "in creating an avenue for surge movement during storms," its "erosion of the wetlands that provide an apron benefiting flood protection levees,"

---

[27] *Id.* at p. 1-6.
[28] *Id.* at p. 1-5.  Although the Corps noted that its current data made it difficult to quantify the precise effect of wetland loss for particular places, it knew enough to conclude that restored "wetlands would have a net effect of lower storm surge and a lower maximum storm wave height for smaller storm conditions" if the MRGO were closed and the wetlands restored, "compared to the future conditions with the No-Action Alternative with extensive emergent wetland loss." *Id.*
[29] *Id.* at p. 1-6. This project was recommended by the Corps at least as early as 2004, but was apparently still unfunded as of October 2008.  *See id.*
[30] Intent to Prepare A Draft Environmental Impact Statement for the Mississippi River-Gulf Outlet, Louisiana, Navigation Project – Bank Stabilization, 71 Fed. Reg. at 74,491.
[31] *Id.  See also* United States Army Corps of Engineers, *Louisiana Coastal Area, Ecosystem Restoration Study*, Attachment 5 (November 2004) at 2, 6-7, 31 (attached as Exhibit 8).
[32] Wilson Status Report at p. 2-1.

and its "breach of wetlands that buffer large lakes from the channel."[33]   The EPA task force

reported that, as a result of MRGO, "there are no fresh or brackish water marshes left in St.

Bernard."[34]   "Land loss due to salt water intrusion and wave action along the MRGO has been

devastating.  **The right of way, purchased by the Federal Government for the construction**

**and maintenance of the MRGO has long been out of [its] boundaries.  The result is that the**

**property of private landowners is being literally washed away.  This committee feels that it**

**is only fair these property owners be compensated at fair market value.**"[35]   The EPA noted

that proponents of closing the MRGO "see it as a land-eating disaster that should be substantially

eliminated and remediated."[36]

Accordingly, the Corps of Engineers has belatedly urged that the MRGO be closed (a

recommendation that Congress has accepted) and, as of October 2008, the Corps is developing a

"comprehensive ecosystem restoration plan to restore the areas affected by the MRGO

navigation channel."[37]   The Corps' plans include:

> (1) Physically modifying the MRGO channel and **restoring areas affected by the**
> **channel**; (2) restoring natural ecosystem features to reduce damage from storm
> surge; (3) measures preventing saltwater intrusion into the waterway; (4)
> measures protecting, restoring or increasing wetlands to prevent saltwater
> intrusion or storm surge; (5) measures reducing risk of storm damage to
> communities by preventing or reducing wetland losses or restoring wetlands . . .[38]

The documents cited and described above clearly show that these projects were not

merely promises but actual projects attempting to ameliorate and correct the problems caused by

MRGO and the destruction of its banks, including plaintiffs' property.

---

[33] *Id.* at pp.2-1 to 2-2.
[34] *Id.* at p. 3-13 (quoting a report of the Task Force's Environmental Subcommittee).
[35] *Id.* at pp. 3-13 to 3-14.
[36] *Id.* at p. 4-2.
[37] Intent to Prepare a Draft Environmental Impact Statement for the Mississippi River-Gulf Outlet
Ecosystem Restoration Feasibility Study, 73 Fed. Reg. 57,340, 57,341 (October 2, 2008) (attached as Exhibit 4).
[38] *Id.*

Finally, the government's argument that promises were not made directly to the plaintiffs is completely irrelevant in light of the Federal Circuit's decision in *Banks*, 76 Fed. Cl. at 697, establishing an objective standard for accrual of a gradual taking claim (the issue "is whether plaintiffs knew of the Corps' mitigation efforts nor whether they believed that such efforts, if they did know about the, would help their situation.").  Actual promises are not required.  *See text* at pp. 10-11 *supra*.

## IV.  CONCLUSION.

For all the reasons set forth above and based on the documents submitted herewith, the government's motion should be denied.

DATED this 2^(ND) day of November, 2012.

| | |
|---|---|
| | Respectfully Submitted:<br><br>Camilo K. Salas III<br>SALAS & Co., L.C.<br>650 Poydras Street, Suite 2000<br>New Orleans, LA  70130<br>Telephone:  504-799-3080<br>Fax:  504-799-3085<br>E-Mail:  csalas@salaslaw.com<br><br>*s/Camilo K. Salas III*<br><br>Counsel of Record for Plaintiffs<br>Biloxi Marsh Lands Corporation and<br>Lake Eugenie Land & Development Inc.<br><br>OF COUNSEL:<br><br>Charlton B. Ogden III<br>TAGGART MORTON, LLC<br>2100 Energy Centre<br>1100 Poydras Street<br>New Orleans, LA 70163-2100<br>Telephone:  (504) 599-8505<br>Fax:  (504) 599-8501<br>E-Mail:  cogden@taggartmorton.com |