# In the United States Court of Federal Claims

No. 12-382
(Filed: 10 August 2026)

| | |
|---|---|
| BILOXI MARSH LANDS CORPORATION, *et.al.*, | * |
| Plaintiffs, | * |
| v. | * |
| THE UNITED STATES, | * |
| Defendant. | * |

*Camilo K. Salas, III,* Salas & Co., L.C., with whom were *Michael G. Stag*, *Ashley M. Liuzza*, and *Matthew D. Rogenes*, Stag Liuzza L.L.C., all of New Orleans, Louisiana, for plaintiffs.

*Erik Van de Stouwe*, Trial Attorney, with whom were *Young Kang*, Trial Attorney, and *Adam R. F. Gustafson*, Principal Deputy Assistant Attorney General, Environment & Natural Resources Division, Department of Justice, all of Washinton, DC, for defendant.

## OPINION AND ORDER

**HOLTE, Judge.**

Plaintiffs Biloxi Marsh Lands Corporation ("Biloxi"), Lake Eugenie Land & Development, Inc. ("Lake Eugenie"), Borgnemouth Realty Co., Limited ("Borgnemouth"), The Livaudais Company, LLC ("Livaudais"), Terre Aux Boeufs Land Co., Inc. ("Terre Aux Boeufs"), and Vincent Marshlands, LLC ("Vincent Marshlands" or "Vincent") (collectively, "plaintiffs"), allege the United States permanently took their properties for public use through inverse condemnation, without providing them just compensation, in violation of the United States Constitution, federal statutes, and certain servitudes granted by plaintiffs and assigned to the United States. Further, plaintiffs alleged the United States was liable for damage to plaintiffs' estates under the contracts granting a servitude to construct an outlet canal on their properties. The government filed its Motion for Summary Judgment on 22 November 2024 arguing plaintiffs' takings and contract claims are barred by this court's six-year statute of limitations and lack merit regardless. After revisions, plaintiffs filed their Cross-Motion for Partial Summary Judgment on the issue of liability on 22 April 2025 addressing the same issues. The Court held oral argument on the Cross-Motions for Summary Judgment on 4 November 2025 in New Orleans, Louisiana. For the following reasons, the Court grants in part and denies in part the government's Motion for Summary Judgment, and denies plaintiffs' Cross-Motion for Partial Summary Judgment on the Issue of Liability.

## I. Factual Background

The factual background of this case was previously outlined in the Court's 19 January 2021 Opinion and Order:[1]

### A. The Mississippi River Gulf Outlet

In the 1940s there were three primary water navigation routes in southeast Louisiana: the Inner Harbor Navigation Canal ("IHNC"), the Gulf Intracoastal Waterway ("GIWW"), and the Mississippi River. Pls.' Corrected Mem. Submitted (1) in Opp. to the U.S.' Mot. for Summary Judgment on the Issue of the Timeliness of Pls.' Takings Claims; and (2) in Supp. of Pls.' Cross-Mot. for Summary Judgment on the Same Issue, ECF No. 110, ("Pls.' Mot. for Partial Summ. J."), Ex. 39 at 3-40 (Mississippi River Gulf Outlet (MGRO) Ecosystem Restoration Plan, Final Environmental Impact Statement (June 2012)). In 1956, Congress authorized construction of a fourth route—the Mississippi River Gulf Outlet ("MRGO"). Pls.' Mot. for Partial Summ. J., Ex. 2 at 1 (U.S. Army Corps of Engineers, MRGO Design Memorandum No. 1-B). The 76-mile-long, 36-foot-deep, 650-foot surface width, and 500-foot bottom width channel would soon connect the INHC and the 38-foot depth contour in the Gulf of Mexico. *Id.* at 1–3. The purpose of the MRGO "was to increase commerce by providing a direct connection between the port of New Orleans and the Gulf of Mexico." *St. Bernard Parish Gov. v. United States*, 887 F.3d 1354, 1357 (Fed. Cir. 2018).

In March of 1956, the Port of New Orleans ("the Port") became the designated non-federal sponsor of the MRGO. Pls.' Mot. for Partial Summ. J., Ex. 2 at 1 (U.S. Army Corps of Engineers, MRGO Design Memorandum No. 1-B). As such, Port Commissioners pursued acquisition of lands and obtained acts of assurance of local cooperation, which included the furnishing of all lands, easements, rights-of-way, and spoil disposal areas by the State of Louisiana. *Id.* at 6.

In April of 1958, the Department of the Interior, in a draft preliminary report prepared for the Army Corps of Engineers ("USACE" or "the Corps"), predicted ecological damage would result from the construction and operation of the MRGO. *See* United States Mot. for Summary Judgment and Supporting Mem., ECF No. 99, ("Gov. Mot. Summ. J."), Ex. 1, at 8 (citing U.S. Department of the Interior, An Interim Report on Fish and Wildlife Resources as Related to Mississippi River-Gulf

[1] At oral argument, the Court invited the parties to note any disputes they may have with the facts as the Court described them in its 2021 Order. In a JSR following oral argument, the government noted two disputes with the Court's recitation of the facts related to the 1958 Department of the Interior Draft Preliminary Report and the 1986 Water Resources Development Act ("WRDA"). *See* 22 January Joint Status Report at 1–5, ECF No. 293. Plaintiffs disagreed with the government's disputes. *See id.* at 5–9. Neither the Draft Preliminary Report nor the 1986 WRDA impact the Court's decision on the parties' cross-motions for summary judgment in this opinion. While the Court does not address these disputes today, the parties remain free to raise these factual issues if they become relevant in a future proceeding.

Outlet Project, Louisiana and an Outline of Proposed Fish and Wildlife Studies (1958)). In the report, the Secretary of the Department of the Interior wrote the Secretary of the Army, noting "*the project is of great concern to fish and wildlife conservationists*" and "*the project plans had not been investigated by fish and wildlife conservation agencies, as contemplated in Wildlife Coordination Act of August 14, 1946*." *Id.* (emphasis added in the government's brief).

Without further agency investigation, the Corps began construction of the outlet in 1958, dredging shallow bays, coastal marshes, and cypress swamps. Pls.' Mot. for Partial Summ. J., Ex. 51 at 2 (U.S. Army Corps of Engineers, MRGO Deep Draft De-authorization Study: Executive Summary). Construction of the MRGO cut through Bayous Bienvenue, Dupre, La Loutre, and the Bayou La Loutre Ridge and resulted in the direct connection of Lake Borgne to the Gulf of Mexico through Breton Sound. Pls.' Mot. for Partial Summ. J., Ex. 39 at 3-40 (Mississippi River Gulf Outlet (MGRO) Ecosystem Restoration Plan, Final Environmental Impact Statement (June 2012)). In 1965, Congress authorized construction of a hurricane protection levee along the south bank of the MRGO. Pub. L. No. 89-298, 79 Stat. 1073 (Oct. 27, 1965).

The Corps completed construction of the MRGO in 1968. *St. Bernard Parish Gov.*, 887 F.3d at 1357. From 1968 to 2009, the MRGO provided deep water vessels direct access from the Gulf of Mexico to the Port of New Orleans. Pls.' Resp./Opp. to the U.S.' Mot. to Dismiss the Compl. for Lack of Jurisdiction, ECF No. 14 ("Pls.' Resp. to Mot. to Dismiss"), Ex. 2, pt. 1 at iv (U.S. Army Corps of Engineers, Integrated Final Report to Congress and Legislative Environmental Impact Statement for the MRGO Deep-Draft De-authorization Study (November 2007)); Pls.' Mot. for Partial Summ. J., Ex. 51 at 2 (U.S. Army Corps of Engineers, MRGO Deep Draft De-authorization Study: Executive Summary). The MRGO extended approximately 70 miles from Breton Sound to eastern New Orleans, traversing wetlands and marshes in Plaquemines, St. Bernard, and eastern Orleans Parishes. Pls.' Mot. for Partial Summ. J., Ex. 39 at 3-28 (Mississippi River Gulf Outlet (MGRO) Ecosystem Restoration Plan, Final Environmental Impact Statement (June 2012)). The MRGO provided a pathway for large ships to do business at the Port and created jobs reliant on the channel. *Id.* at 3-40–3-41. With those ships and jobs, however, came saltwater and damaging ecological change to the area surrounding the MRGO. Pls.' Resp. to Mot. to Dismiss, Ex. 2, pt. 1, at iv (U.S. Army Corps of Engineers, Integrated Final Report to Congress and Legislative Environmental Impact Statement for the MRGO Deep-Draft De-authorization Study (November 2007)).

### B. Environmental Damage and Restoration: Reports and Legislation

Construction of the MRGO converted and eliminated thousands of acres of wetlands. *Id.* at iv. The "[m]ost significant environmental effects occurred in the first 20 years after the MRGO [was] constructed." Pls.' Mot. for Partial Summ. J.,

Ex. 56 at 43 (U.S. Army Corps of Engineers, MRGO Studies). In the first 20 years, construction destroyed 2,500 acres of wetlands and erosion along the banks of the newly constructed MRGO destroyed an additional 4,220 acres. *Id.*

In October 1972, Coastal Environments, Inc., prepared an Environmental Baseline Study for the St. Bernard Parish Police Jury. *See* Gov. Mot. for Summ. J., Ex. 19 (St. Bernard Parish Policy Jury, Environmental Baseline Study (October 1972)). The purpose of the study was "to provide an environmental baseline of [St. Bernard] parish as it currently exists, taking into consideration cultural and natural factors that have modified the landscape . . . [and] to set management guidelines for the system and provide a basis upon which future modifications to the environment can be judged with a high degree of predictability concerning probable impact." *Id.* at 2. In relation to the MRGO, the study stated:

> Of all navigation channels in coastal Louisiana, the [MRGO] has probably had the greatest environmental impact. . . . Construction of the channel destroyed 23,606 acres of marsh and shallow nursery areas—17,058 acres of spoil deposition and 6,548 acres by deepening.
>
> Secondary effects are equally serious. The channel has greatly altered the hydrology and water chemistry of adjacent estuarine areas. The large cross-section of the area provides an avenue of ingress and egress for runoff tidal waters. Changes in salinity are well-documented. Recording stations in the vicinity of the channel show significant changes after the canal was opened (about 1959) and completed (1962).
>
> . . . The thick sequence of poorly consolidated sediment through which the channel was excavated has created highly unstable bank conditions and massive slumping is common. . . . The result of this condition has been a continuous and costly program of maintenance dredging. Undesirable effects of this dredging include increased turbidity and the impact on fauna and flora of spoil disposal.

*Id.* at 86–88, 93 (internal citation omitted). According to the 1972 study, "signs of deterioration [were] evident in the death of trees and opening up of water bodies" and the "change in water regime seems to be the main cause of deterioration." *Id.* at 65–66. The study states, "[t]he MRGO has introduced higher salinities into the study area" and cites drastic changes in parts per thousand at Lake Borgne stations BDL and I-3 "from an average surface salinity of 3.0 ppt in 1959–61 to 10.4 ppt in 1962–64, an increase of over three times." *Id.* at 66.

In 1982, Coastal Environments, Inc., prepared an additional study. *See* Gov. Mot. for Summ. J., Ex. 18 (St. Bernard Parish Police Jury, St. Bernard Parish: A Study in Wetland Management (1982)). The study explains, "[o]ne of the major

causes of wetland deterioration in St. Bernard Parish appears to be closely related to the proliferation of deep navigation and drainage canals connecting the Gulf and interior wetlands." *Id.* at 117. The study continues, "[s]ome of the more noticeable primary and secondary environmental impacts often attributable to canals [include] . . . saltwater intrusion, . . . erosion . . . and consequent loss of marshlands, . . . loss of stable, lower salinity estuarine nursery areas, [and] loss of biological diversity as nonsalt-tolerant [sic] species are squeezed out by higher salinities." *Id.*

In November 1984, the Corps prepared a study of the area. *See* Pls.' Mot. for Partial Summ. J., Ex. 40 (U.S. Army Corps of Engineers, Louisiana Coastal Area, Louisiana—Land Loss and Marsh Creation—Initial Evaluation Report (November 1984)) ("1984 Initial Evaluation Study"). Therein, the Corps stated "[t]he marshes are disappearing at the alarming rate of 39.6 square miles per year due to compaction, subsidence, sea level rise, erosion, saltwater intrusion, and man's activities. The land loss trend is expected to continue and, by year 2040, about 1,000,000 acres of wetlands could disappear beneath the gulf." *Id.* at Syllabus. The study presented "the findings of the initial evaluation study of plans to reduce land loss and create marsh in the coastal area of Louisiana." *Id.* at 1. The Corps noted "[a]s a result of the analysis of changing conditions, the needs and opportunities and concerns of Federal, state, and local interests, . . . objectives were established." *Id.* at 62. These objectives included: "Create marsh to offset losses"; "[e]nhance marsh vegetative growth to reduce marsh losses and increase the nutrient and detritus supply for fish and wildlife production"; and "[r]educe subsidence, erosion, and saltwater intrusion to reduce marsh losses." *Id.*

In 1986 Congress enacted the Water Resources and Development Act ("WRDA"), which in part instructs the "Secretary of USACE to determine the need for modifications in the structure and operations of [the MRGO] for the purpose of improving the quality of the environment . . . ." Pls.' Mot. for Partial Summ. J. at 25. In 1988, the Corps conducted a reconnaissance study of the MRGO's bank erosion and erosion-related problems in Orleans and St. Bernard Parishes, Louisiana. *Id*. at 8–9. The purpose of the study was to:

> [D]efine the extent of erosion and erosion-related problems projected to occur in the study area; identify opportunities to implement potential solutions to the defined problems; appraise Federal interest in potential solutions[;] . . . determine, based on the appraisal, whether planning should proceed beyond the reconnaissance phase into more detailed feasibility phase considerations; estimate the time and cost required to complete feasibility phase studies if Federal interest is indicated; and assess the level of interest and support of non-Federal interests in the identified potential solutions to defined problems.

Pls.' Mot. for Partial Summ. J., Ex. 7 (Mississippi River-Gulf Outlet St. Bernard Parish, La.—Bank Erosion—Reconnaissance Report, February 1988) ("1988

Reconnaissance Report") at 2–3. The Corps warned of erosion if there were no remedial actions:

> The unleveed banks of the MRGO will continue to erode in the absence of remedial action. Currently, banks of the unleveed reached are retreating at rates from five to over 40 feet per year. The average rate of retreat of the north bank in the 41-mile land cut portion of the waterway is 15 ft per year. Failure to reduce bank erosion will result in a significant increase in the required maintenance dredging of the waterway in the future. Annual average maintenance dredging requirements are projected to increase six-fold within the next 15 years (by the year 2002).

*Id*. at 30–31.

In 1990, Congress passed the Water Resource Development Act of 1990, directing the Secretary of the Army to "include environmental protection as one of the primary missions of the Corps of Engineers in planning, designing, construction, operating, and maintaining water resources projects" and stating the Corps shall have "an interim goal of no overall net loss of the Nation's remaining wetlands base, as defined by acreage and function, and a long-term goal to increase the quality and quantity of the Nation's wetlands, as defined by acreage and function." Water Resource Development Act of 1990, Pub. L. No. 101-640, tit. III, § 307(a), 104 Stat. 4604 (1990) (codified at 33 U.S.C. § 2317) ("1990 WRDA"). Additional legislation in 1990 included the Coastal Wetlands Planning, Protection and Restoration Act (the "Breaux Act"), which directed the Corps to establish a comprehensive plan to restore Louisiana wetlands and called for the development of annual lists of "priority projects" which would "provide for the long-term conservation of [Louisiana's] wetlands . . . ." Pls.' Mot. for Partial Summ. J., Ex. 42 at 3–4 (1994 MRGO Bank Erosion Reconnaissance Report). In 1993, a task force submitted a plan to restore and prevent further loss of Louisiana wetlands by "increas[ing] sediment and freshwater input into coastal estuaries" so as to "restart the natural processes of land building and maintenance." Pls.' Mot. for Partial Summ. J., Ex. 41 at 9 (1993 Louisiana Coastal Wetlands Restoration Plan). The task force behind the 1993 Louisiana Coastal Wetlands Restoration Plan developed a "comprehensive approach to restore and prevent the loss of coastal wetlands in Louisiana" by using hydrologic restoration, shoreline protection, marsh creation with dredged materials, and marsh management. *Id.* at 4, 9.

The Breaux Act required the Corps to establish a comprehensive plan to restore Louisiana wetlands exclusively. Pls.' Mot. for Partial Summ. J. at 39. The act authorized 143 projects to "create, protect, or restore over 120,000 acres of wetlands in coastal Louisiana" and dedicated $40 million annually to restoring wetlands in Louisiana and was still being implemented through 2001 or later. *Id.*

In 2000, the Environmental Protection Agency ("EPA") suggested closure of the MRGO at the Bayou LaLoutre Ridge and offered a 10-year program to restore and manage wetland resources, including freshwater diversions into the Central Wetlands area. Pls.' Mot. for Partial Summ. J., Ex. 45 at 2–3 (U.S. Army Corps of Engineers, Louisiana Coastal Area (LCA), Louisiana, Ecosystem Restoration Study (November 2004)). The report recognized the substantial land erosion caused by the MRGO and declared "[a]s long as the MRGO remains authorized to provide deep-draft navigation, ecosystem protection measures are critically needed to minimize further wetland loss and preserve the opportunities for future restoration." *Id*. at 2. Recommendations by the report included construction of rock breakwaters along the shores of the MRGO, the beneficial use of dredged material for marsh creation, freshwater introduction, barrier island restoration, and "channel modification to develop a suite of measures to stabilize and maintain important estuarine components. *Id*. at 3.

Four years later, the Corps' "Louisiana Coastal Area, Ecosystem Restoration Study" disclosed the "rate of wetland loss in the area is accelerating" and "rapid action is required to protect the integrity of the southern Lake Borgne shoreline and to prevent continued erosion of the MRGO channel banks from ocean going vessel wakes." Pls.' Mot. for Partial Summ. J., Ex. 45 at 32 (U.S. Army Corps of Engineers, Louisiana Coastal Area (LCA), Louisiana, Ecosystem Restoration Study (November 2004)). In the same 2004 study, the Corps proposed building "38 miles of rock breakwaters to prevent the merger of the MRGO into Lake Borgne, facilitating wetland creation by using dedicated dredging and/or beneficial use of dredged materials behind the breakwaters, and freshwater introduction into the marsh through Mississippi River diversions." *Id*. The Corps' "Operations and Maintenance Bank Protection" program completed, scheduled, or proposed installation of foreshore protection, dredged material retention, and articulated mattress along over 90 percent of the length of the MRGO. Pls.' Reply Br. Submitted (1) in Opp. to the U.S.' Mot. for Summary Judgment on the Issue of the Timeliness of the Pls.' Takings Claims and (2) in Supp. of Pls.' Cross-Mot. for Summary Judgment on the Same Issue, ECF No. 135, ("Pls.' Reply Br. Opp'n"), Ex. 57 at 1.

### C. The MRGO After Hurricane Katrina

"Hurricane Katrina was 'one of the most devastating hurricanes that has ever hit the United States, generating the largest storm surge elevations in the history of the United States.'" *St. Bernard Parish Gov.*, 887 F.3d at 1358 (quoting *In re Katrina Canal Breaches Consol. Litig*., 647 F.Supp.2d 644, 678 (E.D. La. 2009)). Katrina caused severe shoaling in the MRGO, which in turn drastically changed the channel depth of the outlet. Pls.' Mot. for Partial Summ. J., Ex. 51 at 3 (U.S. Army Corps of Engineers, MRGO Deep Draft De-authorization Study: Executive Summary). After the 2005 Hurricane season, the MRGO was not navigable as a deep draft waterway. *Id.* Dredging to restore the outlet to its originally authorized dimensions would have cost over $133 million. *Id*. To avoid

re-dredging, the Corps limited its maintenance of the outlet to provide for only one-way traffic. *Id.* at 7. The Corps thereafter stopped all maintenance dredging of the MRGO in 2006, thereby halting the beneficial use of dredged materials programs. Pls.' Mot. for Partial Summ. J. at 3. In light of the damage to the MRGO and the high cost of fixing the damage, the Corps recommended total closure of the MRGO by erection of a rock dike across its entire width and the construction of other "rock dikes that protect wetlands along the MRGO." Pls.' Mot. for Partial Summ. J., Ex. 51 at 13 (U.S. Army Corps of Engineers, MRGO Deep Draft De-authorization Study: Executive Summary).

In 2007, the Corps stated in a report to Congress "habitat shifts caused by saline waters brought in by the MRGO might have caused . . . 3,350 acres of fresh/intermediate marsh and 8,000 acres of cypress swamp [to be] converted to brackish marsh and 19,170 acres of brackish marsh and swamp [to] become saline marsh." Pls.' Mot. for Partial Summ. J., Ex. 52 at iv (Integrated Final Report to Congress and Legislative Environmental Impact Statement for the Mississippi River-Gulf Outlet Deep-Draft De-authorization Study). In addition, the Corps noted "[b]ank erosion along the MRGO has been estimated to occur at rates of between 27 and 38 feet per year" and "[b]etween 1964 and 1996, 5,324 acres of marsh have been lost adjacent to the MRGO channel . . . ." *Id.*

The Corps announced a plan in 2007 to close the MRGO by 9 July 2009 because of the cost associated with repair and the potential for great ecological harm. Pls.' Resp. to Mot. to Dismiss, Ex. 2, pt. 1 at 3 (U.S. Army Corps of Engineers, Integrated Final Report to Congress and Legislative Environmental Impact Statement for the MRGO Deep-Draft De-authorization Study (November 2007)). The Corps further published plans outlining ongoing, scheduled, and proposed restoration efforts to bolster the wetlands areas affected by the MRGO. *Id.* at 6–7. Congress again passed the WRDA in 2007 and authorized restoration projects paired with a federally funded study. The projects required a non-federal partner to agree to bear costs alongside the federal government, but no such partner came forward. *Id.*

On 2 October 2008 the Corps announced it was developing a "comprehensive ecosystem restoration plan to restore the areas affected by the MRGO navigation channel." Intent to Prepare a Draft Environmental Impact Statement for the Mississippi River-Gulf Outlet Ecosystem Restoration Feasibility Study, 73 Fed. Reg. 57,340, 57,341 (Sep. 23, 2008). The announcement included the following goals:

> (1) Physically modifying the MRGO channel and restoring areas affected by the channel; (2) restoring natural ecosystem features to reduce damage from storm surge; (3) measures preventing saltwater intrusion into the waterway; (4) measures protecting, restoring or increasing wetlands to prevent saltwater intrusion or storm surge;

> (5) measures reducing risk of storm damage to communities by preventing or reducing wetland losses or restoring wetlands.

*Id*. The Corps officially de-authorized the MRGO from the Gulf Intracoastal Waterway to the Gulf of Mexico in accordance with the 2007 WRDA on 5 June 2008. Amended Compl., ECF No. 37 ("Am. Compl."), Ex. 2 at xvii–xviii. The outlet officially closed on 9 July 2009. *Id.*

Congress and the President directed the Corps to develop a full range of flood control, coastal restoration, and hurricane protection measures exclusive of normal policy considerations for South Louisiana through the Coast 2050 Plan, the 2004 LCA Plan, the Breaux Act, and the 2007 WRDA. *See* Pls.' List of Citations and Excerpts in Chronological Order Which Correspond to Each of the Agreed Subunits in a "Justifiable Uncertainty" Analysis, ECF No. 165 ("Pls.' Supp. Paper") at 8–9, 27–28. These directions included the creation of a long-term, comprehensive plan "for protecting, preserving, and restoring Coastal Louisiana ecosystem." Pls.' Mot. for Partial Summ. J., Ex. 49 (U.S. Army Corps of Engineers, Lake Borgne – Mississippi River Gulf Outlet Shoreline Protection (PO-32), St. Bernard Parish, Louisiana, Final Design Report (December 2004)).

The Corps separated project goals into two categories in its 2012 Final Feasibility Report: "geomorphic" and "habitat specific." Pls.' Reply Br. Opp'n, Ex. 55 at S-12 and S-13 (U.S. Army Corps of Engineers, Mississippi River Gulf Outlet (MRGO) Ecosystem Restoration Plan: Final Feasibility Report (June 2012)) ("2012 Feasibility Report"); *see also* Pls.' Mot. for Partial Summ. J., Ex. 39, at ES-1 (Mississippi River Gulf Outlet (MGRO) Ecosystem Restoration Plan, Final Environmental Impact Statement (June 2012)). In the category dedicated to habitat-specific goals, the Corps stated one goal is "to restore historic salinity conditions in the study area, restore native habitat acreages impacted by the MRGO and their ecosystem functions, and increase the year-round spatial coverage of critical landscape features that provide hurricane and storm surge damage risk reduction in the study area." 2012 Feasibility Report at S-12 and S-13.

**D. Plaintiffs' Land Ownership**

Property owners collectively lost thousands of acres of land since construction of the MRGO. Pls.' Resp. to Mot. to Dismiss., Ex. 2, pt. 1 at iv (U.S. Army Corps of Engineers, Integrated Final Report to Congress and Legislative Environmental Impact Statement for the MRGO Deep-Draft De-authorization Study (November 2007)). Plaintiffs are six property owners with land in the area around the MRGO who allege the Corps, through the construction and maintenance of the MRGO, took their land "for public use without exercising the power of eminent domain and without providing plaintiffs just compensation in violation of the U.S. Constitution." Am. Compl. at 1.

> The United States obtained servitudes from landowners, including plaintiffs, which permitted use of land within 1,500 feet from the channel's original centerline. *Id*. at 4. Specifically, plaintiff Biloxi granted to the United States "a right of entry in and to any and all lands [it] owned . . . in that portion of the Parish of St. Bernard, State of Louisiana, lying south and east of Bayou La Loutre, for the purpose of such dredging and spoil disposal operations." *Id.* at 5–6. At about the same time—the exact date being unknown at this time due to the destruction of records at the St. Bernard Parish Court House caused by Hurricane Katrina in 2005—plaintiffs Lake Eugenie, Borgnemouth, Livaudais, and Vincent Marshland granted to the Port similar 1,500-foot-wide servitudes, on land owned by these companies, for the construction and maintenance of the MRGO. *Id.* at 6; *see also* Gov. Mot. for Summ. J., Exs. 1–4 (four plaintiffs' complaints, later consolidated as the present case). Each plaintiff also granted to the Port a right of entry and temporary spoil disposal servitudes, which the Port assigned to the United States through the Corps. *Id.*
>
> Plaintiffs own separate pieces of land throughout the affected region. *See, e.g.*, Am. Compl. at 3–7. Plaintiffs Biloxi and Lake Eugenie own property in the Biloxi Marsh and have their principal places of business in Metairie, Louisiana. Am. Compl. at 6. Plaintiff Terre Aux Boeufs also owns property in Biloxi Marsh complex, plus a separate plot south of the MRGO. Gov. Mot. for Summ. J., Ex. 3 at 4 (Compl., *Terre Aux Boeufs Land Co., Inc.*, 15-710, ECF No. 1 (July 8, 2015). Terre Aux Boeufs's business operates out of New Orleans, Louisiana. *Id.* at 3. The property Borgnemouth owns consists of around 7,000 acres and includes Proctor's Point, the coastline peninsula landmark cutting into Lake Borgne. Gov. Mot. for Summ. J., Ex. 2 (Compl., *The Borgnemouth Realty Co., Limited and The Livaudais Company, L.L.C. v. U.S.* 14-3, ECF No. 1 (January 2, 2014). Borgnemouth's two tracts of land span from Proctor's Point to the MRGO and southwest of the MRGO. *Id.* at 9. The land Livaudais owns consists of two tracts "located just north of and adjacent to" the land Borgnemouth owns. *Id.* at 5. Livaudais also owns an undivided one-sixth interest in the area known as the Golden Triangle. *Id.* Borgnemouth and Livaudais operate out of Meraux, Louisiana. *Id.* at 3. Vincent Marshlands is based in Harahan, Louisiana. Gov. Mot. for Summ. J., Ex. 4. Vincent Marshlands owns an undivided one-half interest in the Chalmette Meadows Property the MRGO touches. *Id.* Trinity Church, a Louisiana nonprofit corporation ("Trinity Church"); the Rector and Visitors of the University of Virginia, a Virginia public corporation ("University of Virginia"); and the Administrators of Tulane Educational Fund, a Louisiana nonprofit corporation ("Tulane University") formed Vincent Marshlands in October 2008 to manage their respective one-third shares of an undivided one-half interest in the Chalmette Meadows Property. *Id.* Hugh E. Vincent and Frank B. Hayne, Sr. acquired the Chalmette Meadows Property in December 1916. *Id.* Upon his death, Hugh E. Vincent left his undivided interest to these three entities. *Id.*

*Biloxi Marsh Lands Corp. v. United States*, 152 Fed. Cl. 254, 260–68 (2021) (Holte, J.).

## II. Procedural History

The procedural history of this case is as much a quagmire as the marshlands at issue. On 15 June 2012, plaintiffs Biloxi and Lake Eugenie filed a complaint alleging the government's permanent taking of plaintiffs' property without just compensation in violation of the Takings Clause of the Fifth Amendment to the United States Constitution. *See* Compl. ¶ 1, ECF No. 1. The government filed a motion to dismiss on 31 August 2012. *See* Gov't's Mot. to Dismiss, ECF No. 9. On 24 June 2013, the then-assigned judge denied the government's Motion to Dismiss, stating "[p]laintiffs are not clearly without our jurisdiction" as "whether the statute of limitations has run depends on questions of predictability and mitigation" not well addressed at the motion to dismiss stage. Order Denying Mot. to Dismiss at 3, ECF No. 18.

Plaintiffs filed an amended complaint on 29 October 2013. *See* Am. Compl., ECF No. 37. This case was consolidated with *Borgnemouth Realty Co. v. United States*, No. 14-3, on 22 July 2015 and further consolidated with *Terre Aux Boeufs Land Co., Inc. v. United States*, No. 15-710—which was already consolidated with *Vincent Marshlands, LLC et al. v. United States*, No. 15-711—on 30 January 2018. *See* Order Granting Mot. to Consolidate, ECF No. 59; Order Consolidating Related Matters, ECF No. 91; Order Consolidating Cases, *Vincent Marshlands*, No. 15-711, ECF No. 14. Both parties then filed motions for summary judgment. *See* Gov't's Motion for Summ. J., ECF No. 99; Pls.' Mot. for Partial Summ. J., ECF No. 105.

On 29 July 2019, this case was reassigned to the undersigned Judge. *See* Order Reassigning Case, ECF No. 136. The Court held oral argument on the motions for summary judgment in Washington, DC, on 29 June 2020. *See* Order Granting Mot. to Am. Schedule, ECF No. 156. On 19 January 2021, the Court granted-in-part and denied-in-part the government's motion for summary judgment and denied plaintiffs' motion for summary judgment. *See Biloxi Marsh Lands Corp. v. United States*, 152 Fed. Cl. 254 (2021). In that Order, the Court analyzed the timeliness of plaintiffs' takings claims according to seven categories of land. *See id.* at 310–11. As the Court explained, "[w]hen a taking occurs through gradual processes, two applicable doctrines assist in determining when the statute of limitations begins to run: stabilization and justifiable uncertainty." *Id.* at 269 (citations omitted). The Court explained, "the ultimate question in a justifiable uncertainty analysis is whether "*the landowners* [did or] did not know when or if their land would be permanently destroyed." *Id.* at 312 (emphasis and alteration in original) (citation and internal quotations omitted). The Court found "[f]or categories One, Two, Three, Four, Six, and Seven of land, plaintiffs have been able to establish justifiable uncertainty may" apply, *id.*, but "landowners in Category Five could have only been justifiably uncertain until as late as 1996," so the statute of limitations only could have run "as late as 2002," *id.* at 300 (citation omitted). Accordingly, the Court granted the government's motion for summary judgment as to category five because plaintiff's 2012 complaint could not have come within the jurisdictional statute of limitations. *See Biloxi,* 152 Fed. Cl. at 310. As for the remaining categories, the Court held it "cannot definitively say whether or not the government's actions created justifiable uncertainty as to the permanency of the alleged government taking." *Id.* at 312 (citation omitted).

On 17 February 2021, plaintiff filed a motion for partial reconsideration of the Court's 19 January Order, asking the Court "hold that the objective standard must be applied throughout the

entire analysis of the timeliness of the plaintiffs' claims and actual knowledge of the Corp's activities around the MRGO is not required." *See* Pls.' Mot. for Partial Reconsideration at 14, ECF No. 169. The Court denied the motion on 27 October 2021, holding "[f]or purposes of statute of limitations accrual, determining justifiable uncertainty is a two-part inquiry: (1) whether a landowner's *subjective* knowledge of the government's promises or actions caused the landowner to be uncertain about the taking's permanence; and (2) whether government promises or actions caused the landowner an *objectively* reasonable uncertainty of the taking's permanence." *See Biloxi Marsh Lands Corp. v. United States*, 156 Fed. Cl. 301, 319 (2021) (emphasis in original).

After the Court's 27 October 2021 Order denying reconsideration, the parties resumed discovery related to plaintiffs' claims. *See* 3 Nov. 2021 Order, ECF No. 200. On 20 September 2023, after additional discovery, the parties proposed a schedule to complete discovery and submit briefing on summary judgment again regarding: (1) the timeliness of plaintiffs' takings claims "left unresolved" in the Court's 19 January 2021 Order; and (2) legal issues related to plaintiffs' contract claims. *See* 20 Sept. 2023 Joint Status Report ("JSR") at 1–2. The Court adopted the parties' proposed briefing schedule. *See* 16 Oct. 2023 Order, ECF No. 222.

The government filed its currently pending Motion for Summary Judgment on 22 November 2024. *See* Gov't's Mot. for Summ. J. ("Gov't's MSJ"), ECF No. 244. Plaintiffs initially filed a response and cross-motion for partial summary judgment on 30 December 2024. *See* Pls. Mot for Partial Summ. J., ECF No. 253; Pls.' Response to Gov't's MSJ., ECF No. 252. Plaintiffs later filed the currently pending and combined Revised Response to the Government's Motion for Summary Judgment and Cross-Motion for Partial Summary Judgment on the issue of liability on 22 April 2025. *See* Pls.' Rev. Resp. to the Gov't's MSJ and Mot. for Partial Summ. J on the Issue of Liability ("Pls.' Rev. MSJ"), ECF No. 274. The government filed its response and reply on 16 May 2025. *See* Gov't's Reply in Support of Mot. for Summ. J. and Opp. to Pls.' Rev. MSJ ("Gov't's Reply"), ECF No. 276. Plaintiffs filed their reply on 13 June 2025. *See* Pls.' Reply in Support of Cross-Mot. for Partial Summ. J. ("Pls.' Reply"), ECF No. 279. The Court held oral argument on the cross-motions for summary judgment in New Orleans, Louisiana on 4 November 2025. *See* 23 Sept. Order Setting Oral Argument, ECF No. 280.

Shortly after oral argument, the Court ordered the parties to submit a JSR to address any factual disputes the parties had with the Court's recitation of facts in its 2021 Order and to supply additional authority related to plaintiffs' privity of contract with the government. *See* 5 Nov. 2025 Order, ECF No. 284. After three extensions and one correction, the parties filed the JSR on 22 January 2026. *See* 22 Jan. 2026 JSR, ECF No. 293.

## III. Parties' Arguments

### A. The Government's Argument Plaintiffs' Fifth Amendment Claims are Untimely

The government first argues all plaintiffs' Fifth Amendment claims are untimely because the Court held in 2021 all their claims stabilized in 1988, thus triggering accrual of the 6-year statute of limitations. *See* Gov't's MSJ at 15–16, 29, 37, 50–51, 57, 60–63, 67, 68. The

government asserts plaintiffs' claims are untimely by decades unless plaintiffs can demonstrate the doctrine of "justifiable uncertainty" applies to delay accrual of the statute of limitations. *See id.* According to the government, "justifiable uncertainty arises only if the Corps actually undertakes some mitigation activity to redress the government-caused damage or commits itself to undertake such mitigation activity." *Id.* at 16 (citation omitted). The government further contends "[m]ere consideration of potential projects to achieve some environmental goal cannot support a claim of justifiable uncertainty because considering possible projects does not commit the United States to any mitigation activities." *Id.* (cleaned up). The government argues plaintiffs "lacked subjective knowledge of government remediation actions or promises to remediate MRGO-caused damage on their properties." *Id.* at 18 (cleaned up). Both the government and plaintiffs separated their timeliness arguments into seven categories of land. *See id.* at 19–68; Pls.' Rev. MSJ at 133.

### 1. Category One — Central Wetlands

The government's arguments regarding category one are divided according to the relevant owners. *See* Gov't's MSJ at 19.

#### a. Vincent's Category One Property

The government first argues the evidence shows the United States did not make a promise to plaintiff Vincent to remediate MRGO-caused damage because the testimony of Michael Taylor (Vincent's 30(b)(6) witness) shows "[t]he Corps never approached Vincent about conducting marsh creation activity within the boundaries of the Vincent property." *Id.* at 20. The government goes on to argue "[t]he only federal project proposed to occur between 1988 and 2002 on the Vincent property cannot support [plaintiffs'] statute of limitations argument." *Id.* at 25. According to the government, this federal project was a May 1994 letter from the Port trying "to obtain a right of entry to perform a survey to measure subsidence and determine which locations will require additional fill to avoid future loss of land." *Id.* (citations and internal quotations omitted). The government contends the letter: (1) came more than six years after Vincent's claims accrued; (2) could not have given Vincent subjective knowledge triggering justifiable uncertainty; and (3) only contemplated "work on non-Category One properties." *Id.* Plaintiffs, in response to the government's first argument, assert "Mr. Taylor's testimony about contacts, or lack of contacts, between the Corps and Vincent Marshlands, LLC after its formation in 2008 is irrelevant to the issues before the Court" because his testimony was only meant to relate to "events . . . that occurred after the company was formed in 2008." Pls.' Rev. MSJ. at 135–36. In response to the government's remaining arguments, plaintiffs contend Karen Freese (an attorney for Vincent) "testified in her deposition that on July 1, 1994 she had a telephone call with Mr. Bob Gunn, who was the Corps' Operations Manager of the MRGO." *Id.* at 140. Plaintiffs assert "[a]ccording to Ms. Freese's contemporaneous notes of the call, Mr. Gunn told her that the Corps was going to remediate all the damage caused by the MRGO to the Chalmette Meadows Property. *Id.*

#### b. Livaudais and Borgnemouth's Category One Properties

Regarding Livaudais and Borgnemouth's category one properties, the government argues the United States never promised to remediate the MRGO-caused damage. *See* Gov't's MSJ at 31. The government argues Bruce Wallis gave a 30(b)(6) deposition as a representative of Livaudais and Borgnemouth, and "could not recall a Corps promise or commitment to undertake a project to restore MRGO-caused damage." *Id.* (citation omitted). Plaintiffs assert multiple documents addressed in Ms. Delery's deposition demonstrate "various proposals the Corps made to Gatien Livaudais and Judge Oliver Delery . . . were implemented starting in 1991 and continued into the future." *See* Pls.' Rev. MSJ at 159 (citation omitted). Specifically, plaintiffs highlight, *inter alia*, "a set of documents containing information . . . about the work the Corps proposed to do on both shores of the MRGO," "a set of documents showing attendance by Judge Delery and Gatien Livaudais, Jr. . . . at the Corps offices to discuss the work the Corps proposed to perform," and "a Public Notice that 'the U.S. Army Engineer District, New Orleans, proposes to construct bank stabilization between mile 49.9 and mile 56.1 of the Federal navigation project.'" *Id.* at 159–60 (citations omitted). Plaintiffs state "[i]n sum, the many proposals made in writing and in person by the employees of the Port to Mr. Livaudais and Judge Delery created justifiable uncertainty that tolled the statute of limitations." *Id.* at 162.

#### c. Eugenie's Category One Properties

The government argues "the United States did not make a 'mere promise' to remediate MRGO-caused damage on Eugenie's Category One properties." *Id.* at 39 (cleaned up). The government points to Charlton Ogden's 30(b)(6) testimony representing Biloxi and Eugenie, and argues Mr. Ogden stated "he was unaware that anyone at the Corps promised anyone associated with Biloxi or Eugenie to undertake any remediation project associated with the MRGO." *Id.* (citation omitted). The government further argues "Eugenie did not have subject knowledge of a federal project that might have caused reasonable uncertainty." *Id.* at 40 (cleaned up). Plaintiffs respond "[t]he extensive testimony of Mr. Ogden and the documents that are part of his deposition clearly show that the landowners did not know when or if their land would be permanently destroyed and that created justifiable uncertainty." Pls.' Rev. MSJ at 169 (internal quotations omitted).

### 2. Category Two — South Lake Borgne

#### a. Vincent's Category Two Property

The government argues "[t]he same evidence and argument discussed above in relation to Vincent's Category One property apply with equal force to Vincent's Category Two property." Gov't's MSJ at 31. Plaintiffs respond "[h]ere the government relies on the same evidence and arguments it made relative to the Vincent Category One Property. Therefore, Plaintiffs will rely on the same evidence and arguments presented above . . . in response to the government's arguments." Pls.' Rev. MSJ at 171.

#### b. Livaudais and Borgnemouth's Category Two Properties

The government argues "[t]he same evidence and argument discussed above in relation to Livaudais and Borgnemouth's Category One properties apply with equal force to Livaudais and

Borgnemouth Category Two properties." Gov't's MSJ at 52. Plaintiffs respond "[h]ere the government relies on the same evidence and arguments it made relative to the Livaudais' and Borgnemouth's Category One Properties. Therefore, Plaintiffs will rely on the same evidence and arguments presented above . . . in response to the government's arguments." Pls.' Rev. MSJ at 171.

#### c. Biloxi's Category Two Properties

The government argues "[t]he same evidence and argument discussed above in relation to Eugenie's Category One properties apply with equal force to Biloxi's Category Two properties." Gov't's MSJ at 59. Plaintiffs respond "[h]ere the government relies on the same evidence [and] arguments it made relative to the Eugenie's Category One Properties. Therefore, Plaintiffs will rely on the same evidence and arguments presented above . . . in response to the government's arguments." Pls.' Rev. MSJ at 171.

### 3. Category Three — MRGO Spoil Bank

The government argues "[t]he same evidence and argument discussed above in relation to" "Vincent's Category One properties," "Livaudais and Borgnemouth's Category One properties," and "Eugenie's Category One properties," all "apply with equal force" to their respective properties in category three. Gov't's MSJ at 60–61. Plaintiffs respond "the government relies on the same evidence and arguments it presented relative to" Vincent's category one property, Livaudais and Borgnemouth's category one properties, and Eugenie's category one property. Pls.' Rev. MSJ at 172. Plaintiffs then rely on "the same evidence and arguments presented above . . . in response to the government's arguments." *Id.*

### 4. Category Four — Biloxi Marshes Interior

The government argues "[t]he same evidence and argument discussed above in relation to Eugenie's Category One properties apply with equal force to Biloxi and Eugenie's Category Four properties." Gov't's MSJ at 61. Plaintiffs respond, "[h]ere the government relies on the same evidence and arguments it presented relative to the Eugenie's Category One Properties as applicable to the Biloxi and Eugenie's Category Four Properties. Therefore, Plaintiffs will rely on the same evidence and arguments presented above . . . in response to the government's arguments." Pls.' Rev. MSJ at 172.

### 5. Category Five — Biloxi Marshes Exterior

The parties agree the Court granted summary judgment to the government on this category in its 2021 opinion. *See* Gov't's MSJ at 62; Pls.' Rev. MSJ at 172.

### 6. Category Six — Eloi Bay

#### a. Biloxi and Eugenie's Category Six Properties

The government argues "[t]he same evidence and argument discussed above in relation to Eugenie's Category One properties apply with equal force to Biloxi and Eugenie's Category Six properties." Gov't's MSJ at 62. Plaintiffs respond "[h]ere the government relies on the same evidence and arguments it presented relative to the Eugenie's Category One Properties as applicable to the Biloxi and Eugenie's Category Six Properties. Therefore, Plaintiffs will rely on the same evidence and arguments presented above." Pls.' Rev. MSJ at 173.

**b. Terre Aux Boeufs's Category Six Properties**

The government first argues "the United States did not make a "mere promise" to remediate MRGO-caused damage on Terre Aux Boeufs' Category Six properties." Gov't's MSJ at 64 (cleaned up). The government notes "Karl Zollinger testified as the Rule 30(b)(6) deponent for Terre Aux Boeufs" and "stated that he was unaware of any promises, plans or commitments on behalf of the Corps to conduct any environmental restoration work on any of the Terre Aux Boeufs property." Gov't's MSJ at 64 (citation omitted). Plaintiffs argue in response "[t]he government's arguments are all irrelevant." Pls.' Rev. MSJ at 173. Plaintiffs assert "Mr. Zollinger is also a member of the boards directors of Biloxi Marsh Lands Corporation and Lake Eugenie Land and Development, Inc." and "his father was also a member of the board of directors of Biloxi and Lake Eugenie." *Id.* Plaintiffs argue Zollinger's father "attended all the board meetings of those two companies (which is reflected in the minutes of the meetings), where he became aware of all the information about the Corps' plans to repair the MRGO that Mr. Odgen and Mr. Rudolf described in their depositions, and information related to the MRGO found in the records of those two companies." *Id.* According to plaintiffs, "[t]hat information was imputed to Terre Aux Boeufs through his father and based on his father's knowledge the owners of Terre Aux Boeufs did not know when or if their land would be permanently destroyed, which created justifiable uncertainty and tolled the statute of limitations." *Id.*

**7. Category Seven — Jean Louis Robin**

The government again argues "[t]he same evidence and argument discussed above in relation to Eugenie's Category One properties apply with equal force to Biloxi and Eugenie's Category Seven properties." Gov't's MSJ at 67. Likewise, according to the government, "[t]he same evidence and argument discussed above in relation to Terre Aux Boeuf's Category Six properties apply with equal force to Terre Aux Boeuf's Category Seven properties." *Id.* at 68. In response, plaintiffs also rely on "the same evidence and arguments presented above" for "Eugenie's Category One Properties" to apply to "Biloxi and Eugenie's Category Seven Properties" and for "the Terre Aux Boeufs Category Six properties" to apply to the "Terre Aux Boeufs Category Seven Properties." Pls.' Rev. MSJ at 174.

**B. Plaintiffs' Argument the Government is Liable for Breach of Contract**

"In addition to their takings claims, five of the six plaintiffs, Biloxi, Lake Eugenie, Borgnemouth, Livaudais, and the Vincent Marshlands Plaintiffs, have asserted breach of contract (or breach of servitudes) claims based on the government's alleged breach of its contractual obligation to maintain the channel at the designed 500-foot bottom width and 36-foot depth and within the limits of the servitudes." Pls.' Rev. MSJ at 228. Plaintiffs argue the servitudes

require the government to prevent the MRGO from expanding beyond the limits of the area specified in the servitude contracts. *Id.* Plaintiffs further assert "Louisiana substantive law applies to the plaintiffs' breach of servitudes claims" because "[t]he servitudes at issue were granted in Louisiana, by plaintiffs pursuant to Louisiana law, and involve real or immovable property located in Louisiana." *Id.* at 231. Plaintiffs then contend "[a] well-established rule of servitude law in Louisiana is that the dominant estate must not 'aggravate' the condition of the servient estate." *Id.* at 231. Plaintiffs argue "[t]herefore, in accordance with Louisiana law, plaintiffs are entitled to recover from the government the cost of restoring the damage to their properties caused by the government's breach of the Biloxi MRGO Servitudes, the Lake Eugenie MRGO Servitudes, the Borgnemouth MRGO Servitudes, the Livaudais MRGO Servitudes and the Chalmette Meadows MRGO Servitudes as well as the cost of all the lands that eroded and the cypress trees that were killed." Pls.' Rev. MSJ at 233 (citation omitted).

### C. The Government's Argument Plaintiffs' Contract Claims are Unripe and Untimely

The government argues the Court should dismiss plaintiffs' contract claims because: "(a) the six-year statute of limitations, 28 U.S.C. § 2501, bars them; and (b) the United States and Plaintiffs are not in privity of contract." Gov't's MSJ at 73. *First*, the government argues "[a] breach of contract claim against the United States must be filed within six years of when the claim first accrues." Gov't's MSJ at 73. Further, the government asserts "[a] breach of contract claim accrues at the time of breach" and "[a]ccrual of a breach of contract claim may be suspended until the claimant knew or should have known that the claim existed." *Id.* (citations and quotations omitted). Thus, the government argues "the United States breached that contractual duty, if at all, no later than February 1988," the time the Court's 2021 Order held plaintiffs' claims stabilized. *Id.* at 74. Plaintiffs argue the government's duty not to "aggravate" the servient estate is a "continuing" one, so no breach of contract claim accrued until 2009 when the servitudes allegedly terminated. *See* Pls.' Reply at 7. *Second*, the government argues "if the Court concludes that Plaintiffs' breach of contract claims are timely, the Court should dismiss for lack of jurisdiction because there is no privity of contract between Plaintiffs and the United States." Gov't's MSJ at 75. Plaintiffs contend privity of contract is present because the government, "[b]y accepting the assignment of the servitudes, . . . stepped in the shoes of the Port of New Orleans. Therefore, . . . plaintiffs and the government were parties to conventional (contractual) servitudes." Pls.' Reply at 7. The parties also dispute whether the servitudes contractually required the government to maintain the original width of the MRGO. *See* Gov't's MSJ at 80–93; Pls.' Rev. MSJ at 236–40.

Related to plaintiffs' sixth cause of action (alleging a Fifth Amendment Taking based on the government's use, taking, or intent to take plaintiffs' property after the termination of servitudes), the government asserts plaintiffs' claims are unripe because the servitudes have not terminated, and, even if they had, "prescriptive rights cannot be obtained against the federal government." *See* Gov't's MSJ at 69–70 (citations omitted). Though the government maintains privity and timeliness resolve any servitude-related claims, the government argues plaintiffs' sixth cause of action fails anyway because each servitude expressly states it is "perpetual," and the government has not "expressly or otherwise renounced these Servitudes." *Id.* Plaintiffs respond, under Louisiana law, "[a] predial servitude[, *i.e.*, a servitude burdening an estate rather

than a personal servitude specific to a property owner,] is extinguished by nonuse for ten years," and the government stopped using the MRGO in 2009, thus the servitudes must necessarily have extinguished by nonuse in July 2019. Pls.' Rev. MSJ at 244–45.

## IV. Applicable Law

### A. Jurisdiction

"The Tucker Act, 28 U.S.C. § 1491 (a)(1), provides the Court of Federal Claims with jurisdiction over takings claims brought against the United States." *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1359 (Fed. Cir. 2013) (citation omitted). "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (2012). "[T]he Supreme Court made clear the requirements of 28 U.S.C. § 2501 are unwaivable, 'absolute,' and correctly considered *sua sponte*." *Etchegoinberry v. United States*, 132 F.4th 1374 (Fed. Cir. 2025) (citing *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133–34 (2008)). Pursuant to Rule 12(h)(3) of the Rules of the United States Court of Federal Claims ("RCFC"), "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." RCFC 12(h)(3). "Because the statute of limitations is jurisdictional, the plaintiff bears the burden of proof." *Petro-Hunt, L.L.C. v. United States*, 862 F.3d 1370, 1378 (Fed. Cir. 2017).

### B. Summary Judgment Standard

The Court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A court shall not grant summary judgment if "the dispute about a material fact is 'genuine.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is considered genuine if the "evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party." *Id.* "In determining whether there is a genuine issue of material fact, the trial court must assume that the evidence presented by the non-movant is credible and draw all justifiable inferences therefrom in the non-movant's favor." *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed. Cir. 2001) (citing *Anderson*, 477 U.S. at 255). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* (citing *Anderson*, 477 U.S. at 248). "Contract interpretation is a matter of law and thus amenable to decision on summary judgment." *Gov't Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 812 n.1 (Fed. Cir. 1988); *see, e.g., NVT Techs. Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004); *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998).

The party seeking summary judgment bears the burden of establishing the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the moving party has met this burden, the burden shifts to the non-movant who must present sufficient evidence to show a dispute over a material fact allowing a reasonable factfinder to rule in its favor. *Anderson*, 477 U.S. at 256–57. The evidence does not need to be admissible, but

mere denials, conclusory statements, or evidence not significantly probative will not defeat summary judgement. *Celotex*, 477 U.S. at 322–24.

### C. Stabilization Doctrine and Justifiable Uncertainty

The Federal Circuit applies the Supreme Court's holdings in *Dickinson* and *Dow* to stay the accrual of a takings claim when government promises or actions to mitigate the damages stemming from the claim create justifiable uncertainty regarding when a landowner's claim has accrued. *Dickinson* and *Dow* established the "stabilization doctrine," which "discourage[s] a strict application of accrual principles in unique cases involving Fifth Amendment takings by continuous physical processes." *See Applegate v. United States*, 25 F.3d 1579, 1582 (Fed. Cir. 1994) (citing *United States v. Dickinson*, 331 U.S. 745 (1947); *United States v. Dow*, 357 U.S. 17 (1958)). In *Applegate*, the Federal Circuit applied stabilization doctrine to a gradual taking of land from "landowners [who] remain justifiably uncertain about the permanency of the erosion and taking." 25 F.3d at 1583. In that case, the Corps constructed a deep-water harbor, and, "[t]o maintain the channel's entrance, the Corps constructed two jetties" on each side of the harbor, which interrupted the "natural southerly littoral flow of sand [which] replenished 41 miles of white sandy beaches" and caused "the shoreline north of the harbor to accrete and the shoreline to the south to recede." *Id.* at 1580. In 1962, "the River and Harbor Act . . . authorized over five million dollars for the construction of a sand transfer plant . . . [and] the Senate Public Works Committee and the Florida Department of Natural Resources approved a Corps plan to restore the beaches in 1968." *Id.* The plans were delayed, and as of the date of the Federal Circuit's opinion, the plant was not yet built. *Id.*

In 1992, "landowners filed a complaint in the Court of Federal Claims asking for damages under the Fifth Amendment and for an injunctive order requiring the Corps to build the transfer plant." *Id.* at 1581. The United States moved to dismiss, alleging the Court of Federal Claims lacked jurisdiction to provide injunctive relief and alleging the motion was untimely. *Id.* This court granted the government's motion, and the landowners appealed the statute of limitations bar. *Id.* On appeal, the Federal Circuit addressed the issue of how the stabilization doctrine applied to the government's promised mitigation efforts to restore plaintiffs' land. *Id.* at 1582. The court explained, "[t]he gradual character of the natural erosion process set in motion by the Corps, compounded by the Government's promises of a sand transfer plant, have indeed made accrual of the landowners claim uncertain." *Id.* at 1582. "[T]he almost imperceptible physical process has delayed detection of the full extent of destruction—a necessary precondition of striking a final account." *Id.* The court held, "due to both the very gradual nature of this particular physical process and the Corps' promises to restore the littoral flow of sand, this taking situation had not stabilized by 1986—six years before the landowners filed suit . . . [and] [t]he statute of limitations does not bar this action." *Id.* at 1583; *see also Prakhin v. United States*, 131 Fed. Cl. 706, 714 (2017) (holding the government's repeated promises to mitigate conditions rendered the permanency of the taking uncertain and plaintiff is not barred by the six-year limitations period). Therefore, "precisely because of the Government's promises to build a sand transfer plant, the landowners remain[ed] *justifiably uncertain* about the permanency of the erosion and the taking," and the statute of limitations did not bar their claims. *Applegate*, 25 F.3d at 1583 (emphasis added). In other words, justifiable uncertainty on the part of the landowners "stayed the accrual" of plaintiffs' takings claims. *Id*.

The Federal Circuit further examined the effect of justifiable uncertainty on the statute of limitations for takings claims in *Banks v. United States*. 314 F.3d 1304 (Fed. Cir. 2003). In *Banks*, the court explained the "Corps completed the construction of the St. Joseph harbor jetties in 1903[,] [and] [b]etween 1950 and 1989, the Corps installed sandtight steel sheet piling to the jetties." *Id.* at 1306. Installation of the harbor jetties and steel sheet pilings "significantly increased the annual rate of shoreline erosion" along the eastern shoreline of Lake Michigan. *Id*. The Corps attempted to mitigate the damages for more "than fifteen years of beach nourishment with fine sand." *Id.* at 1307. "When the Corps determined that fine sand did not fulfill the role of coarser sediment . . . the Corps deposited coarse material on the . . . shoreline on five different occasions between 1986 and 1993 . . . [and] [t]he mitigation efforts were expanded to placing barge-loads of large rocks into the lake in 1995." *Id.* Plaintiffs filed suit in the Court of Federal Claims alleging takings claims after a "2000 FY–1999 Annual Report . . . emphasized the irreversible and potentially permanent nature of the erosion." *Id.* The government moved to dismiss for lack of jurisdiction due to the timeliness of plaintiffs' claims. *Id.* This court granted the government's motion, finding the claims "arose no later than 1989—the date the Corps completed the steel sheet piling of the jetties." *Id.*

On appeal, the Federal Circuit in *Banks* noted the "question is whether the 'predictability [and permanence] of the extent of damage to the [plaintiffs'] land' was made justifiably uncertain by the Corps' mitigation efforts." *Id.* at 1309 (citing *Applegate*, 25 F.3d at 1583). Applying this standard, the court held "even greater uncertainty was created by the Corps' mitigation plan . . . [because] the Corps in this case actually performed its mitigation activities for several years before the filing of this action." *Id*. at 1309–10. The Federal Circuit made clear justifiable uncertainty does not require "the presence of a legally binding promise or duty or a matter requiring a congressional appropriation." *Id*. at 1309. "Because the Court of Federal Claims misapplied the standard for claim accrual under *Applegate*, and because plaintiffs remained uncertain as to the permanent nature of the taking until the Corps reported that the erosion was permanent and irreversible," the Federal Circuit "conclude[d] that the claims were not time barred." *Id.* at 1310.

In *Boling v. United States*, the Federal Circuit applied the Supreme Court's limitation of *Dickinson* as expressed in *Dow* to eroded lands along a coastal waterway. 220 F.3d at 1370–81. The property owners in *Boling* brought suit alleging takings claims from erosion caused by a government-dredged channel. *Id.* at 1368–69. The Court of Federal Claims dismissed some of the landowners' claims as time barred, holding "a takings claim accrued once any portion of the parcel at issue had suffered erosion damage." *Id.* at 1369. On appeal, the Federal Circuit applied the stabilization doctrine, explaining "stabilization . . . in *Dickinson* is not deferred until the progressive environmental damage stops, but occurs when the environmental forces have *substantially and permanently invaded the private property* such that the permanent nature of the taking is evident and the extent of the damage is reasonably foreseeable." *Id.* at 1371 (emphasis added). Plaintiffs in *Boling* sought in the alternative to extend the time for filing their claims by relying on the doctrine of justifiable uncertainty, arguing authorized government plans to protect their property, which the government later rescinded, caused them to be justifiably uncertain about the extent of their taking. *Id.* at 1372. The Federal Circuit rejected this argument and found plaintiffs were not aware of the government's alleged mitigation plans until after filing

suit, and the Corps denied a previous request for erosion protection. *Id.* The Federal Circuit therefore remanded the case to the Court of Federal Claims to make factual determinations in the first instance about when "the permanent nature of the taking was evident such that a land owner should have known the land suffered erosion," because "[g]iven the realities of the terrain and the difficulty of determining the exact boundary of the easement, it was virtually impossible for the landowner to discern the land had been taken." *Id.* at 1372–73.

To fall within the doctrine the Federal Circuit expressed in *Applegate*, *Banks*, and *Boling*, mitigation efforts must make landowners "justifiably uncertain" about the predictability and permanence of the damage caused by the erosion. In cases where no mitigation efforts are committed to or undertaken, there can be no justifiable uncertainty. *See Mildenberger v. United States*, 643 F.3d 938, 947 (Fed. Cir. 2011). In *Mildenberger*, landowners sued the United States in the Court of Federal Claims "seeking compensation for the alleged taking of their riparian and upland property rights" stemming from government discharges of polluted water from a lake. *Id.* at 941. The government filed a motion to dismiss plaintiffs' claims, arguing they were barred under the statute of limitations, and this court granted the government's motion to dismiss under the doctrines of stabilization and justifiable uncertainty. *Id.* On appeal, the Federal Circuit explained the release of polluted water had occurred "for almost eighty years and the environmental effects have been evident since the 1950." *Id.* at 946. Further, in the "1990's, some Claimants formed the St. Lucie Initiative, Inc. to restore the health and productivity" of the river and produced a newsletter in 1996 "summarizing the history of the harm." *Id.* The Federal Circuit therefore held the "environmental damage was foreseeable and manifested prior" to 2000. *Id.* Addressing the mitigation doctrine in *Applegate* and *Banks*, the Federal Circuit stated "[t]here is no justifiable uncertainty due to the Corps' promises before the 1990s because the Corps neither undertook nor committed itself to any mitigation activities." *Id.* at 947. An internal Corps memorandum addressing "one official's views regarding a possible method of addressing the Corps' public relations problem" and the "Corps' consideration of potential projects to improve management of the waterways" were not, by themselves, sufficient to commit the Corps to any mitigation activities. *Id.* at 947–48. Plaintiffs' claims had therefore stabilized more than six years before plaintiffs brought suit, barring them under the statute of limitations. *Id*.

## V. Impact of *Ecthgoinberry* on Justifiable Uncertainty and the Status of Plaintiffs' Claims in View of Binding Precedent and the Court's 2021 Summary Judgment Order

Most recently, the Federal Circuit applied the doctrine of justifiable uncertainty in *Etchegoinberry v. United States*, 132 F.4th 1374 (Fed. Cir. 2025). There, appellants' land was regularly flooded by irrigation waters, and the United States had committed itself to constructing drainage for the area affected. *See id.* at 1377. Drainage was only ever partially constructed, and by 1986 no drainage was performed at all. *See id.* Appellants sued and alleged "because the United States did not provide the drainage it was obligated to provide, 'the combined effect of the rising water table and the accumulation of saline groundwater beneath and upon their properties has deprived [Appellants] of the benefit of the productive use of their farmlands.'" *Id.* (alteration in original) (citation omitted). The Federal Circuit held the stabilization doctrine did not apply to the claims at all because "Appellants here irrigated their land for over forty years

knowing the United States had not provided any drainage" and "the provision of irrigation water was regular, consistent, and recurring, and not a slow, gradual, physical process that may (or may not) eventually lead to a taking." *Id.* at 1379–80 (footnote, citation, and internal quotations omitted). The Federal Circuit explained, even if the stabilization doctrine did apply to the claims, "[i]t is Appellants' burden to show they were justifiably uncertain about the permanence of the taking until at least [six years prior to filing suit]." *Id.* at 1380 (citing *Diversified Group Inc. v. United States*, 841 F.3d 975, 980 (Fed. Cir. 2016)). The Federal Circuit explained justifiable uncertainty could not rescue appellants' claims because "[w]hile the United States may have conducted studies and issued reports regarding the feasibility of potential drainage construction, actions taken by the United States should have alerted Appellants as to the permanence of their claim before [the date on which appellants argue their claims accrued.]" *Id.* at 1381. As an example of such "actions taken by the United States," the Federal Circuit noted, "[i]n the early 1990s, the United States publicly 'denied that any statutory duty exists to provide drainage.'" *Id.* Accordingly, the Federal Circuit held appellants' claims were time-barred under the six-year statute of limitations. *See id.*

At oral argument, the Court engaged in a lengthy colloquy with the parties regarding how *Etchegoinberry* impacts the Court's analysis of justifiable uncertainty in this case. The government agreed *Etchegoinberry* "doesn't change the law" related to justifiable uncertainty, it simply "gives a higher resolution and provides Federal Circuit precedent on . . . what types of commitments are not sufficient for justifiable uncertainty purposes." 4 Nov. 2025 Oral Argument Transcript ("Tr.") at 252:20–25, ECF No. 286. Although the government expressed "there might be some tension between" *Etchegoinberry* and prior holdings in cases like *Applegate*, *Banks*, and *Mildenberger*, Tr. at 34:5–9, it agreed *Etchegoinberry* "did not overrule *Applegate*," Tr. at 32:16–19. Likewise, plaintiffs made clear at oral argument they do not believe *Etchegoinberry* "has anything to do really in terms of changing the standard that had been announced by the [Federal Circuit] in the *Applegate* and *Banks* decision[s]." Tr. at 13:21–25. Further, the Federal Circuit's discussion of justifiable uncertainty in *Etchegoinberry* is only dicta. *See Nat'l Am. Ins. Co. v. United States*, 498 F.3d 1301, 1306 (Fed. Cir. 2007) ("Dicta, as defined by this court, are statements made by a court that are unnecessary to the decision in the case, and therefore, not precedential (although they may be considered persuasive)." (cleaned up)). In *Etchegoinberry*, the Federal Circuit explained the flooding of the appellants' land was a "regular, consistent, and recurring" event instead of a "slow, gradual, physical process that may (or may not) eventually lead to a taking." *See* 132 F.4th at 1379–80 (citation omitted). The Federal Circuit held the doctrine of stabilization did not apply at all; therefore its analysis of justifiable uncertainty "even if the stabilization doctrine did apply," *id.* at 1380, was "unnecessary to the decision in the case." *See Nat'l Am. Ins. Co.*, 498 F.3d at 1306 (citation omitted). Accordingly, with the agreement of the parties and no intervening change in the applicable law, the Court will apply the same standard.

In its 2021 Order, the Court analyzed plaintiffs' takings claims according to seven separate land categories. *See Biloxi Marsh Lands Corp. v. United States*, 152 Fed. Cl. 254, 310 (2021). For category five, Biloxi Marshes Exterior, the Court held "landowners in Category Five could only have been justifiably uncertain until as late as 1996." *Id.* at 300. Accordingly, the Court granted the government's motion for summary judgment as to category five because plaintiff's 2012 complaint could not have come within the jurisdictional statute of limitations.

*See id.* at 310. As for the remaining categories, the Court held it "cannot definitively say whether or not the government's actions created justifiable uncertainty as to the permanency of the alleged government taking." *Id.* at 312. The Court also stated "the stabilization doctrine started the statute of limitations on plaintiffs' claims during time ranges varying by category, but in each case no later than 1988." *Id.* at 313. The Court explained "[f]or categories One, Two, Three, Four, Six, and Seven of land, plaintiffs have been able to establish justifiable uncertainty may toll the statute of limitations." *Id.* at 312.

Because the Court referenced the potential for "justifiable uncertainty" to "toll" the statute of limitations in 2021, *id.*, the Court next clarifies its holding in view of stabilization doctrine as an *accrual* principle. Stabilization doctrine (and any justifiable uncertainty analysis impacting claim stabilization) relates to when plaintiffs' claims accrue, not to whether the statute of limitations was tolled. *See Boling v. United States*, 220 F.3d 1365, 1371 (Fed. Cir. 2000) ("Thus, while *Dickinson* and its progeny recognize that takings by gradual processes present special difficulties, these cases represent an application of general accrual principles, rather than a broad exception to them." (citation omitted)). As the Supreme Court established in 2008, the statute of limitations for plaintiffs' claims cannot be tolled. *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 136 (2008) (noting this court's "statute's limitations period [is] jurisdictional and not susceptible to equitable tolling" (cleaned up)). For this reason, justifiable uncertainty does not "toll" the statute of limitations after a takings claim stabilizes, but instead impacts the date of stabilization itself by preventing a landowner from ascertaining whether a taking is permanent and delaying accrual of the claim. *See Applegate v. United States*, 25 F.3d 1579, 1582–83 (Fed. Cir. 1994) ("Here again, uncertainty has *stayed accrual* of the claim[, because t]he Government's promises to restore the littoral flow destroyed any predictability of the extent of damage to the land." (emphasis added)); *Mildenberger v. United States*, 643 F.3d 938, 947 (Fed. Cir. 2011) ("the Government's promises to mitigate damages caused by a continuous physical process *delays accrual* of a takings claim when the claimant demonstrates that the predictability and permanence of the extent of the damage to the claimant's land was made justifiably uncertain by the Corps' mitigation efforts" (cleaned up)); *see also Biloxi*, 152 Fed. Cl. at 312 ("the statute of limitations on each claim ran until 1994 or earlier, barring justifiable uncertainty" (citing *Applegate*, 25 F.3d at 1583)).

While the Court's prior findings in 2021 are now clarified regarding how stabilization doctrine works, *see Biloxi*, 152 Fed. Cl. at 312–13, the proper framing of stabilization doctrine as an accrual principle does not change any part of the 2021 summary judgment outcome. In its 2021 decision, the Court decided claim stabilization without deciding justifiable uncertainty because the Court lacked sufficient evidence for a justifiable uncertainty analysis. *See id.* at 313 ("the Court cannot definitively say whether or not the government's actions created justifiable uncertainty as to the permanency of the alleged government taking"). For this reason, although the Court stated "the stabilization doctrine started the statute of limitations on plaintiffs' claims during time ranges varying by category, but in each case no later than 1988," *id.*, a more accurate statement would read: "the stabilization doctrine [*would have*] started the statute of limitations on plaintiffs' claims during time ranges varying by category, but in each case no later than 1988 [*in the absence of a showing of justifiable uncertainty*]," *see id.*; *see also Applegate*, 25 F.3d at 1582–83 ("Here again, uncertainty has *stayed accrual* of the claim[, because t]he Government's promises to restore the littoral flow destroyed any predictability of the extent of damage to the

land." (emphasis added)). While stabilization of claims in 1988 would have foreclosed plaintiffs' claims in 2012 under the statute of limitations, the Court properly declined to make such a holding, because it lacked the necessary evidence to decide justifiable uncertainty. *See Biloxi*, 152 Fed. Cl. at 313. While the Court noted justifiable uncertainty may *toll* the statute of limitations after plaintiffs' claims accrued in 1988, a more precise holding would have noted justifiable uncertainty may have *delayed the accrual* of plaintiffs' claims beyond 1988. *See Applegate*, 25 F.3d at 1582–83 ("Here again, uncertainty has *stayed accrual* of the claim[, because t]he Government's promises to restore the littoral flow destroyed any predictability of the extent of damage to the land." (emphasis added)); *see also Biloxi*, 152 Fed. Cl. at 312 ("the statute of limitations on each claim ran until 1994 or earlier, barring justifiable uncertainty" (citing *Applegate*, 25 F.3d at 1583)). In 2021 the Court found plaintiffs' claims survived summary judgment because "plaintiffs have shown proposed or completed projects which [may have] left landowners justifiably uncertain as to the permanency of the alleged taking," but further noted, "examining the totality of the government's actions . . . , the Court cannot definitively say whether or not the government's actions created justifiable uncertainty." *Biloxi*, 152 Fed. Cl. at 311–12. The Court added, even if the government's actions could create justifiable uncertainty, plaintiffs must still establish they had "actual knowledge of enough of the proposed and completed mitigation projects to be justifiably uncertain as to the permanency of the alleged taking." *See id.* at 312 (citing *Applegate*, 25 F.3d at 1583).

In short, in 2021 the Court identified three claim accrual issues left for resolution. *First*: in the absence of justifiable uncertainty, did plaintiffs' claims stabilize earlier than the 1988 reconnaissance report? *See id.* at 312 ("stabilization of each of plaintiffs' claims occurred at some point in a range of time starting in the late 1970s or early 1980s and ending in 1988. . . . This in turn means the statute of limitations on each claim ran until 1994 or earlier, barring justifiable uncertainty."). *Second*: could the totality of government mitigation actions form a sufficient objective basis for justifiable uncertainty? *See id.* ("examining the totality of the government's actions in the form of previously completed projects and numerous studies, reports, legislation, and funding appropriated for future projects in the light most favorable to the non-moving party, the Court cannot definitively say whether or not the government's actions created justifiable uncertainty"). *Third*: could plaintiff landowners' actual knowledge of such government actions form a sufficient subjective basis for justifiable uncertainty?[2] *See id.* ("At

[2] Because the latest date on which stabilization could have occurred in the absence of justifiable uncertainty is the date of the 1988 reconnaissance report, plaintiffs must demonstrate an objective and subjective basis for justifiable uncertainty at least as far back as the date of the reconnaissance report—showing uncertainty due to government action only after the taking became apparent in 1988 would constitute equitable tolling, which does not apply to this court's jurisdictional statute of limitations. *See, e.g.*, *Boling v. United States*, 220 F.3d 1365, 1374 (Fed. Cir. 2000) ("As a basis for equitable tolling, plaintiffs point to the fluctuations of the Corps' policy regarding erosion along the waterway and the fluctuating status of the legal claim that they were attempting to assert."); *see also John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 136 (2008) (noting this court's "statute's limitations period [is] jurisdictional and not susceptible to equitable tolling" (cleaned up)). It remains an open question as to whether the 1988 reconnaissance report itself could serve as a source of justifiable uncertainty as part of "the totality of the government's actions in the form of previously completed projects and numerous studies, reports, legislation, and funding appropriated for future projects." *See Biloxi Marsh Lands Corp. v. United States*, 152 Fed. Cl. 254, 312 (2021). Of course, the government could establish plaintiffs' claims stabilized (barring justifiable uncertainty) earlier than the 1988 reconnaissance report, in which case plaintiffs would need to present evidence of justifiable uncertainty as far back as this earlier date. *See* Section IX, *infra*. Even then, plaintiffs must still demonstrate subjective knowledge of government promises or projects to remediate the damage caused by the MRGO that, as an

any future trial the Court will have to closely examine the specific knowledge landowners had related to the proposed and completed mitigation actions contained in the record and whether these actions resulted in justifiable uncertainty on the part of the landowners").

"The ultimate question in a justifiable uncertainty analysis is whether *the landowners* did or did not know when or if their land would be permanently destroyed." *Biloxi*, 152 Fed. Cl. at 312 (emphasis in original) (cleaned up). At summary judgment in 2021, the Court explained, "[a]t any future trial the Court will have to closely examine the specific knowledge landowners had related to the proposed and completed mitigation actions contained in the record and whether these actions resulted in justifiable uncertainty on the part of the landowners as to the permanency of the government's taking." *Id.* at 312. Later, on reconsideration, the Court further explained: "[f]or purposes of statute of limitations accrual, determining justifiable uncertainty is a two-part inquiry: (1) whether a landowner's *subjective* knowledge of the government's promises or actions caused the landowner to be uncertain about the taking's permanence; and (2) whether government promises or actions caused the landowner an *objectively* reasonable uncertainty of the taking's permanence." *Biloxi Marsh Lands Corp. v. United States*, 156 Fed. Cl. 301, 319 (2021). Compliance with the Tucker Act's six-year statute of limitations is a jurisdictional prerequisite for claims in the Court of Federal Claims. *See John R. Sand*, 552 U.S. at 133–34 ("The Court has often read the time limits of these statutes as more absolute, say, as requiring a court to decide a timeliness question despite a waiver, or as forbidding a court to consider whether certain equitable considerations warrant extending a limitations period. . . . This Court has long interpreted the court of claims limitations statute as setting forth this second, more absolute, kind of limitations period." (citations omitted)). Accordingly, to decide the timeliness of plaintiffs' taking claims at summary judgment, the Court must determine whether the undisputed facts establish justifiable uncertainty delayed the accrual of plaintiffs' claims to within six years of filing suit. *Applegate*, 25 F.3d at 1581 ("Actions in the Court of Federal Claims must be filed within six years of the claim's accrual. Therefore, this court's review of the trial court's action depends upon when this alleged taking accrued." (citing 28 U.S.C. § 2501 (1988))), 1582–83 (justifiable uncertainty standard), 1583 ("Here again, uncertainty has stayed accrual of the claim."); RCFC 56(a) (summary judgment standard).

## VI. Summary of Undisputed Facts and the Parties' Primary Pieces of Evidence

Before proceeding to legal analysis, the Court first briefly summarizes the most salient pieces of evidence in the Joint Compendium.

---

objective matter, reasonably created uncertainty as to the permanence of the damage to their land—plaintiffs must then demonstrate this subjective knowledge and objectively reasonable uncertainty was *continuously* present from at or before the moment they knew or should have known of the permanent damage to their property until fewer than six years before the date of filing. *See, e.g.*, *id.* at 300 ("Even assuming the proposed freshwater diversion resulted in justifiable uncertainty until Louisiana expressed its opposition to the project in 1996, there is at least an eleven-year gap in plaintiffs' timeline of the proposed, but explicitly rejected, project. . . . It is not enough the project remained 'authorized' by the 1988 WRDA, in the face of the state's opposition and no evidence in the record of plans to complete the project after 1996, for landowners in Category Five to have remained justifiably uncertain as to the permanency of the alleged taking during at least this 11-year period." (citing *Banks v. United States*, 314 F.3d 1304, 1309 (Fed. Cir. 2003))).

Two maps are particularly helpful in delineating ownership parcels and work completed. Document 296 of the Joint Compendium is a map dated October 1991, "made for Board of Commissioners of the Port of New Orleans," which show a highlighted area along the north shore of the MRGO with arrows designating work done labeled "overbank cross-section surveys areas of work." JC-296. The map shows the ownership parcels along the MRGO from "miles 48 to 58," with the highlighted work area sitting in the middle of this range. *Id.* Document 477 is a regional map of the area of the MRGO encompassing the properties owned by plaintiffs, labeled "Beneficial Use Through MRGO O&M Dredging Miles 60 to 20." JC-477. The map provides color-coded outlines of each plaintiffs' property along the length of the MRGO and includes labels for work done running into the 1990s and early 2000s as highlighted white areas. *See id.*

The Joint Compendium also includes several evaluations and maps the parties used in their briefs and at oral argument—of particular interest are Documents 442 and 576. Document 442 of the Joint Compendium is a September 1991 evaluation prepared by Coastal Environments, Inc. evaluating a New Orleans District, USACE proposal for "bank stabilization and dredge material disposal along the [MRGO] outlet canal." JC-442 at 2. The evaluation, submitted to the St. Bernard Parish Police Jury and the St. Bernard Parish Costal Advisory Committee, explains the USACE presented a preliminary plan for partial bank stabilization and maintenance dredge material disposal at a meeting held at the Department of Natural Resources on 3 September 1991; "representatives of the St. Bernard Parish Police Jury, and interested landowners and members of the general public" attended the meeting. *See id.* The evaluation also references "earlier meetings concerning the matter." *Id.* The document evaluates USACE's preliminary plan to construct a dike between mile 51.1 and mile 54.6 along the MRGO, followed by "disposal of dredge material in two large marsh areas lying between the [MRGO] and Lake Borgne." *Id.* at 2–3. The evaluation notes "it would be cost prohibitive to restore the eroded bank," but construction of the 3.5 mile dike would cost approximately $3.5 million. *Id.* at 2–3. While the evaluation criticizes the plan because it "provides no provisions for reducing erosion along the lake shore" and "does not provide for future maintenance dredging," it concludes "[USACE]'s proposal for the foreshore dike is generally acceptable." *Id.* at 3–4. Document 576 is a regional map showing projects between Mile 20 and Mile 60 along the MRGO, but does not include a date for these projects. *See* JC-576. The map shows significant lengths of completed foreshore protection and dredged materials retention projects along the north bank of the MRGO. *See id.* Between miles 45 and 60 are significant completed hurricane protection foreshore protection projects, and there are scheduled foreshore protection projects between miles 30 and 25 on the south bank of the MRGO. *See id.*

The parties also included letters exchanged between plaintiffs and various individuals. Document 443 of the Joint Compendium is a 19 November 1991 letter from the Port of New Orleans to the Borgnemouth Realty Company requesting a "right of entry, with ingress and egress, to [an] area located south of the MRGO, for the performance of hydrographic surveys." JC-443 at 1. The letter specifies "surveys shall consist of taking soundings along the lengths of the bayous and canals, in midchannel, and taking cross-sections (depth observations at right angles to the courses of the waterways) at 500 or 1000 foot intervals." *Id.* The letter then requests the recipient "grant . . . approval to this request for a right of entry by having a properly authorized corporate officer sign the enclosed duplicate original of this letter . . . and return[]

said duplicate original." *Id.* at 1–2. The document includes the signature of the President of Borgnemouth Realty Company on 26 November 1991 in the space provided to grant the right of way request. *See id.* at 2. The letter states the hydrographic surveys will be performed "in connection with the upcoming bank protection project." *See id.* at 1. Document 476 is an 11 August 1983 letter from a New Orleans law firm advising the Secretary of Tulane University regarding the scope of the University's agreement with USACE to use and access land near the MRGO. *See* JC-476 at 1. The letter states the firm reviewed another letter by USACE to the University which stated USACE's intent to build a "2400-foot test section of foreshore protection dikes along the [MRGO]," and the firm then reviewed the agreement to determine what effect this construction would have on the property. *Id.* The letter notes "[t]he purpose of the foreshore protection dike is to prevent erosion along the bank of the waterway, and this method is being tested in order to determine whether it will be effective." *Id.* The letter ultimately states "the Corps has the right under the terms of our agreement to take this action, and, rather than being detrimental to the owners, I believe it will enure to our advantage to keep the waterway from eroding and keep us from losing more of the land." *Id.* 1–2.

The Joint Compendium also included numerous government reports or notices related to activities along the MRGO. Document 444 of the Joint Compendium is a public notice by the Department of the Army on 17 October 1991 regarding a proposal to "construct bank stabilization" and to "designate additional disposal areas for shoal material removed during routine maintenance dredging of the waterway" along the MRGO. JC-444 at 1. The notice explains the project will involve construction of "earthen retention dikes" along a multiple-mile section of the MRGO, with designation of disposal areas to be made along the shore-side of the dike and in nearby open-water areas. *See id.* at 2. The notice further states all dredge material which is deposited as part of this project will "be placed into the disposal areas in a manner conducive to wetland nourishment and/or wetland development." *Id.* Document 1067 is a "finding of no significant impact" document prepared in January 1985 by USACE assessing the environmental impact of a proposed project on the south bank of the MRGO to "plac[e] 30-inch graded stone on a 9-inch shell bedding to provide foreshore protection" and potentially dredge "an adjacent flotation channel." JC-1067 at 1. The document provides an assessment of the project's scope and its likely effect on the surrounding environment, with reference to "numerous foreshore protection test sections" constructed "[d]uring the fall of 1982 and the winter of 1983" "along the south bank of the MR-GO." *Id.* at 2. The assessment explains the project is "designed to control foreshore erosion on the south bank of the MR-GO," by placing stone and a shell bedding along an area of the south bank, along with additional stone and shell for maintenance purposes in the future. *Id.* at 2–3. The assessment also notes "[t]here is a possibility that a flotation channel might be dredged adjacent to the work area" and, if so, "the dredged material would be deposited on the MR-GO side of the flotation channel." *Id.* at 3. Included in the assessment are maps of the proposed activity occurring along a length of the MRGO. *See id.* at 5–6. The assessment ultimately determines "the action would have no significant impact upon the human environment[, t]herefore no Environmental Impact Statement will be prepared." *Id.* at 1. Document 32 of the Joint Compendium is a 1995 detailed report prepared by the Louisiana Department of Natural Resources concerning the progress and operations of the Violet Siphon project. JC-32 at 1, 3. The report explains "[t]he Violet Siphon was constructed by St. Bernard Parish" "in December 1979," "operated until April 1980," and "renovated in May 1992" "to introduce fresh water from the Mississippi River into the

12,400-acre deteriorating marsh" located near the MRGO. *Id.* at 1. The report finds "bottom salinities at stations 2 and 3 (closest to the siphon, respectively) decreased with the opening of the siphon, but substantially increased . . . when the siphon was closed." *Id.* at 2. At other stations farther from the Siphon, the report shows "it appears that the siphon has minimal influence on salinities at [stations 4, 5, 6, and 8]." *Id.* The report also confirms the Violet Siphon was "inactive" at the time of the report due to decreased water levels in the Mississippi River. *Id.* Document 301 is a USACE draft environmental assessment and finding of no significant impact published in December 2002 assessing the "the potential impacts of designating additional disposal areas, constructing bank stabilization and retention dikes, and excavating flotation channels between Mile 66.0 and Mile 49.0 of the . . . MR-GO." JC-301 at 3. The assessment notes "[w]idespread public support . . . for the protection of environmental resources within the Lake Borgne/MR-GO region, with special emphasis on averting further loss or degradation of wetland habitats." *Id.* at 5. The assessment also references environmental impact assessments from 1976 (finding of no significant impact), 1991 (finding of no significant impact), 1994 (finding of no significant impact), 1996 (finding of no significant impact), 1997 (finding of no significant impact), 1998 (finding of no significant impact), 1999 (finding of no significant impact), and 2001 (finding of no significant impact). *Id.* at 4–5. The 2002 draft assessment describes a project involving "the beneficial use of dredged material to aid the restoration of marsh areas" and "[a]dditional disposal areas would be designated for the beneficial use of dredged material removed during routine maintenance dredging of the MR-GO." *Id.* at 5. "Closures and bank stabilization/retention dikes would be constructed at the proposed disposal areas[] as needed" and material "would be utilized to construct closures and dikes, stabilize sections of the MR-GO banks against erosion, and prevent dredged material from re-entering the navigational channel and adjacent waterways." *Id.* The assessment also notes, under a "no-action alternative," "dredged material would be placed in existing upland confined disposal facilities located on the south bank of the MR-GO" and "[b]ank edge and marsh habitat within the proposed disposal areas would continue to erode." *Id.* at 7.

Finally, both parties relied heavily on depositions of various individuals and representatives of the plaintiffs and the government. Document 593 of the Joint Compendium is a transcript of a 2016 deposition of Edmond Russo. *See* JC-593. Mr. Russo worked as an "engineer for preparation of plans and specifications for channel maintenance dredging" with the USACE in the New Orleans District from November of 1992 to August 2005. *Id.* at 11:23–12:11, 23:22–24. Mr. Russo testified he personally had conversations with various landowners, including Mr. Livaudais, after he began working in 1998, in which he discussed the possibility of depositing dredged material onto their lands and discussed the locations where landowners thought their land could benefit from dredge material. *See id.* at 60:25–65:10. Mr. Russo noted he would, while working with the USACE in New Orleans, "correspond with, or meet with, landowners to discuss their interest in placing materials and would take their feedback . . . to either place the material in upland areas or for beneficial use." *Id.* at 57:5–16. Mr. Russo also testified he was "reasonably sure" his predecessor, Bob Gunn, communicated with Mr. Livaudais "[f]or many years" regarding "coordination of real estate to place materials in the upland disposal areas." *Id.* at 67:1–22. Karen Freese, a Rule 30(b)(6) representative for Vincent Marshlands, testified to her interactions with the government related to projects on the MRGO surrounding the Vincent properties. *See* JC-279. Ms. Freese testified she received communications from USACE seeking right-of-way entry onto the Vincent property to conduct

surveys in preparation for "projects on the property to help address the loss of wetlands and the erosion." *Id.* at 40:7–24; *see also id.* at 69:19 –25. She also testified, in response to questioning about what promises USACE made to conduct specific projects on property near the MRGO, she "view[ed] the times [USACE] came to us to get rights of access to do projects on the [Vincent] property as a commitment that those projects were being done." *Id.* at 63:8–15. Ms. Freese also testified regarding her personal notes[3] of a conversation with Bob Gunn, working with the USACE, which noted Mr. Gunn explained to her USACE would conduct surveys and potentially get approval for additional "plans to restore land." *See id.* at 111:16–112:21. Michael Taylor also testified as a Rule 30(b)(6) witness for Vincent Marshlands. *See* JC-46. Mr. Taylor testified regarding USACE work in the region around the MRGO, and stated he was not aware of any "rock work, foreshore protection, bank stabilization, [or] anything of that nature" performed on the Vincent property. *Id.* at 41:1–7. Moreover, he indicated USACE had not, to his knowledge, "approached Vincent Marshlands about conducting any type of marsh creation activity" and there had not been "dredge material from the operation of and maintenance dredging of the [MRGO] that has been placed within the boundaries of the Vincent Marshlands property." *Id.* at 41:10–23.

## VII. Whether The Court Can Grant Summary Judgment on Plaintiffs' Takings Claims

The Court next determines whether the government is entitled to summary judgment on its argument the Court lacks jurisdiction over plaintiffs' takings claims because they are untimely. Following its decision on timeliness, the Court determines whether it can grant summary judgment as to the government's liability for a taking. The six-year statute of limitations established under the Tucker Act "is an explicit condition of the Government's waiver of sovereign immunity and, as a matter of law, jurisdictional." *Prakhin v. United States*, 131 Fed. Cl. 706, 713 (2017) (citing *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 139 (2008)). "Because the statute of limitations is jurisdictional, the plaintiff bears the burden of proof." *Petro-Hunt, L.L.C. v. United States*, 862 F.3d 1370, 1378 (Fed. Cir. 2017) (citation omitted). Given each of the plaintiffs must demonstrate knowledge of government mitigation efforts which justifies uncertainty about the permanency of a taking, *see* Section V, *supra*, the Court will conduct its analysis by individual category and landowner. Plaintiffs and the government agree the evidence related to the properties in the first three categories is the exact same as for categories four, six, and seven, with the exception of the Terre Aux Boeufs property in categories six and seven. *See* Section III, *supra*. *First*, the Court evaluates whether, reviewing the evidence in the light most favorable to plaintiffs, plaintiffs have shown subjective knowledge of commitments or actions by the government to repair the damage to their properties, and whether such knowledge could create objectively reasonable uncertainty regarding the permanence of the damage to their properties from 1988 to six years before the filing of suit, *see* Section V *supra*, for categories one, two, and three. *Second*, the Court conducts the same evaluation for categories four, six, and seven. *Third*, after the Court evaluates jurisdiction under the justifiable uncertainty doctrine, the Court determines whether plaintiffs are entitled to partial summary judgment on the government's liability for damage to their properties. For reference, a map of the region demarcating the boundaries of each land category

[3] Although Ms. Freese did not personally recall her conversation with Bob Gunn, *see* JC-279 at 107:5–6, she testified at her deposition regarding the meaning of her personal handwritten notes of the conversation, *see id.* at 31:21–32:3; 108:12–16.

is reproduced below:




JC-607 (2012 Feasibility Report) at 2-58 (*Category One*, Subunit 13, Central Wetlands; *Category Two*, Subunit 40, South Lake Borgne; *Category Three*, Subunit 32, MRGO Spoil Bank; *Category Four*, Subunit 7, Biloxi Marshes Interior; *Category Six*, Subunit 18, Eloi Bay; *Category Seven*, Subunit 23, Jean Louis Robin.)

### A. Whether the Evidence, Taken in the Light Most Favorable to Plaintiffs, Establishes Plaintiffs Were Justifiably Uncertain About the Permanence of the Damage to Their Property in Categories One, Two, and Three

#### 1. Category One – Central Wetlands

The Central Wetlands correspond to geographical "Subunit 13" in the Final Feasibility Report map, JC-607 at 2-58. Subunit 13 includes the Borgnemouth, Livaudais, Vincent Marshlands, and Lake Eugenie properties. *See Biloxi*, *Marsh Lands Corp. v. United States*, 152 Fed. Cl. 254, 273–74 (2021).

##### a. Vincent Marshlands

The government argues plaintiff Vincent Marshlands could not have been justifiably uncertain as to the permanence of the damage their property because USACE made no "promise to mitigate MRGO-caused damage on [Vincent's] property" nor took any "action to mitigate MRGO-caused damage on [Vincent's] property." Gov't's Reply at 7. The government chiefly asserts the depositions of Michael Taylor (Vincent's Administrative Manager and 30(b)(6) representative), Karen Freese (an attorney for Vincent), and William Rudolf (one plaintiff-owner of Vincent Marshlands) showed none of Vincent's witnesses could identify a USACE promise or action to repair the damage to Vincent's land. *Id.* Plaintiffs argue Taylor did not become a part of Vincent until too late to testify as to contacts between USACE and the landowners at the relevant time, and Karen Freese testified "that based on her communications with personnel from the Port of New Orleans (Lisa Mulready) and the Corps (Mr. Gunn), and the documents she received from them, she formed an understanding that the Corps intended to repair all the damage caused by the MRGO." Pls.' Rev. MSJ at 140; *see also id.* at 134–37. As to Mr. Rudolf, plaintiffs contend his testimony reflects "he relied on various statutes enacted by Congress in 1990 that required the government to repair the damage caused by the MRGO and he considered them to be 'promises' by the United States." *Id.* at 152. Further, plaintiffs point to numerous letters and project proposals in the record to assert it was objectively reasonable for the owners of the Vincent property to be uncertain of the permanence of the damage to their land. *See id.* at 140, 145.

The parties dispute whether the deposition testimony of Taylor, Freese, and Rudolf establishes subjective awareness of USACE promises to repair the damage caused by the MRGO. The government notes Taylor's testimony indicates he began as Administrative Manager of Vincent Marshlands as early as 2003 and the "Corps never approached Vincent about conducting marsh creation activity." Gov't's MSJ at 20. Plaintiffs do not dispute Taylor could not identify any promise or action by the United States to remediate the damage caused by the MRGO. *See* Pls.' Rev. MSJ at 134–35. Plaintiffs do, however, dispute Taylor could testify to Vincent contacts with the Corps before 2008 because Vincent was not incorporated until 2008. *Id.* at 134–35. Plaintiffs instead point to the deposition of Karen Freese, another 30(b)(6) witness for Vincent, who testified to "managing the property" as a family relation of some of the landowners of Vincent's precursor, "Chalmette Meadows," as well as representing all Chalmette Meadows landowners in her capacity as an attorney at Stone Pigman—with both roles spanning from the early 1990s until 2003, after which her cousin, Will Rudolf, "took over managing the property." *See* JC-279 at 16:16–24:8 (Freese Deposition). Ms. Freese testified, *inter alia*, to "getting phone calls from Lisa Mulready about [USACE] wanting to do projects on the property to help address the loss of wetlands and the erosion" in the early 1990s. JC-279 at 40:15–24; 48:16–24 (Freese Deposition); *see also* Pls.' Rev. MSJ at 139–40. Freese also testified there were "records of . . . the various times that the Corps approached us about doing work to help restore the property and repair the damage that had been done by the MRGO." JC-279 at 40:15–24 (Freese Deposition). Freese's testimony conflicts with Taylor's testimony insofar as Taylor was unable to recall any contact between Vincent and the government related to repair projects, while Freese testified to her contacts with the government which led her to believe repair projects were coming or ongoing. Moreover, other pieces of evidence in the record indicate USACE project proposals on the south bank of the MRGO within category one as late as 2002. *See, e.g.*, JC-301 at 1, 6 (Environmental Assessment #354, 23 Dec. 2002) (discussing

proposed disposal areas within "Mile 66 to Mile 49" of the MRGO and including a map showing an area of work on the western edge of category one near Vincent's property). These factual disputes are "material" because whether the government was actively engaged in projects within category one property to repair MRGO-caused damage is of critical importance to discern whether Ms. Freese's awareness of these projects could demonstrate justifiable uncertainty as to the permanence of the damage to the Vincent property. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). Drawing all inferences in favor of plaintiffs, the nature and extent of the work described by Ms. Freese in her deposition is genuinely disputed, and the nature of this work is material as to whether Vincent can demonstrate justifiable uncertainty for its category one claims. *See* Section V, *supra*. Accordingly, this genuine dispute of material fact is sufficient to defeat the government's Motion for Summary Judgment as to plaintiff Vincent's category one takings claim. *See* Section V, *supra*; *Anderson*, 477 U.S. at 248 (describing material fact disputes under the summary judgment standard).

**b. Livaudais and Borgnemouth**

The government argues plaintiffs could not have been justifiably uncertain as to the permanence of the damage to the Livaudais and Borgnemouth properties because USACE made no "promise to mitigate MRGO-caused damage on [Livaudais and Borgnemouth's] property" nor took any "action to mitigate MRGO-caused damage on [Livaudais and Borgnemouth's] property." Gov't's Reply at 17. The government specifically asserts Bruce Wallis gave a 30(b)(6) deposition as a representative of Livaudais and Borgnemouth, and "could not recall a Corps promise or commitment to undertake a project to restore MRGO-caused damage." *Id.* Plaintiffs argue the deposition testimony of Edmund Russo, an employee of USACE and Operations Manager for the MRGO, confirms dredge material was being deposited in the area of Livaudais and Borgnemouth's properties, and documents from the early 1990s confirm knowledge of ongoing projects and proposals. *See* Pls.' Rev. MSJ at 161.

First, plaintiffs assert plaintiffs' "subjective knowledge of the operation of the Violet Siphon [project] tolled the statute of limitations with respect to the damage caused by the MRGO." *Id.* at 162. The Violet Siphon program was a freshwater diversion system built by local interests "with the objective of restoring the project area to a fresher state through mimicking the former behavior of the Mississippi River by siphoning fresh water into the marsh." JC-223 at 1-14 (USACE, New Orleans District, *FINAL Environmental Impact Statement for the Mississippi River-Gulf Outlet (MRGO), Louisiana, and Lake Borgne — Wetland Creation and Shoreline Protection Project* (June 2009) ("2009 USACE MRGO Environmental Impact Statement"). The Violet Siphon program was initiated in 1978, built by the St. Bernard Parish in 1979, initially operated until 1983, and brought into operation again in the 1990s by the Louisiana Department of Natural Resources. *See* JC-77 at 28–29 (9 Dec. 2016 Expert Rpt. of Day & Shaffer). Plaintiffs agreed the Violet Siphon, if it could contribute to justifiable uncertainty, could only do so for Livaudais and Borgnemouth's category one properties. *See* Tr. at 129:15–130:2. ("[THE COURT:] [F]or the Violet Siphon, that would only affect Category one area[, r]ight? [PLAINTIFFS:] Yes, sir. THE COURT] And which landowner properties? . . . [PLAINTIFFS:] Actually Borgnemouth and Livaudais Company also

owns property there.").

The government argues plaintiffs cannot rely on the Violet Siphon to establish justifiable uncertainty, in part because the project was not a federal project. Gov't's Reply at 23. At oral argument, plaintiffs confirmed—and the government did not dispute—the Violet Siphon was built in 1979 by local interests, but using *federal* dollars. *See* Tr. at 130:3–7; *see also* JC-223 at 1-14 (2009 USACE MRGO Environmental Impact Statement) ("This project has been reauthorized under the Water Resources Development Act of 2007"). Neither party could offer caselaw to establish whether this kind of local/federal cooperation can or cannot support the doctrine of justifiable uncertainty. *See* Tr. at 130:14–132:3. In the January 2021 Summary Judgment Order, the Court left open the possibility plaintiffs could rely on the Violet Siphon to support justifiable uncertainty whether it constituted a federal project or not, in part because the source of the funding for the project remained unclear. *See Biloxi*, 152 Fed. Cl. at 278 n.13 ("To the extent the original operation of the Violet Siphon by 'local interests' affects whether landowners were justifiably uncertain as to the permanency of the alleged takings in Category One, projects to restore damaged land conducted by entities besides the government may still leave a landowner justifiably uncertain as to the permanency of any alleged government taking."). It is unnecessary for the Court to immediately and finally decide the question of whether plaintiffs can rely on the Violet Siphon project and, if so, whether its intermittent operation supports justifiable uncertainty; the Violet Siphon is not the only project or promise on which plaintiffs rely to support application of justifiable uncertainty. As the Court determines below, plaintiffs have other evidence of federal promises or mitigation projects sufficient to create a genuine dispute of material fact as to whether plaintiffs were justifiably uncertain regarding the permanence of the damage to their land. Accordingly, the Court need not rely on evidence related to the Violet Siphon project to hold the claim related to Borgnemouth and Livaudais' category one property survives the government's Motion for Summary Judgment. *See* Section V, *supra*.

Second, plaintiffs argue Mr. Russo's deposition testimony establishes "the property owners along the MRGO, including Mr. Livaudais, were involved in the process of selecting locations for placing dredged material on their properties." Pls.' Rev. MSJ at 161. Mr. Russo stated he was "reasonably sure" there had been communications between his predecessor at USACE, Bob Gunn, and Mr. Livaudais "for many years" prior to 1998 regarding "coordination of real estate to place materials in the upland disposal areas." JC-593 at 67:1–22 (Russo Deposition). Further, Mr. Russo testified he personally would meet with Mr. Livaudais to coordinate "areas on that map that he was interested in having materials placed into for wetland creation or restoration." *Id.* at 71:4–21. Mr. Russo's description of communications with Mr. Livaudais regarding placement of material for the purposes of land repair is supported by proposals by the USACE in the 1990s to conduct bank stabilization and dredged material disposal. *See, e.g.*, JC-444 at 2 (USACE Oct. 1991 Public Notice of Proposed Bank Stabilization Project) (proposing dike construction and dredged material deposition at various sites along the MRGO and noting "[a]ll dredged material would be placed into the disposal areas in a manner conducive to wetland nourishment and/or wetland development"). Taken together, this evidence shows USACE's commitment to mitigation efforts and consistent communication with the local property owners to coordinate these efforts.

The government argues the evidence of USACE's efforts cannot establish justifiable uncertainty because, at his deposition, Bruce Wallis "could not recall a Corps promise or commitment to undertake a project to restore MRGO-caused damage to Livaudais and Borgnemouth's Category One properties and referred only to an undefined hope of some future project." Gov't's Reply at 17; *see also* JC-50 at 14:15–19, 20:7–24, 23:13–16, 30:12–23 (Wallis Deposition) (Mr. Wallis testifying as 30(b)(6) representative for Livaudais and Borgnemouth, in his capacity as a past manager and representative of the Livaudais LLC since its formation in 1997 and as board member and president of Borgnemouth since 2009), 18:10–19:5 (Mr. Wallis explaining the people best situated to testify personally to the 1980s, 1990s, and early 2000s are deceased, so he and others are "the people closest to them that worked with them . . . And then other than that, [Mr. Wallis] read as much information as [they] had at the time"). Plaintiffs have not identified any promise or commitment Mr. Wallis could recall at his deposition. *See, e.g.*, JC-50 at 32:7–33:5 (Wallis Deposition). Nevertheless, the conflict between Mr. Russo's testimony, which supports regular contact between the USACE and Phillip Livaudais concerning mitigation efforts, and Mr. Wallis, who could not identify any such efforts or communication, creates a dispute of material fact. On the one hand, Mr. Livaudais's contacts with USACE and the surrounding mitigation efforts could conceivably create uncertainty as to the permanence of the damage to the relevant property. *See Applegate*, 25 F.3d at 1584 ("[P]roposals to correct the damage" done to the land put forward by the government can "further complicate[] ascertaining the extent and nature of the consequences" of the physical taking enough to trigger the doctrine of justifiable uncertainty). On the other hand, plaintiff Livaudais and Borgnemouth's 30(b)(6) representative, speaking on behalf of plaintiff, could not identify any specific promise or proposal which could trigger the doctrine of justifiable uncertainty. *See, e.g.*, JC-50 at 32:7–33:5 (Wallis Deposition). The resulting conflict would force the Court to make a factual finding as to the true extent of USACE's communication and mitigation work related to Livaudais and Borgnemouth's category one property, which is inappropriate on a motion for summary judgment. *See Anderson*, 477 U.S. at 248 ("summary judgment will not lie if the dispute about a material fact is 'genuine.'").

Drawing all inferences in favor of plaintiffs, the communication and mitigation activities described in Mr. Russo's deposition and in various documents cited by plaintiffs could conceivably create uncertainty as to the permanence of the damage to the relevant property, and the conflict between Mr. Russo and Mr. Wallis's deposition testimony complicates ascertaining plaintiff's subjective knowledge of mitigation efforts. *See* Section V, *supra*; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) ("On summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." (citation and internal quotations omitted)). Accordingly, this genuine dispute of material fact is sufficient to defeat the government's Motion for Summary Judgment as to plaintiffs Livaudais and Borgnemouth's category one takings claim. *See* Section V, *supra.*

**c. Lake Eugenie**

As discussed *supra* in relation to the Vincent Marshlands and Livaudais and Borgnemouth properties, the record indicates USACE may have been committed to mitigation efforts within the bounds of category one. Moreover, Charlton Ogden, Eugenie's 30(b)(6)

witness, testified at his deposition "we were discussing issues going on with [USACE] and DNR . . . from the late '80s to the '90s, and it was all about . . . restoring the damage that was caused by the MRGO." JC-321 at 134:2–8 (Ogden Deposition). The government argues Ogden could not identify any particular promise or action taken by the government to remediate MRGO-caused damage, and this precludes justifiable uncertainty. *See* Gov't's Reply at 26. Taking the evidence in the light most favorable to plaintiff, however, the beneficial use projects in category one could reasonably cause a property owner to become uncertain as to the permanence of the damage to its land due to "the Corps' mitigation efforts," *see Banks*, 314 at 1309 (citing *Applegate*, 25 F.3d at 1583), and Ogden's testimony regarding the consistent communications with USACE and exchange of letters with the government, *see, e.g.* JC-321 at 134:2–19, could rise to the level of sufficient, subjective knowledge to create justifiable uncertainty. *See Matsushita*, 475 U.S. at 587–88 (noting courts must draw all inferences at the summary judgment stage "in the light most favorable to the party opposing the motion" (citation omitted)). Given the parties dispute the extent of plaintiff Eugenie's knowledge of government commitments and projects to remediate damage caused by the MRGO within category one, the Court would be forced to make a factual finding based on the evidence which would be inappropriate at the summary judgment stage. *See Anderson*, 477 U.S. at 248 ("[S]ummary judgment will not lie if the dispute about a material fact is 'genuine.'"). Accordingly, plaintiffs have produced sufficient evidence to show a genuine dispute of material fact to defeat the government's Motion for Summary Judgment as to Eugenie's category one property. *See supra* Section V; *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed. Cir. 2001) ("In determining whether there is a genuine issue of material fact, the trial court must assume that the evidence presented by the non-movant is credible and draw all justifiable inferences therefrom in the non-movant's favor.").

**2. Category Two – South Lake Borgne-Channel**

South Lake Borgne corresponds to geographical "Subunit 40" in the Final Feasibility Report map, JC-607 at 2-58. *See* Section VII, *supra*. Subunit 40 includes the Livaudais, Vincent Marshlands, Borgnemouth, Biloxi, and Lake Eugenie properties. *See Biloxi*, 152 Fed. Cl. at 281.

**a. Vincent Marshlands**

The parties each stated they are relying on the same set of evidence and arguments as they made related to Vincent Marshlands's category one properties. *See* Pls.' Rev. MSJ at 171 ("Here the government relies on the same evidence and arguments it made relative to the Vincent Category One Property. As a result, Plaintiffs will rely on the same evidence and arguments presented above."); Gov't's Reply at 31 ("The same evidence and argument discussed above in relation to Vincent's Category One property apply with equal force to Vincent's Category Two property.").

The regional map of beneficial dredging projects along the MRGO, JC-477, (described in Section VI, *supra*) shows beneficial dredging projects occurring along the southwestern shore of Lake Borgne encompassed by category two. The map also shows a large area of work within category two between the Vincent property and the Livaudais property, with a label showing work was undertaken in 1993, 1995, and 2004. *Id.* The government contends the work being

done in this region was not to rebuild land damaged by the MRGO, but was "intended to protect the structural integrity of the land bridge on the north shore of the MRGO, separating the waters of Lake Borgne and MRGO." Tr. at 151:18–24. Plaintiff disputes this characterization and argues "it was to rebuild land that had eroded before, and the concern was that the land had eroded so much over time that it was little by little going to cause a break of the lake into the MRGO." Tr. at 153:25–154:3. A 7 April 1992 USACE environmental evaluation of the nearby projects proposes to "designate new disposal sites provided for the beneficial use of dredged material" and notes "[t]he proposed activity would result in the creation and nourishment of wetlands and associated wildlife habitat." JC-441 at 3 (Environmental Assessment #162). Ms. Freese, moreover, testified she had been provided a map of "[a]n area of work that [USACE] was going to be doing associated with the MRGO wetlands loss." JC-279 at 147:11–18 (Freese Deposition). This map, reproduced in the parties' joint compendium as JC-296, shows a highlighted area of work on the north shore of the MRGO which plaintiff confirmed at oral argument is within the Vincent property. *See* Tr. at 52:2–15. Although the highlighted area of the map is labeled "Overbank Cross-Section Surveys Area of Work," plaintiffs and the government dispute whether this "work" included mere surveys or projects to repair damage caused by the MRGO. *Compare* Tr. at 52:5–10 ("[PLAINTIFFS:] the yellow portions of the map, those are the areas that were supposed to be going to be restored by the Corps of Engineers of the property through the placement of -- through the placement of dredge material going forward") *with* Tr. at 58:23–59:3 ("[GOVERNMENT:] [T]here's no factual indication in the record that these yellow highlights represent dredge material and not survey work"). Viewing the record in the light most favorable to plaintiffs, however, a property owner in category two could construe the government's ongoing and proposed work as projects to replace lost land, which could make them uncertain as to the permanence of the damage to its land due to "the Corps' mitigation efforts." *See supra* Section V; *Banks*, 314 at 1309 (citing *Applegate*, 25 F.3d at 1583). At this stage, a genuine dispute of material fact exists regarding the nature and extent of the work being completed at the various beneficial dredging sites shown on JC-477 and the map of work shown on JC-296, and whether plaintiffs could reasonably rely on that work to support justifiable uncertainty. *See id.* Accordingly, plaintiffs have adduced sufficient evidence to raise a genuine dispute of material fact to defeat the government's Motion for Summary Judgment as to Vincent's property in category two. *See* Section V, *supra*; *Monon*, 239 F.3d at 1257 ("In determining whether there is a genuine issue of material fact, the trial court must assume that the evidence presented by the non-movant is credible and draw all justifiable inferences therefrom in the non-movant's favor.").

**b. Livaudais and Borgnemouth**

The parties each stated they are relying on the same set of evidence and arguments as they made related to Livaudais and Borgnemouth's category one properties. *See* Pls.' Rev. MSJ at 171 ("Here the government relies on the same evidence and arguments it made relative to the Livaudais' and Borgnemouth's Category One Properties. Therefore, Plaintiffs will rely on the same evidence and arguments presented above."); Gov't's Reply at 31 ("The same evidence and argument discussed above in relation to Livaudais and Borgnemouth's Category One property apply with equal force to Livaudais and Borgnemouth's Category Two property.").

The same regional map of beneficial dredging projects along the MRGO, JC-477

(described in Section VI, *supra*, and analyzed in Section VII.A.2.a, *supra*), shows significant beneficial dredging deposition in 1993, 1995, and 2004 within the Livaudais and Borgnemouth properties in category two. Likewise, Environmental Assessment #162's 7 April 1992 proposal to "designate new disposal sites provided for the beneficial use of dredged material" to result in "the creation and nourishment of wetlands and associated wildlife habitat" also applies to these areas within the Livaudais and Borgnemouth property. *See* JC-441 at 3 (Environmental Assessment #162). Viewing this evidence in the light most favorable to plaintiffs, a property owner in category two could see the government executing projects to replace lost land, which could make the landowner uncertain as to the permanence of the damage to its land due to "the Corps' mitigation efforts." *See supra* Section V. At this stage, a genuine dispute of material fact exists regarding the nature and extent of the work being completed at the various beneficial dredging sites shown on JC-477 and whether plaintiffs could reasonably rely on those projects to support justifiable uncertainty. *See Banks*, 314 F.3d at 1309 (citing *Applegate*, 25 F.3d at 1583). Accordingly, plaintiffs have adduced sufficient evidence to raise a genuine dispute of material fact to defeat the government's Motion for Summary Judgment as to Livaudais and Borgnemouth's property in category two. *See Monon*, 239 F.3d at 1257; Section V, *supra*.

**c. Biloxi**

The parties each stated they are relying on the same set of evidence and arguments for Biloxi's category two properties as presented for Lake Eugenie's category one properties. *See* Pls.' Rev. MSJ at 171 ("Here the government relies on the same evidence and arguments it made relative to the Eugenie's Category One Properties. Therefore, Plaintiffs will rely on the same evidence and arguments presented above."); Gov't's Reply at 32 ("The same evidence and argument discussed above in relation to Eugenie's Category One property apply with equal force to Biloxi's Category Two property.").

As discussed *supra*, the regional map of beneficial use of dredge material along the MRGO shows numerous government projects occurring in 1993, 1995, and 2004 within category two and near the Biloxi property. *See* JC-477 (described in Section VI, *supra*, and analyzed in Section VII.A.2.a, *supra*). Likewise, environmental assessment #162's proposal to "designate new disposal sites provided for the beneficial use of dredged material" to result in "the creation and nourishment of wetlands and associated wildlife habitat" applies to these category two properties. JC-441 at 3 (Environmental Assessment #162). As the Court explained in Section VII.A.1.c, *supra*, Charlton Ogden, testifying as both Biloxi and Eugenie's 30(b)(6) representative, stated the plaintiffs were "discussing issues going on with [USACE] and DNR . . . from the late '80s to the '90s, and it was all about . . . restoring the damage that was caused by the MRGO." JC-321 at 134:2–8 (Ogden Deposition). Viewing this evidence in the light most favorable to plaintiffs, however, a property owner in category two could see the government executing projects to replace lost land, which could make them uncertain as to the permanence of the damage to its land due to "the Corps' mitigation efforts." *See* Section V, *supra*. At this stage, a genuine dispute of material fact exists regarding the nature and extent of the work being completed at the various beneficial dredging sites shown on JC-477 near the Biloxi category two property and whether plaintiffs can reasonably rely on this work to support justifiable uncertainty. *See* Section V, *supra.* Accordingly, plaintiffs have adduced sufficient evidence to raise a genuine dispute of material fact to defeat the government's Motion for

Summary Judgment as to plaintiff Biloxi's property in category two. *See Monon*, 239 F.3d at 1257; Section V, *supra.*

### 3. Category Three – MRGO Spoil Bank

Category three, the MRGO Spoil Bank corresponds to geographical "Subunit 32" in the Final Feasibility Report map, JC-607 at 2-58. *See* Section VII, *supra*. Subunit 32 is composed of dredged material placed along the southern shore of the MRGO, separating the MRGO channel from Subunit 13 and 23. *See Biloxi*, 152 Fed. Cl. at 289. Subunit 32 includes Vincent Marshlands, Livaudais and Borgnemouth, Lake Eugenie, and Biloxi properties. *See id.* For each of plaintiffs' claims in category three, plaintiffs and the government rely solely on their presentation of evidence related to the same plaintiffs' claims in categories one and two. *See* Pls.' Rev. MSJ at 172; Gov't's Reply at 32.

#### a. Vincent Marshlands

Category three runs along the southern shore of the MRGO from the southeastern coast of Lake Borgne to the MRGO's outlet into the Gulf of America, at the junction of Subunits 23 and 18. *See* Section VII, *supra*, (reproducing the Final Feasibility Report map, JC-607 at 2-58). The regional map of beneficial use of dredge material along the MRGO, JC-477, shows at least one area of beneficial use of dredged material within the northern section of category three within the Livaudais and Borgnemouth property and abutting Eugenie's sliver of property spanning categories one and three. *See* JC-477 (described in Section VI, *supra*, and analyzed in Section VII.A.2.a, *supra*). This area of work is labelled as occurring in 1993. *See id.* As discussed in Section VII.A.1.a, *supra*, Karen Freese was in contact with the Port of New Orleans in the early 1990s, regarding USACE "wanting to do projects on the [Vincent] property to help address the loss of wetlands and the erosion" caused by the MRGO, and Ms. Freese testified to "various time that the Corps approached [Vincent] about doing work to help restore the property." *See* JC-279 at 40:15–24, 48:16–24 (Freese Deposition). Viewing the evidence in the light most favorable to plaintiffs, these contacts with USACE regarding remediation projects combined with actual beneficial use of dredged materials within category three could cause Vincent to be reasonably uncertain to the permanence of damage to property due to "the Corps' mitigation efforts." *See Banks*, 314 F.3d at 1309 (citing *Applegate*, 25 F.3d at 1583); *Matsushita*, 475 U.S. at 587–88 (noting courts must draw all inferences at the summary judgment stage "in the light most favorable to the party opposing the motion"). At this stage, a genuine dispute of material fact exists regarding the nature and extent of: (1) the work being completed at the beneficial dredging sites shown on JC-477 within category three and (2) Vincent's subjective knowledge of those projects. *See* Sections VII.A.1.a, VII.A.2.a, *supra*; *Banks*, 314 F.3d at 1309 (citing *Applegate*, 25 F.3d at 1583). Given the parties dispute the extent of plaintiff Vincent's knowledge of government projects to remediate damage caused by the MRGO in category three, as well as the extent of those projects, the Court would be forced to make a factual finding based on the evidence which would be inappropriate at the summary judgment stage. *See supra*, Section V; *Anderson*, 477 U.S. at 248. Accordingly, plaintiffs have adduced sufficient evidence to raise a genuine dispute of material fact to defeat the government's Motion for Summary Judgment as to plaintiff Vincent's property in category three. *See* Section V, *supra*; *Monon*, 239 F.3d at 1257.

**b. Livaudais and Borgnemouth**

As discussed *supra*, the regional map of beneficial use of dredge material along the MRGO, JC-477, shows at least one area of beneficial use within the northern section of category three within the Livaudais and Borgnemouth property and abutting Eugenie's sliver of property spanning categories one and three. *See* JC-477 (described in Section VI, *supra*, and analyzed in Sections VII.A.2.a, VII.A.3.a, *supra*). This area of work is labelled as occurring in 1993. *See id.* The Court explained in Section VII.A.1.b, *supra*, USACE was in contact with Livaudais and Borgnemouth "for many years" prior to 1998 through Bob Gunn and Edmond Russo concerning mitigation efforts related to damage caused by the MRGO. *See* JC-593 at 60:25–65:10 (Russo Deposition). Viewing the evidence in the light most favorable to plaintiffs, these contacts with USACE regarding remediation projects combined with actual beneficial use of dredged materials within category three could cause Livaudais and Borgnemouth to be reasonably uncertain to the permanence of the damage to its property due to "the Corps' mitigation efforts." *See Banks*, 314 F.3d at 1309 (citing *Applegate*, 25 F.3d at 1583); *Matsushita*, 475 U.S. at 587–88 (noting courts must draw all inferences at the summary judgment stage "in the light most favorable to the party opposing the motion"). At this stage, a genuine dispute of material fact exists regarding the nature and extent of: (1) the work being completed at the beneficial dredging sites shown on JC-477 near the Livaudais and Borgnemouth category three property and (2) Livaudais and Borgnemouth's subjective knowledge of those projects. *See Banks*, 314 F.3d at 1309 (citing *Applegate*, 25 F.3d at 1583). Given the parties dispute the extent of plaintiffs Livaudais and Borgnemouth's knowledge of government projects to remediate damage caused by the MRGO in category three, as well as the extent of those projects, the Court would be forced to make a factual finding based on the evidence which would be inappropriate at the summary judgment stage. *See supra*, Section V; *Anderson*, 477 U.S. at 248. Accordingly, plaintiffs have adduced sufficient evidence to raise a genuine dispute of material fact to defeat the government's Motion for Summary Judgment as to plaintiffs Livaudais and Borgnemouth's property in category three. *See* Section V, *supra*; *Monon*, 239 F.3d at 1257.

**c. Lake Eugenie and Biloxi**

The parties each stated, for Lake Eugenie and Biloxi's category three properties, they are relying on the same set of evidence and arguments as they made related to Lake Eugenie's category one properties. *See* Pls.' Rev. MSJ at 172 ("[T]he government relies on the same evidence and arguments it presented relative to the Eugenie's Category One Properties as applicable to the Biloxi and Eugenie's Category Three Properties. Therefore, Plaintiffs will rely on the same evidence and arguments presented above."); Gov't's Reply at 32 ("The same evidence and argument discussed above in relation to Vincent's, Livaudais and Borgnemouth's, and Eugenie's Category One properties apply with equal force to those Plaintiffs' Category Three properties.").

As discussed *supra*, the regional map of beneficial use of dredge material along the MRGO, JC-477, shows at least one area of beneficial use within the northern section of category three within the Livaudais and Borgnemouth property and abutting Eugenie's sliver of property spanning categories one and three. *See* JC-477 (described in Section VI, *supra*, and analyzed in

Sections VII.A.2.a, VII.A.3.a–b, *supra*). This area of work is labelled as occurring in 1993. *See id.* The Court explained in Section VII.A.1.c, *supra*, Charlton Ogden, testifying as both Biloxi and Eugenie's 30(b)(6) representative, stated the plaintiffs were "discussing issues going on with [USACE] and DNR . . . from the late '80s to the '90s, and it was all about . . . restoring the damage that was caused by the MRGO." JC-321 at 134:2–8 (Ogden Deposition). Viewing the evidence in the light most favorable to plaintiffs, these contacts with USACE regarding remediation projects combined with actual beneficial use of dredged materials within category three could cause Eugenie and Biloxi to be reasonably uncertain to the permanence of the damage to their property due to "the Corps' mitigation efforts." *See Banks*, 314 F.3d at 1309 (citing *Applegate*, 25 F.3d at 1583); *Matsushita*, 475 U.S. at 587–88 (noting courts must draw all inferences at the summary judgment stage "in the light most favorable to the party opposing the motion"). At this stage, a genuine dispute of material fact exists regarding the nature and extent of: (1) the work being completed at the beneficial dredging sites shown on JC-477 within category three and (2) Eugenie's subjective knowledge of those projects. Given the parties dispute the extent of plaintiffs Eugenie and Biloxi's knowledge of government projects to remediate damage caused by the MRGO in category three, as well as the extent of those projects, the Court would be forced to make a factual finding based on the evidence which would be inappropriate at the summary judgment stage. *See Anderson*, 477 U.S. at 248. Accordingly, plaintiffs have adduced sufficient evidence to raise a genuine dispute of material fact to defeat the government's Motion for Summary Judgment as to plaintiffs Biloxi and Eugenie's property in category three. *See* Section V, *supra*; *Monon*, 239 F.3d at 1257.

### B. Whether the Evidence, Taken in the Light Most Favorable to Plaintiffs, Establishes Plaintiffs Were Justifiably Uncertain About the Permanence of the Damage to Their Property in Categories Four, Six, and Seven[4]

#### 1. Category Four – Biloxi Marshes Interior

Biloxi Marshes Interior corresponds to geographical "Subunit 07" in the Final Feasibility Report map, JC-607 at 2-58. *See* Section VII, *supra*. Subunit 07 includes Biloxi and Lake Eugenie properties. *See Biloxi*, 152 Fed. Cl. at 293. The "'Biloxi Marshes' is a geographical name for the remnant marshes of the St. Bernard delta, which is distinct from the Biloxi Marsh Land Corporation, a legal entity." JC-57 at 21 (2017 Mendelssohn Report at 16). The boundaries of the Biloxi Marshes Interior do not touch the MRGO channel itself, as the marshlands of South Lake Borgne separate the two. *See* JC-607 at 2-58 (2012 Feasibility Report). The Biloxi Marshes Interior subunit is located to the north of the MRGO and borders Lake Borgne's shoreline. *See id.*

The parties each stated they are relying on the same set of evidence and arguments for Biloxi and Lake Eugenie category four properties as presented for Lake Eugenie's category one properties. *See* Pls.' Rev. MSJ at 172 ("Here the government relies on the same evidence and arguments it presented relative to the Eugenie's Category One Properties as applicable to the Biloxi and Eugenie's Category Four Properties. Therefore, Plaintiffs will rely on the same evidence and arguments presented above."); Gov't's Reply at 32 ("The same evidence and

[4] In the Court's January 2021 order, the Court dismissed plaintiffs' takings claims related to category five properties. *See Biloxi Marsh Lands Corp. v. United States,* 152 Fed. Cl. 254, 300, 310 (2021).

argument discussed above in relation to Eugenie's Category One properties apply with equal force to Biloxi and Eugenie's Category Four properties.").

The regional map of beneficial use of dredge material along the MRGO, JC-477—which has thus far formed the backbone of plaintiffs' evidence of government action to support justifiable uncertainty—shows no beneficial use projects occurring at any time within category four. In their brief, plaintiffs made no attempt to specifically designate any federal projects occurring in category four. *See generally* Pls.' Rev. MSJ. Plaintiffs instead point generally to Charlton Ogden's deposition testimony, various letters proposing hydrographic surveys, plans for MRGO remediation from 1998 or later, and two Acts of Congress, including the 1990 WRDA and the 1990 Breaux Act. *See* Pls.' Rev. MSJ at 169–70. Plaintiffs, however, do not connect any of this evidence to showing an objectively reasonable basis for justifiable uncertainty as to the permanence of the damage to their property in category four. Although plaintiffs point generally to Mr. Ogden's deposition to support their argument, plaintiffs do not identify any particular statement from Mr. Ogden's deposition which shows a promise or action by the United States which could reasonably create uncertainty as to the permanence of the damage specifically to the Biloxi and Eugenie properties in category four. *See id.* Likewise, none of the hydrographic surveys specifically reference remediation work to be performed within category 4; while ongoing surveys which contemplate remediation in the future as *part* of a broader ongoing effort to repair damage in a particular land category may be considered for purposes of justifiable uncertainty, preliminary studies standing alone are insufficient. *See Mildenberger*, 643 F.3d at 948 (holding "consideration of potential projects to improve management of waterways" insufficient to support justifiable uncertainty because they "did not commit [USACE] to any mitigation activities" and the proposed projects never "materialized"). Plaintiffs concede each of the plans they cite were published too late to support justifiable uncertainty in this case. *See* Pls.' Rev. MSJ at 170 ("The government complains that those studies were published too late. But they were not intended to interrupt the statute of limitations."). Finally, neither the 1990 WRDA nor the Breaux Act committed the United States to any specific action to remediate damage caused by the MRGO *specifically* in category 4. Further, plaintiffs do not dispute the 1990 WRDA set a *national* goal of "no net loss of acreage" of wetlands, *see* JC-321 at 303:17–25 (Ogden Deposition), but did not promise or require any specific action to remediate MRGO-caused damage in category four. *See* Pls.' Rev. MSJ at 170–71. The Breaux Act directed the Corps to establish a comprehensive plan to restore Louisiana wetlands generally and called for the development of annual lists of priority projects for the area, but did not require the United States to promise or complete any specific mitigation project related to the MRGO, let alone a specific mitigation project in category four. *See* JC-27 at 11–12 (1994 MRGO Bank Erosion Reconnaissance Report at 3–4) ("These reports recommend projects which can be implemented within a 5-year period, as required by the authorization."). The 1990 WRDA directed the Secretary of the Army to "include environmental protection as one of the primary missions of the Corps of Engineers in planning, designing, construction, operating, and maintaining water resources projects," 33 U.S.C. § 2316, and stated the Corps shall have "an interim goal of no overall net loss of the Nation's remaining wetlands base, as defined by acreage and function, and a long-term goal to increase the quality and quantity of the Nation's wetlands, as defined by acreage and function," 33 U.S.C. § 2317. The goals and priorities of both of these statutes are national in scope and do not commit the government to any mitigation projects specific to restoring Biloxi and Lake Eugenie's properties

in category four, and plaintiffs provide no evidence of specific remediation projects in category 4 which could be traced to these federal statutes. Accordingly, none of plaintiffs' asserted evidence related to Eugenie and Biloxi's properties demonstrates subjective knowledge of a government promise or action to remediate MRGO-caused damage which could reasonably create uncertainty as to the permanence of the damage to their properties. *See* Section V, *supra*.

In keeping with the Court's obligation at the summary judgment stage to view the evidence and make all inferences "in the light most favorable to the party opposing the motion," throughout this opinion the Court has permitted plaintiffs to rely on projects conducted on other plaintiffs' properties within the same land category to show government remediation action. *See Matsushita*, 475 U.S. at 587–88 (noting courts must draw all inferences at the summary judgment stage "in the light most favorable to the party opposing the motion"); *Monon*, 239 F.3d at 1257 ("In determining whether there is a genuine issue of material fact, the trial court must assume that the evidence presented by the non-movant is credible and draw all justifiable inferences therefrom in the non-movant's favor." (citation omitted)). Plaintiffs, nevertheless, must still adduce evidence of *subjective* knowledge of government promises or action which could create *objectively* reasonable uncertainty as to the permanence of the damage to their land. *See Boling*, 220 F.3d at 1372 (finding plaintiffs could not prevail without showing subjective knowledge); *Mildenberger*, 643 F.3d at 947–48 (finding claimants could not prevail without proving knowledge was objectively justifiable); Section V, *supra*. Plaintiffs invoke evidence related to previous land categories to support justifiable uncertainty on Biloxi and Eugenie's property in category four. *See* Pls.' Rev. MSJ at 172. Given plaintiffs must show *subjective* knowledge, plaintiffs may not rely on knowledge held by other plaintiffs to support justifiable uncertainty because the core question is whether "*the landowners* did not know when or if their land would be permanently destroyed." *See Applegate*, 25 F.3d at 1582. In the same vein, it is not objectively justifiable to rely on government promises or actions to remediate damage in other categories of land to support uncertainty about the permanence of the damage to a plaintiff's land in a different category unaffected by the government action or promise. *See Mildenberger*, 643 F.3d at 947–48 (finding claimants could not prevail without proving knowledge was objectively justifiable). In short, each plaintiff must show its *own* subjective knowledge of government promises or actions which creates uncertainty as to the permanence of the damage to its *own* specific land categories.

Accordingly, given plaintiffs' evidence related to Eugenie and Biloxi's properties demonstrates no subjective knowledge of a government promise or action to remediate MRGO-caused damage which would reasonably create uncertainty as to the permanence of the damage to their properties in category four, the doctrine of justifiable uncertainty does not apply. *See* Section V, *supra*. Absent justifiable uncertainty, plaintiffs Eugenie and Biloxi's claim related to its category four property stabilized "no later than 1988," *Biloxi*, 152 Fed. Cl. at 297, and therefore expired no later than 1994, six years after stabilization and long before plaintiffs filed this action. *See* Section V, *supra*. Accordingly, the Court lacks jurisdiction over plaintiffs' takings claims related to their category four property, and the Court must grant the government's Motion for Summary Judgment as to those claims. *See* Section V, *supra.*

**2. Category Six – Eloi Bay**

Eloi Bay corresponds to geographical "Subunit 18" in the Final Feasibility Report map, JC-607 at 2-58. *See* Section VII, *supra*. Subunit 18 includes Terre Aux Boeufs, Lake Eugenie, and Biloxi properties. *See Biloxi*, 152 Fed. Cl. at 300–01. Eloi Bay is situated on the northern channel bank of the MRGO, east of South Lake Borgne subunit and extending north into the marshlands below the Biloxi Marshes Interior and Exterior. *See id.*

**a. Lake Eugenie and Biloxi**

The parties each stated they are relying on the same set of evidence and arguments as they made related to Lake Eugenie's category one properties. *See* Pls.' Rev. MSJ at 172–73 ("Here the government relies on the same evidence and arguments it presented relative to the Eugenie's Category One Properties as applicable to the Biloxi and Eugenie's Category Six Properties. Therefore, Plaintiffs will rely on the same evidence and arguments presented above."); Gov't's Reply at 33 ("The same evidence and argument discussed above in relation to Eugenie's Category One properties apply with equal force to Biloxi and Eugenie's Category [Six] properties.").

As the Court held *supra* relating to Eugenie and Biloxi's category four properties, the evidence cited by plaintiffs relating to the category one properties does not demonstrate subjective knowledge of a government promise or action to remediate MRGO-caused damage which would reasonably create uncertainty as to the permanence of the damage to their properties. *See* Section VII.B.1, *supra*. Looking to the regional map of beneficial dredging projects along the MRGO, JC-477, however, the parties agreed at oral argument there is a highlighted section of work from 1992 and 1996 within category six near the northern bank of the MRGO. *See* Tr. at 170:16–172:2. Plaintiffs state "[t]here was a canal there that was filled in, that had eroded because of salt water coming in from the MRGO, backing into that marsh there." Tr. at 171:25–172:2. The Court explained in Section VII.A.1.c, *supra*, Charlton Ogden, testifying as both Biloxi and Eugenie's 30(b)(6) representative, stated the plaintiffs were "discussing issues going on with [USACE] and DNR . . . from the late '80s to the '90s, and it was all about . . . restoring the damage that was caused by the MRGO." JC-321 at 134:2–8 (Ogden Deposition). At this stage, a genuine dispute of material fact exists regarding the nature, timing, and extent of: (1) the work being completed at the beneficial dredging site shown on JC-477 near the Eugenie and Biloxi category six properties and (2) plaintiffs' subjective knowledge of those projects. Given the parties dispute the extent of plaintiffs' knowledge of government projects to remediate damage caused by the MRGO in category six, as well as the extent of those projects, the Court would be forced to make a disputed factual finding based on the evidence which would be inappropriate at the summary judgment stage. *See Anderson*, 477 U.S. at 248. Accordingly, plaintiffs have adduced sufficient evidence to raise a genuine dispute of material fact to defeat the government's Motion for Summary Judgment as to plaintiffs Eugenie and Biloxi's property in category six. *See* Section V, *supra*; *Monon*, 239 F.3d at 1257.

**b. Terre Aux Boeufs**

Regarding plaintiff Terre Aux Boeufs's category six property, plaintiffs stated at oral argument the evidence in support of justifiable uncertainty related to this property is "that Mr. Zollinger's"—Terre Aux Boeufs's 30(b)(6) representative—"father was a member of the board

of directors of Biloxi Marsh, and all of these three things we have relied on for purposes of Biloxi Marsh have been discussed in board meetings of Biloxi Marsh." Tr. at 174:3–11. In other words, plaintiffs argue, because Zollinger's father was a member of the board for Biloxi Marsh, then Zollinger's father would be aware of the evidence and communications related to that property, and then, due to their familial relationship, the knowledge of that evidence can be imputed to Zollinger, and thus to Terre Aux Boeufs. *See* Tr. at 174:14–19 ("THE COURT: It's just the imputing, as the Government has described, the imputing of evidence from other property owners to Zollinger for Terre Aux Boeufs. [PLAINTIFFS]: Yes, because . . . the father is dead."). The government argues "[t]here is no logical or legal basis supporting Plaintiffs' position that other peoples' claimed knowledge could be 'imputed' to Mr. Zollinger's father, and that imputed knowledge could somehow supplement Mr. Zollinger's 30(b)(6) testimony." Gov't's Reply at 35.

RCFC 30(b)(6) directs an organization to produce a witness to "testify about information known or reasonably available to the organization." While Terre Aux Boeufs's 30(b)(6) witness, Mr. Zollinger (who joined the Terre Aux Boeufs Board in 2008) provided few specifics on his own subjective knowledge of government projects to remediate Terre Aux Boeufs's property in the past, *see, e.g.*, JC-52 at 58:5–11 (Zollinger Deposition), his testimony did raise a genuine dispute of material fact. As Mr. Zollinger noted in his deposition, his father "had joint directorship with Lake Eugenie and Terre aux Boeufs starting in 1987," and his brother would later take over similar positions prior to Mr. Zollinger's own subsequent role on the boards of these organizations. JC-52 at 62:5–64:2 (Zollinger Deposition). Moreover, Zollinger testified his "father and brother were directors over Eugenie and Biloxi," so "[a]ny knowledge . . . they heard in those meetings would carry over to . . . Terre aux Boeufs . . . because they were also on the board of Terre aux Boeufs." *Id.* Mr. Zollinger reviewed extensive board meeting notes detailing Eugenie's and Biloxi's concern over erosion, as well as the USACE's repeated requests for entry onto their land, including "11 [times in 1988], 11 of '91, 1 of '93, 3 of '93, 7 of '94, 8 of '95, 12 of '96, and then the Terre aux Boeufs one was 2 of '98." *See* JC-52 at 67:4–75:5 (Zollinger Deposition). Additionally, as the Court noted for Biloxi and Lake Eugenie's category six properties, the regional map of beneficial dredging projects along the MRGO, JC-477, shows a highlighted section of work from 1992 and 1996 within category six near the northern bank of the MRGO. *See* Section VII.B.2.a, *supra*; *see also* Tr. at 170:16–172:2 (parties acknowledging this work). While the government casts doubt on whether Rule 30(b)(6) enables a factfinder to impute knowledge of government mitigation projects from one company (such as Eugenie or Biloxi) to another company (such as Terre Aux Boeufs) through board members common to all companies, *see* Gov't's Reply at 25, at this stage, a genuine dispute of material fact exists regarding the nature, timing, and extent of: (1) the work being completed at the beneficial dredging site shown on JC-477 near the Terre Aux Boeufs category six property and (2) plaintiffs' subjective knowledge of those projects. Given the parties dispute the extent of plaintiffs' knowledge of government projects to remediate damage caused by the MRGO in category six, as well as the extent of those projects, the Court would be forced to make a disputed factual finding based on the evidence which would be inappropriate at the summary judgment stage. *See Anderson*, 477 U.S. at 248. Accordingly, plaintiffs have adduced sufficient evidence to raise a genuine dispute of material fact to defeat the government's Motion for Summary Judgment as to Terre Aux Boeufs's property in category six. *See* Section V, *supra*; *Monon*, 239 F.3d at 1257

### 3. Category Seven – Jean Louis Robin

Jean Louis Robin corresponds to geographical "Subunit 23" in the Final Feasibility Report map, JC-607 at 2-58. *See* Section VII, *supra*. Subunit 23 includes Terre Aux Boeufs, Lake Eugenie, and Biloxi properties. *See Biloxi*, 152 Fed. Cl. at 307. The MRGO Spoil Bank (Subunit 32) separates much of Subunit 23 from the MRGO channel bank, except for the eastern-most corner of Subunit 23, which abuts the south bank of the MRGO channel after Subunit 32 ends—directly opposite the southern-most tip of Eloi Bay (Subunit 18) on the north bank. *See* JC-607 at 2-58 (2012 Feasibility Report).

#### a. Lake Eugenie and Biloxi

The parties each stated they are relying on the same set of evidence and arguments as they made related to Lake Eugenie's category one properties. *See* Pls.' Rev. MSJ at 174 ("Here the government relies on the same evidence and arguments it presented relative to the Eugenie's Category One Properties as applicable to the Biloxi and Eugenie's Category Seven Properties. Therefore, Plaintiffs will rely on the same evidence and arguments presented above."); Gov't's Reply at 35 ("The same evidence and argument discussed above in relation to Eugenie's Category One properties apply with equal force to Biloxi and Eugenie's Category Seven properties.").

The regional map of beneficial use of dredging material along the MRGO, JC-477, shows a small area of work on the southern tip of the MRGO just inside category seven. *See* JC-477 (described in Section VI, *supra*, and analyzed in Sections VII.A.2.a, VII.A.3.a–b, *supra*). The label on the work area shows work took place in 1985 through 2003. *Id.* As the Court previously analyzed in Section VII.A.1.c, *supra*, Charlton Ogden, testifying as both Biloxi and Eugenie's 30(b)(6) representative, stated the plaintiffs were "discussing issues going on with [USACE] and DNR . . . from the late '80s to the '90s, and it was all about . . . restoring the damage that was caused by the MRGO." JC-321 at 134:2–8 (Ogden Deposition). Both Biloxi and Eugenie each possess property in category seven near the worksite and, viewing the evidence in the light most favorable to plaintiffs, Biloxi and Eugenie could have been in communication with the government and could have seen the government executing projects to replace lost land along the MRGO in category seven, which could reasonably make them uncertain as to the permanence of the damage to their own land due to "the Corps' mitigation efforts." *See* Section V, *supra*. Moreover, assuming the label on the regional map, JC-477, accurately shows work to remediate MRGO-caused damage continuously from 1984 to 2003, *see Monon*, 239 F.3d at 1257 ("the trial court must assume that the evidence presented by the non-movant is credible"), such work could prevent the accrual of Biloxi and Eugenie's claims related to category seven from 1988 to fewer than six years before each plaintiff filed suit—to the extent it evidences justifiable uncertainty. *See* Section V, *supra*. Accordingly, plaintiffs have adduced sufficient evidence to raise a genuine dispute of material fact regarding justifiable uncertainty to defeat the government's Motion for Summary Judgment as to plaintiffs Biloxi and Eugenie's property in category seven. *See Monon*, 239 F.3d at 1257; Section V, *supra.*

#### b. Terre Aux Beoufs

The parties each stated they are relying on the same set of evidence and arguments as they made related to Terre Aux Boeufs's category six properties. *See* Pls.' Rev. MSJ at 172 ("Here the government relies on the same evidence and arguments it presented relative to the Terre Aux Boeufs Category Six Properties as applicable to the Terre Aux Boeufs Category Seven Properties. Therefore, Plaintiffs will rely on the same evidence and arguments presented above."); Gov't's Reply at 36 ("The same evidence and argument discussed above in relation to Terre Aux Boeuf's Category Six properties apply with equal force to Terre Aux Boeuf's Category Seven properties.").

As the Court previously analyzed in Section VII.B.2.b, *supra*, Mr. Zollinger, testifying as Terre Aux Boeufs's 30(b)(6) representative, stated his "father and brother were directors over Eugenie and Biloxi," so "[a]ny knowledge . . . they heard in those meetings would carry over to . . . Terre aux Boeufs . . . because they were also on the board of Terre aux Boeufs." JC-52 at 62:5–64:2 (Zollinger Deposition). Mr. Zollinger reviewed extensive board meeting notes detailing Eugenie's and Biloxi's concern over erosion, as well as the USACE's repeated requests for entry onto their land, including "11 [times in 1988], 11 of '91, 1 of '93, 3 of '93, 7 of '94, 8 of '95, 12 of '96, and then the Terre aux Boeufs one was 2 of '98." *See* JC-52 at 67:4–75:5 (Zollinger Deposition). The regional map of beneficial use of dredging material along the MRGO, JC-477, shows a small area of work on the southern tip of the MRGO just inside category seven. *See* JC-477 (described in Section VI, *supra*, and analyzed in Sections VII.A.2.a, VII.A.3.a–b, *supra*). The label on the work area shows work took place in 1985 through 2003. *Id.* Eugenie, Biloxi, and Terre Aux Boeufs all own property in category seven near this worksite and, viewing the evidence in the light most favorable to plaintiffs, Terre Aux Boeufs representatives could have seen the government executing projects to replace lost land along the MRGO in category seven, which could reasonably make them uncertain as to the permanence of the damage to their own land due to "the Corps' mitigation efforts." *See* Section V, *supra*. Moreover, assuming the label on the regional map, JC-477, accurately shows work to remediate MRGO-caused damage continuously from 1984 to 2003, *see Monon*, 239 F.3d at 1257 ("the trial court must assume that the evidence presented by the non-movant is credible"), such work could prevent the accrual of Terre Aux Boeufs's claims related to category seven from 1988 to fewer than six years before it filed suit—to the extent it evidences justifiable uncertainty. *See* Section V, *supra*. Accordingly, Terre Aux Boeufs has adduced sufficient evidence to raise a genuine dispute of material fact regarding justifiable uncertainty to defeat the government's Motion for Summary Judgment as to its property in category seven. *See Monon*, 239 F.3d at 1257; Section V, *supra.*

### C. Whether the Court Can Grant Summary Judgment to Plaintiffs on the Government's Liability for Plaintiffs' Takings Claims Given the Court's Conclusions Related to Justifiable Uncertainty

While plaintiffs' Revised Motion for Partial Summary Judgment urges the Court to "hold the government liable to plaintiffs for . . . violation[s] of the Takings Clause," Pls.' Rev. MSJ at 1, the unresolved threshold issue of subject matter jurisdiction prevents the Court from reaching the merits of plaintiffs' arguments regarding liability, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) ("The requirement that jurisdiction be established as a threshold

matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception." (cleaned up)). Compliance with the Tucker Act's 6-year statute of limitations is a jurisdictional prerequisite for claims in the Court of Federal Claims, *see Etchegoinberry v. United States*, 132 F.4th 1374, 1378 (Fed. Cir. 2025), and the parties have not provided the Court an adequate basis to decide whether plaintiffs' claims are timely such that the Court may assess liability, *see* Section VII.B, *supra*. Genuine disputes of material fact exist and preclude the Court from deciding the timeliness of plaintiffs' claims related to land categories one, two, three, six, and seven. *See* Section VII.B, *supra*. Plaintiffs agreed at oral argument there remains a "murkiness of facts on both sides." Tr. at 178:20–25. This lack of clarity precludes the Court from holding it has jurisdiction over these claims at the summary judgment stage. *See* Section VII.B, *supra*. Given the Court is unable to definitively establish subject-matter jurisdiction over these claims, it would be inappropriate for the Court to proceed to the merits of plaintiffs' liability arguments before confirming it has jurisdiction to decide such issues. *See Etchegoinberry*, 132 F.4th at 1378 ("Appellants argue the 2023 court was not required by RCFC 12(h)(3) to determine subject matter jurisdiction under 28 U.S.C. § 2501 because that statute provides for statutory, not constitutional, jurisdiction, which does not need to be determined before addressing the merits of a case. We do not agree." (cleaned up)). As to plaintiffs' category four claims, the Court holds these claims are untimely, and, in the absence of jurisdiction over these claims, grants the government's motion for summary judgment without reaching the issue of liability. *See id.*; RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

## VIII. Whether the Court can Grant Summary Judgment as to Plaintiffs' Contract Claims

The Court next turns to whether it can grant summary judgment to either party as to the government's liability for plaintiffs' contract claims. First, the Court will determine whether plaintiffs and the United States are in privity of contract, as required to invoke this court's jurisdiction. Second, the Court will determine whether plaintiffs' contract claims were timely filed. Third, the Court will address whether the servitudes plaintiffs granted to the Port of New Orleans, and then assigned to the United States, have terminated. Fourth, the Court will determine whether plaintiffs waived their contractual claims for damage caused by the MRGO in the servitudes each signed with the Port of New Orleans. Fifth, and finally, the Court will determine whether plaintiffs may make a non-contract claim against the United States for the damage to their properties.

### A. Whether Plaintiffs are in Privity of Contract with the United States

The government first argues the Court lacks jurisdiction over plaintiffs' claims for breach of contract because "there is no privity of contract between Plaintiffs and the United States." Gov't's MSJ at 75. The government asserts there is no privity between plaintiffs and the government because "assignment alone is not enough to create privity with the United States." 22 Jan. 2026 JSR at 12, ECF No. 293. Plaintiffs counter they "entered into conventional (contractual) servitudes with the Port of New Orleans, the Port of New Orleans assigned the servitudes to the United States, and the United States accepted the assignment of the servitudes." Pls.' Reply at 7 (cleaned up). Plaintiff argues, "[t]herefore, because the plaintiffs and the government were parties to conventional (contractual) servitudes, they were in a contractual

relation while the servitudes were in effect." *Id.* The parties agree plaintiffs must be in privity of contract with the United States to bring a contract claim. *See* Tr. at 181:20–23 ("[GOVERNMENT:] [F]or this Court to have jurisdiction over Plaintiffs' contract claims, there needs to be privity of contract between the United States and the Plaintiffs."); Tr. at 182:1–9 ("THE COURT: Well, do you agree . . . Plaintiffs must be in privity of contract with the United States in order to be able to sue on a contract claim? [PLAINTIFF]: Oh, yes. That's basic."); *see also Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998) ("To maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government. In other words, there must be privity of contract between the plaintiff and the United States." (cleaned up)). Plaintiffs, moreover, have disclaimed reliance on exceptions to the privity requirement. *See* Tr. at 191:24–192:2 ("THE COURT: Just to confirm, you're not arguing any third-party beneficiary or agency arguments[? PLAINTIFFS: N]ot at this point."). The Court must therefore determine whether plaintiffs are in privity of contract with the United States in order to ensure its jurisdiction over plaintiff's contract claims. *See Cienega Gardens*, 194 F.3d at 1239.

At oral argument, neither party could identify a case addressing the particular issue of a servitude entered into by a third party and thereafter assigned to the United States. Shortly after oral argument, the Court ordered the parties to research the issue once more and submit a joint status report to "identify[] any authority regarding assignment of an easement or servitude to the United States." 5 Nov. 2025 Order, ECF No. 284. In the parties' JSR, the government stated it "did not find case-law directly on point for this case," but analogized the situation in this case to others "where the plaintiff was an assignee and the United States was a contracting party." 22 Jan. 2026 JSR at 10. Plaintiffs, for their part, did not identify any on-point authority, but vigorously argued "the United States, as assignee, now stands in the shoes of the Port" of New Orleans and, despite no mention of the Anti-Assignment Act by the government, argued the statute does not apply to prohibit the transfer of a contract. *Id.* at 15–17. The Court conducted its own inquiry into the caselaw, and agrees this particular situation presents a novel issue not directly addressed by the Federal Circuit or this court. Further complicating the Court's inquiry are several other disputed questions of law the Court attempted to clarify with the parties at oral argument: (1) whether Louisiana or Federal law controls the contracts at issue, *see* Tr. at 209:2–6; (2) to what extent the Port of New Orleans' conveyance to the government indicates plaintiffs entered a contract with the government, *see* Tr. 185:4–186:14; and (3) whether the conveyances evidence the Port retained any rights under the contract or indemnified the government, *see* Tr. at 188:6–20. Though these questions and the lack of controlling law complicate the Court's inquiry, the Court next determines whether the parties are in privity of contract according to basic principles of contract law.

The government argues there is no privity of contract between plaintiffs and the United States because plaintiffs entered into the servitudes with the Port of New Orleans, who retained all *obligations* under the contracts, while only assigning to the United States the *benefits* of the contracts. *See* 22 Jan. 2026 JSR at 11–12; Gov't's MSJ at 75–79. Plaintiffs argue the United States, as the assignee, "stands in the shoes" of the Port of New Orleans, including all "rights, benefits, remedies and obligations," and this is sufficient to establish privity. 22 Jan. 2026 JSR at 15–16; *see also* Pls.' Reply at 7. "Under the Tucker Act, the Court of Federal Claims has jurisdiction over claims based on 'any express or implied contract with the United States.'"

*Cienega Gardens*, 194 F.3d at 1239 (quoting 28 U.S.C. § 1491(a)(1)). Thus, the Federal Circuit has held "[t]o maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government," *id.*, because "[t]he government consents to be sued only by those with whom it has privity of contract," *Erickson Air Crane Co. of Washington v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984).

After contracting with plaintiffs for the relevant servitudes in 1959, the Port of New Orleans assigned the servitudes to the United States in 1966. *See, e.g.*, JC-5 (Assignment Instrument from Port to United States for Livaudais property); JC-6 (Assignment Instrument from Port to United States for Borgnemouth property); JC-7 (Assignment Instrument from Port to United States for Vincent Property). These assignments were part of "certain conditions of local cooperation" to develop the MRGO to benefit the Port of New Orleans. *See, e.g.*, JC-5 at 9 (Assignment Instrument from Port to United States for Livaudais property). In each conveyance, the Port agrees to "donate, grant, convey, transfer, assign, abandon and deliver . . . unto the said United States of America and assigns, the full, complete and perpetual right, power, privilege, easement or servitude in, on and to the land hereinafter described." *See, e.g.*, JC-6 at 21 (Assignment Instrument from Port to United States for Borgnemouth property). Further, the conveyances state "[i]t is understood and agreed that this instrument is a donation, grant, conveyance, transfer and assignment of only the same rights, privileges, easements or servitudes acquired by [the Port] from [landowner]." *See, e.g.*, *id.* at 22. Although the government agreed at oral argument if the United States were granted the "entirety" of the servitude, then "there would be privity" between the United States and plaintiffs, *see* Tr. at 203:16–21, the government explained the easement does not convey the *entire* servitude, but merely the rights of the servitude and not the obligations, which are retained by the Port. *See* Tr. at 204:23–205:12. For support, the government cites another provision of the conveyances which states the Port "holds and saves the United States of America and assigns free from claims by the owners of the herein described lands in and to which the above-mentioned servitudes appertain for damage to their said lands incident to the construction, maintenance and operation of [the MRGO]." JC-6 at 22 (Assignment Instrument from Port to United States for Borgnemouth property); *see also* Tr. at 187:1–14.

This contractual provision stating the Port "assigns [the servitude to the United States] free from claims by owners," quite literally, "saves" for the Port the liability for potential damage to plaintiffs' properties incident to the MRGO. *See* JC-6 at 22 (Assignment Instrument from Port to United States for Borgnemouth property). "[I]t is not always easy to determine whether or not the assignee actually contracts to perform the duties of the assignor[, but i]f he has not so contracted, no action can be maintained against him, either by the assignor, or by the third party as a beneficiary." 9 *Corbin on Contracts* § 47.6 (2026). By retaining a crucial obligation under the contract, the Port could not have assigned, as plaintiff insists, all "rights, benefits, remedies and *obligations*" sufficient to establish privity of contract between the parties. *See id.*; *see also* 22 Jan. 2026 JSR at 15–16. As the Federal Circuit has held, for those cases in which a plaintiff is allowed to bring a contract claim without explicitly contracting with the United States, "the common thread that unites these exceptions is that the party standing outside of privity[,] by contractual obligation[,] stands in the shoes of a party within privity." *First Hartford Corp. Pension Plan & Tr. v. United States*, 194 F.3d 1279, 1289 (Fed. Cir. 1999). Although "these exceptions" concern third-party plaintiffs and do not address when the United

States is a third party, the underlying logic of these exceptions indicates there is no privity with the United States when it has not assumed the obligations of the contract. *See id.* Bolstering this conclusion, the conveyances state the Port assigned to the United States "*only* the same *rights, privileges, easements or servitudes*" as those acquired by the Port. JC-6 at 22 (Assignment Instrument from Port to United States for Borgnemouth property) (emphasis added). Nowhere does the document assign to the United States any specific obligation; rather, the obligation to answer for damage to plaintiffs' lands is expressly reserved by the Port. *See id.* Accordingly, in the absence of a full and complete assignment of all rights *and* obligations under the contract, the United States is not in privity of contract with plaintiffs and plaintiffs therefore cannot sue the United States in this court for breach of the same contract. *See Erickson*, 731 F.2d at 813 ("The government consents to be sued only by those with whom it has privity of contract.").

### B. Whether Plaintiffs' Contract Claims are Timely

Given the Court's holding plaintiffs are not in privity of contract with the United States, plaintiffs cannot sustain any contract claims against the United States, and this holding independently compels dismissal of plaintiffs contract claims. *See* Section VIII.A, *supra*. Even if the Court held plaintiffs were in privity of contract with the government, the Court would still have to determine whether plaintiffs' contract claims were timely filed. The government argues plaintiffs' contract claims relate to alleged breaches of contract from damage caused by the operation of the MRGO, and the Court's January 2021 Order established such damage was knowable no later than the publication of the 1988 Reconnaissance Report. *See* Gov't's MSJ at 73–74. The government therefore argues if the government breached a contract with plaintiffs, plaintiffs' contract claims accrued in 1988, and the six-year statute of limitations in the Tucker Act expired well before plaintiffs filed suit. *Id.* Plaintiffs argue their claims did not accrue until 2009 at the earliest, when the government ceased ocean faring operations on the MRGO and thus abandoned the servitudes without remediating all damage caused by the use of the easement. *See* Pls.' Reply at 7.

"Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. "[T]he Supreme Court made clear the requirements of 28 U.S.C. § 2501 are unwaivable, 'absolute,' and correctly considered *sua sponte*." *Etchegoinberry v. United States*, 132 F.4th 1374, 1378 (Fed. Cir. 2025) (citing *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133–34 (2008)). "[A] cause of action accrues when all the events have occurred that fix the defendant's alleged liability and entitle the plaintiff to institute an action." *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed. Cir. 1995) (citation omitted). "Because the statute of limitations is jurisdictional, the plaintiff bears the burden of proof." *Petro-Hunt, L.L.C. v. United States*, 862 F.3d 1370, 1378 (Fed. Cir. 2017) (citation omitted).

Plaintiffs have expressly disclaimed reliance on accrual suspension for their breach of contract claims, *see* Tr. at 7:14–17, therefore the normal rule "[a] breach of contract claim accrues at the time of breach" applies. *Holmes v. United States*, 657 F.3d 1303, 1317 (Fed. Cir. 2011) (citations omitted). Plaintiffs argue the United States is liable under the servitude contracts because the United States "has a duty not to injure the servient estate." Tr. at 228:2–3; *see also* Tr. at 228:8–10 ("[PLAINTIFF:] So basically you have to confine yourself to the

servitude itself and not go beyond the servitude and not cause any damage to the servient estate."). Plaintiffs thus assert "the statute of limitations did not begin to run until the government abandoned the servitudes in 2009, which is when it stopped providing maintenance to the MRGO and to the servient estate." Pls.' Reply at 7. A cause of action, however, "accrues when all the events have occurred that fix the defendant's alleged liability and entitle the plaintiff to institute an action." *Ind. Mich. Power Co.*, 422 F.3d at 1378. The alleged breach, in this case, is the damage caused by the MRGO to plaintiffs' estates when the government failed "to maintain the MRGO to its original dimensions" and allowed "salt-water intrusion that caused environmental damage throughout their lands," *see* Pls.' Reply at 7, 32, 228—plaintiffs' contract claims therefore accrued when these breaches occurred, *see Brighton Vill. Assocs. v. United States*, 52 F.3d 1056, 1060 (Fed. Cir. 1995) ("These claims accrued on the dates the alleged breaches occurred."). While the exact date when operation of the MRGO first caused damage to plaintiffs' estates is unknown, the Court's 2021 Opinion held, "viewing the evidence in the light most favorable" to plaintiffs, each plaintiff was aware of permanent damage to their property "in each case no later than 1988." *Biloxi Marsh Lands Corp. v. United States*, 152 Fed. Cl. 254, 313 (2021). This holding did not resolve the Court's jurisdiction over plaintiffs' takings claims because the evidence "result[ed] in landowners who *were, or may have been*, 'justifiably uncertain' as to the permanency of alleged taking" due to uncertainty caused by government mitigation efforts. *Id.* (emphasis added). While the Federal Circuit has applied justifiable uncertainty to delay accrual of a *takings* claim until a plaintiff is certain of permanent damage to its property, the extent of which damage is foreseeable, *see, e.g.*, *Boling v. United States*, 220 F.3d 1365, 1372 (Fed. Cir. 2000), no court has ever applied that principle to a contract claim. *See Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874, 879 (Fed. Cir. 1998) ("The *Dickinson* stabilization principle, however, does not apply outside its context. Later cases have essentially confined the stabilization doctrine to the class of flooding cases from which it originated." (citations omitted)); *accord Arakaki v. United States*, 62 Fed. Cl. 244, 256–57 (2004) (distinguishing claim accrual for breach of contract from claim accrual for takings claims involving justifiable uncertainty). "The 6–year statute of limitations on actions against the United States is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed." *FloorPro, Inc. v. United States*, 680 F.3d 1377, 1380–81 (Fed. Cir. 2012) (quoting *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576–77 (Fed. Cir. 1988) (holding claim for breach of contract time-barred because plaintiff became aware of breach in 2002 and complaint was filed in 2009)). Notwithstanding the special consideration the Federal Circuit has applied to certain takings claims, the statute of limitations for a contract claim in this court "is jurisdictional and may not be waived or tolled." *Id.* at 1381–82. Plaintiffs' contractual claims therefore accrued when damage caused by the operation of the MRGO was present and evident, *see id.*; the Court's 2021 order established, "viewing the evidence in the light most favorable" to plaintiffs, this occurred no later than 1988. *Biloxi*, 152 Fed. Cl. at 313. The earliest of plaintiffs' suits was filed in 2012, many years too late under the Tucker Act's strict 6-year statute of limitations. *See* Compl. (filed 15 June 2012), ECF No. 1. Accordingly, the Court lacks jurisdiction to entertain plaintiffs' contractual claims against the United States. *See FloorPro, Inc.*, 680 F.3d at 1380–81; *John R. Sand*, 552 U.S. at 133–34.

Plaintiffs relied during oral argument, but not in their briefs, on *Franconia Associates v. United States*, 536 U.S. 129 (2002), to argue plaintiffs' claims did not accrue when damage first

occurred to their lands because "the Government was doing some maintenance" and so "it's not necessary for the property owners to sue immediately, but to wait and see if the repairs are done." Tr. at 232:17–25. *Franconia*, however, applied the repudiation doctrine to hold a plaintiff's claim does not "first accrue" for statute of limitations purposes at the moment the government repudiates, and instead includes a well-established period for the government to retract its repudiation. *See Franconia*, 536 U.S. at 146–47. The Supreme Court explained "the time of accrual depends on whether the injured party chooses to treat the repudiation as a present breach." *Id.* at 144 (cleaned up). Here, there has not been any repudiation by the government; rather, the issue is whether and when the government allegedly violated a duty imposed by the contracts with plaintiffs. *See Brighton Vill. Assocs.*, 52 F.3d at 1060. Plaintiffs cite no case entitling a plaintiff to choose when and whether to treat a specific violation of a contractual duty as a breach of contract and therefore decide for themselves when the statute of limitations begins to run, as opposed to choosing whether to treat an anticipatory repudiation as a present breach. Nor, as stated earlier, may plaintiffs rely on the doctrine of justifiable uncertainty, as that doctrine has never been applied to a contractual claim. *See supra*. Accordingly, *Franconia Associates* offers no support to rescue plaintiffs' contract claims.

Plaintiffs further asserted at oral argument they could not have sued the government in 1988 "because of the release[s]" in the servitude contracts. *See* Tr. at 234:23–235:2. As discussed in Section VIII.D, *infra*, the releases in the servitude contracts constituted "full, complete and final settlement of all claims, rights and actions Vendor has, or may have, against Vendee, or its assigns, for any land, improvements and crops, used or destroyed, or for any damage to Vendor's herein described lands by reason of the construction, maintenance and operation of said Mississippi River Gulf Outlet." *See* JC-1 at 10 (Vincent Servitude); JC-2 at 6 (Livaudais Servitude); JC-3 at 6 (Borgnemouth Servitude); JC-4 at 7 (Biloxi Servitude); JC-62 at 6 (Lake Eugenie Servitude). Plaintiffs have therefore released the government from all claims within the scope of these releases. *See* Section VIII.D*, infra*. The releases cannot both apply to plaintiffs' claims such that plaintiffs could not file suit in 1988, and not apply such that plaintiffs were free to file suit in 2012. Accordingly, all claims subject to the servitudes' release have been waived, and all claims not subject to the release could not have been barred in 1988.

Plaintiffs further argue "[i]n December 2023 the U.S. Congress acknowledged the government's obligation to pay 100% of the restoration project for the MRGO," and thus "even if the statute of limitations had run . . . the government's acknowledgment of the debt in 2023 started the limitations period again." Pls.' Reply at 8. For support, plaintiffs cite to no federal cases and do not identify what part, if any, of the 2024 WRDA constitutes such an acknowledgment, only citing Louisiana law and decisions of the Supreme Court of Louisiana. *See id.* (citations omitted). This Court's six-year statute of limitations, imposed by federal statute, is "jurisdictional and not susceptible to equitable tolling." *John R. Sand*, 552 U.S. at 133–34 (cleaned up). Although "at least some authority supports the proposition that the government's acknowledgment of indebtedness could delay accrual of a claim," *Didley v. United* States, 173 Fed. Cl. 170, 176 (2024) (collecting cases), plaintiffs acknowledge "no restoration work" has been done pursuant to the 2024 WRDA, Pls.' MSJ at 34. Moreover, plaintiffs do not explain how accrual of a contract claim in 1988 could be delayed by government acknowledgement 30 years after the statute of limitations expired. *See* Section V, *supra* (explaining the difference between tolling and accrual). Plaintiffs do not even attempt to explain

how a purported commitment to pay for a restoration plan which has not taken place constitutes an acknowledgement or promise to pay any debt, much less how this promise relates to the servitude contracts at issue. Accordingly, plaintiffs' attempt to turn the 2024 WRDA into an amorphous acknowledgment and promise to pay debt related to the servitude contracts fails.[5]

### C. Whether the Servitudes on Plaintiffs' Lands Have Terminated

The Court next addresses whether the servitudes on which plaintiffs base their contract claims have, as plaintiffs argue, terminated due to non-use, given plaintiffs argue the United States is liable for all repairs to the servient estate upon the termination of the contracts. Plaintiffs argue the servitudes were abandoned and extinguished by non-use under Louisiana law in 2019, ten years after the government plugged the MRGO, preventing navigation into the Gulf of America. *See* Pls.' Rev. MSJ at 235. Plaintiff therefore asserts the government has a duty to repair all damage to the servient estates caused by its use of the property. *See id.* at 229–35. The government argues because the servitudes expressly state the interest is "perpetual," Louisiana law providing for extinguishment by non-use does not apply. *See* Gov't's Reply at 38. The government further asserts, even if Louisiana law does apply, the servitudes have not been extinguished by non-use because MRGO remains in some use. *See* Tr. at 235:16–21 ("[THE GOVERNMENT:] [T]here was the plug [in the MRGO], but that was only a deauthorization of . . . deep draft passage. But all the other uses are still there, and the United States still holds the servitudes.").

Under Louisiana law, "[p]redial servitudes may be established by an owner on his estate or acquired for its benefit" and "[t]he use and extent of such servitudes are regulated by the title

[5] Plaintiffs also argue the government's duty not to damage the servient estates under Louisiana law is a "continuing" one, and therefore "the statute of limitations did not begin to run until the government abandoned the servitudes in 2009." Pls.' Reply at 7 (citing *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 316 (5th Cir. 2002)). Plaintiffs assert "in the year 1990 the government started to provide maintenance to the MRGO and plaintiffs' lands on a continuous basis until the MRGO was decommissioned and closed in 2009." *Id*. Under the "continuing claim doctrine," where the federal government owes a continuing duty to a plaintiff, and the duty is breached in "a series of distinct events," each event is treated as a separate cause of action, and later-arising claims occurring within six years of suit may not be time-barred under the Tucker Act. *See Ariadne Financial Servs. Pty. Ltd. v. United States*, 133 F.3d 874, 879 (Fed. Cir. 1998). "In order for the continuing claim doctrine to apply, the plaintiff's claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." *Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1456 (Fed. Cir. 1997). For example, a typical case may be in the military pay context, "where the payments are to be made periodically, [and] each successive failure to make proper payment gives rise to a new claim upon which suit can be brought." *Id.* (citation omitted). Here, plaintiffs' claims for damage to their estates are not "inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." *Id.* In fact, such a breakdown would likely be impossible, as the damage to plaintiffs' estates is the consequence of "irregular or intermittent physical processes of which the permanent effect on the land is difficult to pinpoint." *Etchegoinberry v. United States*, 132 F.4th 1374, 1379 (2025) (cleaned up) (discussing applicability of justifiable uncertainty as limited to irregular and intermittent physical processes, as the Court has described the damage to plaintiffs' lands in this case, *see Biloxi Marsh Lands Corp. v. United States*, 152 Fed. Cl. 254, 275 (2021)). Accordingly, in the absence of a distinct series of events with distinct damages, plaintiffs cannot avail themselves of the continuing claim doctrine. *See Brown Park*, 127 F.3d at 1456. The events which "fix[ed] the [government]'s alleged liability" occurred when plaintiffs' estates were damaged due to the operation of the MRGO, which damage the Court established as apparent no later than 1988, well over six years before plaintiffs filed this action. *See Biloxi*, 152 Fed. Cl. at 313; *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed. Cir. 1995); *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133–34 (2008).

by which they are created, and, in the absence of such regulation, by [the Louisiana Civil Code]." La. Civ. Code art. 697. The Louisiana Civil Code provides a "predial servitude is extinguished by nonuse for ten years." La. Civ. Code art. 753. "Prescription of nonuse begins to run for affirmative servitudes from the date of their last use." La. Civ. Code art. 754. Alternatively, a predial servitude may be "extinguished by an express and written renunciation by the owner of the dominant estate." La. Civ. Code art. 771. Plaintiffs agree the government has not formally renounced the servitudes. Pls.' Rev. MSJ at 235 ("The government has not renounced the servitudes, we know that.").

First, the government argues Louisiana law regarding extinguishment of the servitudes does not apply because the servitudes specifically state they are "perpetual," and were assigned to the United States "forever." Gov't's Reply at 38. At the outset, the servitudes related to the lands owned by plaintiffs Biloxi and Lake Eugenie specifically contemplate extinguishment of the servitudes "[i]f the United States of America, or its assigns, should at any time abandon the use of the servitude granted under Paragraph 5 for the purpose for which it is granted." JC-4 at 9 (Biloxi Servitude); JC-62 at 8 (Lake Eugenie Servitude). These servitudes therefore specifically contemplate termination if the government ceases to use the servitudes for the purpose for which they were granted, thus reaching the same result as if Louisiana law applied. *See* La. Civ. Code art. 754 ("Prescription of nonuse begins to run for affirmative servitudes from the date of their last use."). The remaining servitudes, however, do not include any express abandonment clause. *See* JC-1 (Vincent Servitude ); JC-2 (Livaudais Servitude ); JC-3 (Borgnemouth Servitude). These contracts provide only that the servitudes convey a "full, complete and perpetual right, power, privilege, easement or servitude" to the Port, which was then assigned to the United States. *See* JC-1 at 7 (Vincent Servitude); JC-2 at 3 (Livaudais Servitude); JC-3 at 3 (Borgnemouth Servitude). Given these servitudes' express terms state they are "perpetual" and include no provision for abandonment, the servitudes related to the Vincent, Borgnemouth, and Livaudais properties are not subject to contrary suppletive law regarding abandonment and remain in effect. *See* La. Civ. Code art. 697 ("The use and extent of such servitudes *are regulated by the title by which they are created*, and, *in the absence of such regulation*, by [the Louisiana Civil Code].") (emphasis added).

Second, the government argues, even if the servitudes could revert to plaintiffs due to nonuse, the government is still using the servitudes for the purpose they were granted. *See* Tr. at 243:8–23. Although the government agrees the MRGO was plugged in 2009, the government asserts the servitudes are still in use because only the deep draft channel was de-authorized, and the waterway itself is still open as "a long channel" without access to the Gulf of America. *See* Tr. at 244:1–22. Plaintiffs argue when the government plugged the MRGO in 2009 and removed access to the Gulf, this ended all use related to the purpose of the servitudes and the servitudes thus terminated after 10 years of nonuse. *See* Tr. at 242:6–243:6. Although the government asserted at oral argument the MRGO is still in use even though it does not permit access to the Gulf of America, *see* Tr. at 244:1–22, the government was "not sure" if there was evidence in the record to show the servitudes had been used since the MRGO's closure in 2009, *see* Tr. at 243:8–16. The Court's review of the record revealed no evidence as to the post-closure use of the MRGO and, in the briefs, neither party adduced evidence of the MRGO's use or non use after 2009. Accordingly, the Court is left without sufficient evidence to determine, at the summary judgment stage, whether the Biloxi and Lake Eugenie servitudes have terminated. This

question, however, is not necessary to the Court's judgment here, as regardless of whether the servitudes terminated or not, plaintiffs' lack of privity of contract with the United States and the untimeliness of plaintiffs' claims divests this Court of jurisdiction. *See* Sections VIII.A–B, *supra*.

### D. Whether Plaintiffs Have Waived Claims for Damage to their Property Covered by the Government's Easements Due to the Operation of the MRGO

The Court will next determine whether plaintiffs waived their contractual claims for damage caused by the MRGO through the releases in the servitudes each signed with the Port of New Orleans. The government argues the servitudes constituted a "full, complete, and final settlement of all claims, rights and actions [plaintiffs] ha[ve], or may have . . . for any damage to [plaintiffs'] lands by reason of the construction, maintenance, and operation of said [MRGO]." Gov't's MSJ at 88. The government thus asserts "[b]y signing the Servitudes, Plaintiffs agreed to release the Port and the United States from any damages caused by that operation." *Id.* Plaintiffs respond the releases only applied to plaintiffs' "herein described lands," which encompasses only the 1500-foot land of the servitude. Tr. at 220:1–8.

Each of the servitude contracts at issue in this case utilizes substantially the same language releasing the Port of New Orleans and the government from claims for damage related to the MRGO:

> The hereinabove grants and conveyances are made for and in consideration of the price and sum of [various amounts of money] cash in hand paid by Board of Commissioners of the Port of New Orleans to Vendor, the receipt of which is hereby acknowledged, and the said payment is declared to constitute full and adequate consideration for all rights, servitudes and privileges herein conveyed by Vendor to Vendee and *full, complete and final settlement of all claims, rights and actions Vendor has, or may have, against Vendee, or its assigns, for any land, improvements and crops, used or destroyed, or for any damage to Vendor's herein described lands by reason of the construction, maintenance and operation of said Mississippi River Gulf Outlet*, in the manner prescribed by the aforesaid Act of Congress.

*See* JC-1 at 10 (Vincent Servitude) (emphasis added); JC-2 at 6 (Livaudais Servitude); JC-3 at 6 (Borgnemouth Servitude); JC-4 at 7 (Biloxi Servitude); JC-62 at 6 (Lake Eugenie Servitude). The language of each release specifically states the servitude contracts constitute a "full, complete, and final settlement of *all claims*, rights and actions" for "any damage to [plaintiffs'] herein described lands *by reason of the construction, maintenance and operation of [the MRGO]*." *Id.* (emphasis added). Plaintiffs agreed at oral argument this release applies to the entire easement area covered by the MRGO unless there was evidence of improper use of the land covered by the government's easement. *See* Tr. at 220:1–8. If there was improper use of the easement, although plaintiffs expressly disclaimed that argument, plaintiffs further agreed any claims related to that use would sound in tort, and not as a contract claim against the government which is within the jurisdiction of this court. *See* Tr. at 220:13–20 ("THE COURT:

[I]t seems to me that what is not released is if the operation is improper. [PLAINTIFFS]: Yes. But I don't want to make that argument, because it would make it into a tort possibly."); Gov't's Reply at 45 ("If, as Plaintiffs argue, the releases are inapplicable because they only cover the geographic area covered by the Servitudes, then any claim where the release is inapplicable is also ineligible for a breach of contract claim because they are not covered by the Servitudes."). "The Court of Federal Claims is a court of limited jurisdiction[ and] lacks jurisdiction over tort actions against the United States." *Brown v. United States*, 105 F.3d 621, 623 (Fed. Cir. 1997) (citations omitted). Plaintiffs, moreover, have not identified any other basis for money damages on contract claims "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States" other than those addressed by the waivers above. *See Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005). Accordingly, for the land covered by the government's easement over plaintiffs' properties, plaintiffs or their predecessors in interest have released the government from "all claims" related to damage caused by the normal operation of the MRGO, and any claims not covered by that release would not be within the jurisdiction of this court.[6] *See Brown*, 105 F.3d at 623.

## IX. Conclusion

Viewing the evidence of justifiable uncertainty in the light most favorable to plaintiffs, the evidence of proposed and completed remediation projects within categories one, two, three, six, and seven result in landowners who may have been "justifiably uncertain" as to the permanency of the alleged taking, and therefore may have delayed accrual of those claims. The Court cannot, at the summary judgment stage, definitively say whether these landowners were justifiably uncertain. To make this fact determination, the Court will require the parties to present evidence at a future trial. *See, e.g.*, *Henderson County Drainage Dist. No. 3 v. United States*, 60 Fed. Cl. 748, 751–52, 758–68 (2004) (relying on witness and expert testimony related to documents in the record presented at trial in part to rule on whether plaintiffs' takings claims related to the operation and maintenance of a navigation channel was justifiably delayed); *Kingsport Horizontal Property Regime v. United States*, 53 Fed. Cl. 556 (2002) (utilizing expert and witness testimony, as well as surveys entered into the record, presented to the court during a trial to determine whether the stabilization doctrine applied to different tracts of land). As noted in Section V, *supra*, three issues are still in dispute concerning the timeliness of plaintiffs' taking claims: (1) whether, in the absence of justifiable uncertainty, plaintiffs claims would have accrued earlier than the 1988 Reconnaissance Report; (2) whether a sufficient objective basis for justifiable uncertainty exists to delay the accrual of plaintiffs' claims continuously to six years

[6] The Federal Circuit's recent decision in *Campo v. United States*, held a group of plaintiffs could not recover under the Fifth Amendment for damage to their oysters grown on a Louisiana oyster lease because Louisiana's statutory regulations "limits the property rights of oyster lessees and prevents them from raising certain claims against the United States." No. 24-2312, 2023 WL 1425479, at *3 (Fed. Cir. May 21, 2026). Given "[b]ackground principles of law may inhere in a plaintiff's title to his property and thereby limit his ability to recover for a taking," the Federal Circuit held plaintiffs lacked "a cognizable property interest for Fifth Amendment purposes." *Id.* at *2, *4 (citations omitted). Here, plaintiffs agreed to waive claims for damage to their properties as part of the contracts with the Port of New Orleans. *See supra*. It is possible plaintiffs therefore stripped themselves of a cognizable property interest by agreeing to waive their claims for damage, but the government does not advance such an argument here. *See* Gov't's Reply 44–45 ("But the United States' Motion does not argue that the release bars Plaintiffs' Fifth Amendment claims, only that it bars Plaintiffs' contract claims.").

prior to filing suit; and (3) whether landowners knew of enough government mitigation actions to form a subjective basis for justifiable uncertainty to delay the accrual of plaintiffs' claims continuously to six years prior to filing suit. *See also* note 2, *supra*. In 2021, the Court considered the first two issues and decided it lacked a sufficient evidentiary basis to grant summary judgment. *See* Section V, *supra*. Now, the Court has considered the third issue and again decides it lacks a sufficient evidentiary basis to grant summary judgment for many of plaintiffs' claims. At a future trial on the jurisdictional issues presented here, the parties will have an opportunity to present evidence on all three issues for all relevant time periods—from the beginning of construction of the MRGO in 1958 to its closing date in 2009.

For all plaintiffs' takings claims related to category four, viewing the evidence in the light most favorable to plaintiffs, plaintiffs have failed to present sufficient evidence of proposed or completed projects to raise a genuine dispute of material fact as to justifiable uncertainty. Viewing the evidence related to plaintiffs' contract claims in the light most favorable to plaintiffs, plaintiffs are not in privity of contract with the United States and any alleged breach would have accrued more than six years before each plaintiff filed suit. Accordingly, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the government's Motion for Summary Judgment, ECF No 244. The Court **DENIES** plaintiffs' Revised Cross-Motion for Summary Judgment, ECF No. 274. The parties **SHALL** meet and confer and **SHALL FILE** a joint status report proposing a timeline for further proceedings consistent with this opinion on or before **9 September 2026**. The joint status report shall include:

(1) Whether the parties will request any further discovery on issues related to subject matter jurisdiction or liability before proceeding to trial and, if so, a proposed schedule for further discovery;
(2) A list of witnesses and proposed trial schedule for subject matter jurisdiction;
(3) A list of witnesses and proposed trial schedule for liability;
(4) A list of witnesses and proposed trial schedule for any other outstanding issues;
(5) A proposed location for trial and general availability of counsel and witnesses; and
(6) Any further outstanding items for the Court to consider prior to trial.

**IT IS SO ORDERED.**

/s/ Ryan T. Holte
RYAN T. HOLTE
Judge